# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| TAHIRIH JUSTICE CENTER<br>6400 Arlington Blvd., Suite 400<br>Falls Church, VA 22042;<br><br>and<br><br>AYUDA, INC.<br>6925 B Willow Street NW<br>Washington, DC 20012;<br><br>*Plaintiffs*,<br><br>v.<br><br>PETER GAYNOR, purported Acting Secretary of<br>Homeland Security, in his official capacity,<br>2707 Martin Luther King Jr. Avenue SE<br>Washington, DC 20528;<br><br>CHAD MIZELLE, purported Senior Official<br>Performing the Duties of the General Counsel for<br>the Department of Homeland Security, in his<br>official capacity,<br>2707 Martin Luther King Jr. Avenue SE<br>Washington, DC 20528;<br><br>U.S. DEPARTMENT OF HOMELAND<br>SECURITY<br>2707 Martin Luther King Jr. Avenue SE<br>Washington, DC 20528;<br><br>U.S. CITIZENSHIP AND IMMIGRATION<br>SERVICES<br>20 Massachusetts Avenue, NW, Room 4210<br>Washington, DC 20529;<br><br>JEFFREY ROSEN, Acting Attorney General of<br>the United States, in his official capacity,<br>950 Pennsylvania Avenue, NW<br>Washington, DC 20530; | Civil Action No. _____<br><br>**COMPLAINT**<br>(Violation of Immigration and<br>Nationality Act, Administrative<br>Procedure Act, Convention Against<br>Torture, United States Constitution,<br>Homeland Security Act, and Federal<br>Vacancies Reform Act) |

U.S. DEPARTMENT OF JUSTICE            )
950 Pennsylvania Avenue, NW           )
Washington, DC 20530;                 )
                                      )
and                                   )
                                      )
EXECUTIVE OFFICE OF IMMIGRATION       )
REVIEW                                )
5107 Leesburg Pike                    )
Falls Church, VA 22041                )
                                      )
                                      )
                    *Defendants*.     )
                                      )

# <u>TABLE OF CONTENTS</u>

TABLE OF CONTENTS .................................................................................................. i

PRELIMINARY STATEMENT ...................................................................................... 1

PARTIES ......................................................................................................................... 3

JURISDICTION AND VENUE ....................................................................................... 6

BACKGROUND .............................................................................................................. 6

    A.    Background on the United States Asylum Program ............................................. 6

        1.    The Immigration and Nationality Act ....................................................... 6

        2.    Asylum and Withholding of Removal ....................................................... 7

        3.    The Convention Against Torture ............................................................. 10

        4.    The Asylum Application Process ............................................................. 11

    B.    Background on the Appointments Clause, the Federal Vacancies Reform
        Act, and the Homeland Security Act ................................................................ 13

        1.    The Appointments Clause ....................................................................... 13

        2.    The Federal Vacancies Reform Act ........................................................ 14

        3.    The Homeland Security Act ..................................................................... 17

    C.    The Issuance of the Rule .................................................................................. 18

GENERAL ALLEGATIONS .......................................................................................... 20

    A.    The Defendants Lacked Authority To Promulgate the Rule ............................. 20

        1.    Chad Wolf Lacked Authority To Propose or Issue the Rule
            Because He Was Not the Lawful Acting Secretary of DHS .................... 21

        2.    Chad Mizelle Had No Inherent Authority To Sign or Approve the
            Rule ........................................................................................................ 38

        3.    Wolf's Purported Ratification of the Rule Has No Effect ....................... 40

    B.    The Rule as a Whole Is Unlawful Under the APA ........................................... 43

        1.    The Rule Does Not Provide Facts, Evidence or Rational
            Explanations To Support Its Stated Objections ...................................... 43

2.      Defendants Provided Insufficient Time for Public Comment ..................47

C.    The Rule's List of Claims Purportedly Barred on Nexus Grounds Is
      Contrary to Law and Arbitrary and Capricious .....................................................50

      1.      The Entire List of Claims Barred on Nexus Grounds Violates the
              APA.........................................................................................................51

      2.      The Rule's "Gender" Bar Is Arbitrary and Capricious .............................53

      3.      The Rule's "Gender" Bar Violates the Equal Protection Clause ..............57

      4.      The Rule's Bars on Claims Involving Interpersonal Animus Are
              Contrary to Law and Arbitrary and Capricious .........................................58

      5.      The Rule's Bars on Claims Related to Resisting Gang Recruitment
              and Political Opposition to Gangs Are Arbitrary and Capricious ............61

      6.      The Rule's Nexus Ban on Perceived Gang Affiliation Is Contrary
              to Law and Arbitrary and Capricious........................................................62

D.    The Rule's Changes to PSGs Are Contrary to Law and Arbitrary and
      Capricious ...............................................................................................................64

      1.      The Rule Illegally Creates a New List of Disfavored PSGs......................65

      2.      The Rule's Changes to the Anti-Circularity Principle Are Arbitrary
              and Capricious ..........................................................................................71

      3.      The Rule's Particularity and Social Distinction Requirements Are
              Arbitrary and Capricious...........................................................................73

E.    The Rule's Restrictions on "Political Opinion" Violate the INA and the
      APA..........................................................................................................................73

      1.      The Rule's Restrictions on Political Opinion Claims Are Contrary
              to the INA .................................................................................................74

      2.      The Rule's Restrictions on Political Opinion Claims Are Arbitrary
              and Capricious ..........................................................................................76

F.    The Rule's Restrictions on the Definition of Persecution Are Contrary to
      Law and Arbitrary and Capricious..........................................................................78

G.    The Rule's Bar on Evidence that "Promotes Cultural Stereotypes"
      Excludes Relevant Country-Conditions Evidence and Is Arbitrary and
      Capricious ...............................................................................................................83

H.    The Rule's Changes to Internal Relocation Are Contrary to Law and Arbitrary and Capricious............................................................................85

    1.    The Rule Arbitrarily and Capriciously Overhauls the Internal Relocation Analysis ........................................................86

    2.    The Rule Impermissibly Shifts the Burden of Proof on Reasonableness of Internal Relocation ......................................89

I.    The Rule's Changes to CAT Standards Are Contrary to Law and Arbitrary and Capricious .........................................................................90

    1.    The Rule Unlawfully Excludes Acts of Torture Conducted by Officials Who Are Not Acting in an Official Capacity ...........................91

    2.    The Rule Arbitrarily and Capriciously Changes the Standard and Burden To Prove Acquiescence by a Public Official ...............................93

J.    The Rule's New Discretionary Bars Are Contrary to Law and Arbitrary and Capricious .........................................................................96

    1.    The Discretionary Bars Are Contrary to Law and Exceed the Scope of the Agencies' Rulemaking Authority ......................................99

    2.    The Agencies Did Not Respond to Significant Comments ....................102

    3.    The Agencies Failed to Consider Alternatives .........................................103

    4.    The Agencies Failed to Consider the Harm to Individuals....................104

    5.    Many of the Bars Have No Rational Connection to Facts Identified by the Agencies...........................................................................................106

    6.    The Agencies' Justifications for the Discretionary Bars Are Contrary to the Evidence ......................................................................108

K.    The Rule's Changes to Firm Resettlement Are Contrary to Law and Arbitrary and Capricious..........................................................................109

    1.    The Rule Is Contrary to the Plain Meaning of "Firm Resettlement".......111

    2.    The Expansion of the Meaning of "Firm Resettlement" Is Arbitrary and Capricious. .....................................................................111

    3.    The Rule Arbitrarily Shifts the Burden of Proof ....................................113

L.    The Rule Harms Plaintiffs ..................................................................115

1.      The Rule Frustrates Plaintiffs' Missions....................................................115

2.      The Rule Diverts Resources from Core Programs and Services .............116

CLAIMS FOR RELIEF ...........................................................................................119

PRAYER FOR RELIEF ..........................................................................................126

## PRELIMINARY STATEMENT

1.      Plaintiffs Tahirih Justice Center ("Tahirih") and Ayuda, Inc. ("Ayuda") (collectively, "Plaintiffs") bring this action to prevent the evisceration of statutory asylum protections that were created by Congress to fulfill the United States' obligation to shelter immigrants fleeing persecution.

2.      This action challenges a final rule issued by the Department of Homeland Security ("DHS") and the Department of Justice ("DOJ").  *See* DHS & DOJ, *Procedures for Asylum and Withholding of Removal; Credible Fear and Reasonable Fear Review*, 85 Fed. Reg. 80,274 (Dec. 11, 2020) (the "Rule").  The Rule imposes vague and sweeping new limitations on asylum eligibility that will dramatically curtail the availability of asylum and related relief to people fleeing persecution, in contravention of the plain language of the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1101 *et seq.*, as amended by the Refugee Act of 1980, and the United States' international commitments.  The Rule will have a devastating impact on asylum seekers and those who provide legal services to those asylum seekers—including Plaintiffs.

3.      The Rule is illegal for at least five reasons.  *First*, the Rule is void because it was promulgated by those without proper authority to do so.  Chad Wolf, the former purported Acting Secretary of Homeland Security who approved the Rule on behalf of DHS, was serving as Acting Secretary unlawfully in violation of the Appointments Clause of the United States Constitution, the Federal Vacancies Reform Act of 1998 ("FVRA"), and the Homeland Security Act ("HSA").  Wolf thus lacked the authority to propose or issue the Rule.  Moreover, Wolf could not "delegate" the Secretary's authority to sign the Rule to Chad Mizelle, the purported

"Senior Official Performing the Duties of the General Counsel for DHS," and Mizelle had no inherent power to sign or approve the Rule.

4.    *Second*, the Rule violates the INA.  Almost every provision of the Rule changes agency regulations in a manner that is in direct violation of the INA or is contrary to Congress's intent in drafting and passing the Refugee Act, which set forth the country's processes for admitting refugees, aligned United States asylum standards with international law, and codified the United States' humanitarian duties to protect asylum seekers and refugees.

5.    *Third*, the Rule violates the protections of the Convention Against Torture ("CAT").  The Rule changes the standard by which adjudicators are to assess "public officials" and their "acquiescence" to torture in a way that is contrary to CAT and to the United States' codification of CAT into federal law.  *See* Foreign Affairs Reform and Restructuring Act of 1998 ("FARRA"), Pub. L. No. 105-277, div. G, Title XXII, § 2242, 112 Stat. 2681, 2681-2822 (1998) (codified as note to 8 U.S.C. § 1231); 8 C.F.R. § 208.18.

6.    *Fourth*, the Rule violates the Administrative Procedure Act ("APA") in numerous respects.  The changes implemented by the Rule are contrary to law, in excess of DOJ and DHS's authority, and arbitrary and capricious.  Further, in issuing the Rule, Defendants failed to provide valid reasons for the many ways in which the Rule departs dramatically and arbitrarily from decades of consistent agency precedent; failed to provide adequate explanation or supporting evidence for, or meaningful analysis of, those changes; and failed to address important aspects of the problem, notably including the effects of the Rule on asylum seekers and the real-world circumstances facing those fleeing persecution and torture.  *Motor Vehicle Mfrs Ass'n v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 43 (1983).

7.      Defendants also failed to satisfy the basic procedural requirements of the APA. Defendants did not provide sufficient opportunity for public comment on this major overhaul of the asylum system, allowing just 30 days for the public to digest and comment on a sweeping proposal with such significant impacts.  Nor did Defendants respond in any meaningful way to many arguments and objections raised in the more than 87,000 comments the public did submit during those 30 days.

8.      *Fifth*, by drawing lines expressly based on gender, the Rule violates the Equal Protection Clause of the Fourteenth Amendment, as applied to the federal government by the Due Process Clause of the Fifth Amendment.

9.      In short, the Rule is inconsistent with the INA; is inconsistent with CAT; is substantively and procedurally invalid under the APA; was issued by an official who was holding office unlawfully under the FVRA, the HSA, and the Appointments Clause; and is unconstitutional under the Fourteenth Amendment's Equal Protection Clause.  Because the Rule will send bona fide asylum seekers to countries where they will likely face violence, torture, and even death, it also conflicts with the international law obligation of *non-refoulement*, which Congress directly incorporated into U.S. law.  *See* United Nations Convention Relating to the Status of Refugees, art. 33, July 28, 1951, 189 U.N.T.S. 150 ("Refugee Convention"); Protocol Relating to the Status of Refugees, Jan. 31, 1967, 19 U.S.T. 6223, 606 U.N.T.S. 267 ("1967 Protocol").  The Court should hold the Rule unlawful, set it aside, and enjoin its enforcement.

## PARTIES

10.      Plaintiff Tahirih Justice Center ("Tahirih") is a nonprofit and nonpartisan organization established in 1997 that provides free legal immigration services to survivors of gender-based violence.  Tahirih's mission is to provide free holistic services to immigrant

women and girls fleeing violence such as rape, domestic violence, female genital mutilation/cutting, forced marriage, and human trafficking, and who seek legal immigration status under U.S. law.  Tahirih offers legal representation and social services for individuals who seek protection, including asylum, in their immigration proceedings.  Tahirih operates in five locations across the country: Falls Church, Virginia; Baltimore, Maryland; Atlanta, Georgia; Houston, Texas; and San Bruno, California.

11.     Plaintiff Ayuda, Inc. ("Ayuda") is a nonprofit organization established in 1973 with offices in Washington, D.C.; Virginia; and Maryland, whose mission is to advocate for low-income immigrants through direct legal, social, and language services, training, and outreach. Ayuda envisions a community where all immigrants succeed and thrive in the United States. Ayuda's direct legal immigration services include helping individuals seek a wide range of immigration benefits, including asylum, withholding of removal, and relief under the Convention Against Torture, in addition to an array of other benefits under the INA.  Ayuda provides clients with representation in immigration court removal proceedings in addition to in affirmative applications for relief before USCIS.  Ayuda has offices in Virginia, D.C., and Maryland. Ayuda's other legal services include a project combatting immigration legal services fraud and other fraudulent schema targeting low-income immigrants.  Ayuda has special programs representing survivors of domestic violence, sexual assault, stalking, and human trafficking, in addition to programs focusing on serving children, including unaccompanied minors.

12.     Defendant Peter Gaynor is the purported Acting Secretary of Homeland Security. He is sued in his official capacity.  He directs each of the component agencies within DHS.  The Secretary of Homeland Security has authority to promulgate regulations regarding immigration law, and Gaynor's predecessor Chad Wolf approved the proposed and final versions of the Rule.

13.     Defendant Chad Mizelle is the purported Senior Official Performing the Duties of the General Counsel, DHS.  He is sued in his official capacity.  Pursuant to purported delegations of authority from Wolf, Defendant Mizelle signed the proposed and final versions of the Rule on behalf of DHS.

14.     Defendant DHS is a cabinet-level department of the United States federal government, whose components include U.S. Citizenship and Immigration Services ("USCIS"), U.S. Customs and Border Protection ("CBP"), and Immigration and Customs Enforcement ("ICE").

15.     Defendant USCIS adjudicates applications for asylum and other immigration benefits.

16.     Defendant Jeffrey Rosen is the Acting Attorney General of the United States.  He is sued in his official capacity, as the head of DOJ.  The Attorney General is responsible for the administration of the immigration laws pursuant to 8 U.S.C. § 1103 and is empowered to grant asylum or other relief.

17.     Defendant DOJ is a cabinet-level department of the United States federal government.

18.     Defendant Executive Office for Immigration Review ("EOIR") is a sub-agency of DOJ responsible for adjudicating claims concerning federal immigration laws, including asylum applications filed in immigration court.

19.      "Defendants," as used herein, collectively refers to Defendant Peter Gaynor, Defendant Chad Mizelle, Defendant DHS, Defendant USCIS, Defendant Jeffrey Rosen, Defendant DOJ, and Defendant EOIR.

<u>JURISDICTION AND VENUE</u>

20.    This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1346.

21.    Defendants' publication of the final Rule in the Federal Register on December 11, 2020, constitutes final agency action subject to judicial review.  5 U.S.C. §§ 2201-2202.

22.    Plaintiffs have standing to challenge the Rule under 5 U.S.C. § 702 because they have been and will be injured by the Rule's operation.  *See infra*, General Allegations, § L. Plaintiffs also meet the requirements for prudential standing, as their missions fall within INA's zone of interests, which establishes asylum eligibility requirements.

23.    Venue is proper in this District under 28 U.S.C. § 1391(e)(1).

<u>BACKGROUND</u>

A.    <u>Background on the United States Asylum Program</u>

24.    Federal law affords several humanitarian protections for non-citizens who fear persecution and violence in their countries of nationality or of last habitual residence.  These protections include asylum, 8 U.S.C. § 1158; withholding of removal, 8 U.S.C. § 1231(b)(3); and protection under CAT, *see* FARRA § 2242; 8 C.F.R. § 208.18.

1.    **The Immigration and Nationality Act**

25.    Statutory asylum protections were enacted based on the United States' obligations under the Refugee Convention and the 1967 Protocol.  Opened for signature in 1951, the Refugee Convention was designed to avoid the horrors experienced by refugees during World War II. The 1967 Protocol, which the United States ratified in 1968, expanded the Convention's protections, allowing them to be applied universally.

26.    Under the Refugee Convention (or its 1967 Protocol), no state party "shall expel or return ('refouler') a refugee in any manner whatsoever to the frontiers of territories where his

6

life or freedom would be threatened on account of his race, religion, nationality, membership in a particular social group or political opinion." Refugee Convention, art. 33, July 28, 1951, 19 U.S.T. 6223 (1968), 189 U.N.T.S. 137. This is referred to as the duty of *non-refoulement*.

27.     Congress incorporated international humanitarian principles into U.S. law in the Refugee Act of 1980, Pub. L. No. 96-212, 94 Stat. 102, which amended the INA to include a formal process under which people fearing persecution in their home countries may apply for asylum. *Id.* § 101(a) (codified at 8 U.S.C. § 1521 Note). By enacting the Refugee Act, Congress thus codified the United States' longstanding tradition of "welcoming the oppressed of other nations" (H.R. Rep. No. 96-781, at 17–18 (1980) (Conf. Rep.)) and sought to bring the United States into compliance with its international obligations under the 1967 Protocol to the Refugee Convention (*see* H.R. Rep. No. 96-608, at 17 (1979); S. Rep. No. 96-256, at 4 (1979); *INS v. Cardoza- Fonseca*, 480 U.S. 421, 436–37 (1987)).

### 2.     Asylum and Withholding of Removal

28.     U.S. law guarantees that any non-citizen "who is physically present in the United States or who arrives in the United States (whether or not at a designated port of arrival and including [a non-citizen] who is brought to the United States after having been interdicted in international or United States waters), irrespective of such [non-citizen's] status, may apply for asylum." 8 U.S.C. § 1158(a)(1)(A).

29.     Under the INA, asylum may be granted to a person who (i) has suffered persecution or who has a "well-founded fear of persecution" (ii) "on account of" (iii) one of five enumerated protected grounds: "race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1158(b)(1)(B); *id.* § 1101(a)(42)(A).

7

30.     The Supreme Court has long recognized that a fear of persecution may be well-founded if an asylum-seeker shows even a "10% chance" of future persecution.  *Cardoza-Fonseca*, 480 U.S. at 440.

31.     A showing of past persecution gives rise to a presumption that an asylum applicant has a well-founded fear of future persecution.  8 C.F.R. §§ 208.13(b)(1), 1208.13(b)(1).  To rebut that presumption, the government must show either (i) a "fundamental change in circumstances" in the applicant's home country, or (ii) that "[t]he applicant could avoid future persecution by relocating to another part" of her home country and that "it would be reasonable to expect" her to do so.  *Id.* §§ 208.13(b)(1)(i)(A)-(B), 1208.13(b)(1)(i)(A)-(B).

32.     Individuals are eligible for asylum if they have suffered past persecution, or have a well-founded fear of future persecution, that is inflicted either by government officials or by actors whom the government is unable or unwilling to control.  8 U.S.C. § 1101(a)(42)(A); *see also, e.g.*, *Crespin-Valladares v. Holder*, 632 F.3d 117, 128 (4th Cir. 2011).

33.     Congress has made clear that persecution is "on account of" a protected ground if that ground "was or will be at least one central reason for persecuting the applicant."  8 U.S.C. § 1158(b)(1)(B)(i).  The requisite nexus between persecution and a protected ground therefore exists even if the protected ground is not the sole, or the primary, reason for the persecution.

34.     Membership in a "particular social group," or PSG, is a statutorily protected ground.  A PSG is based either on a shared characteristic that members cannot change or on a characteristic they should not be required to change.  *See Matter of Acosta*, 19 I. & N. Dec. 211 (BIA 1985) (listing gender as an immutable characteristic).

35.     Congress has specified carefully tailored exceptions to asylum eligibility.  For instance, Congress mandated that individuals are ineligible to apply for asylum if they do not do

so within one year of arriving in the United States and cannot show "extraordinary circumstances" or "changed circumstances" relating to the delay.  Individuals are also ineligible for asylum if they have previously applied for and been denied asylum in the United States, absent extraordinary or changed circumstances materially affecting their eligibility for asylum.  8 U.S.C. § 1158(a)(2)(B)–(D).

36.     Congress also specified limited circumstances in which grants of asylum are generally barred.  Specifically, individuals are barred from receiving asylum if they (i) have participated in the persecution of others; (ii) have been convicted of a "particularly serious crime," such as an "aggravated felony," that makes them a danger to the United States; (iii) have committed a "serious nonpolitical crime outside the United States"; (iv) represent a danger to the security of the United States; (v) have engaged in "terrorist activity"; or (vi) firmly resettled in a third country prior to arriving in the United States.  *See id.* § 1158(b)(2)(A)(i)–(vi), (b)(2)(B)(i).

37.     Because the INA states that individuals who show persecution on account of a protected ground "may" be granted asylum (8 U.S.C. § 1158(b)(1)(A)), the government treats grants of asylum as discretionary.

38.     The INA also provides non-citizens the option to apply for "withholding of removal."  To be eligible, non-citizens must establish that it is more likely than not that their life or freedom would be threatened on account of race, religion, nationality, membership in a particular social group, or political opinion in the proposed country of removal.  8 U.S.C. § 1231(b)(3)(A).

39.     Withholding of removal requires applicants to satisfy a higher standard of proof than asylum.  But there are fewer statutory bars to withholding than to asylum: Congress has specified that individuals are entitled to withholding of removal unless they (i) participated in

Nazi persecution, genocide, torture, or extrajudicial killing; (ii) participated in the persecution of others; (iii) "hav[e] been convicted of a particularly serious crime," including an aggravated felony that triggered certain sentences, showing that they are "a danger to the community of the United States"; (iv) committed a "serious nonpolitical crime outside the United States"; or (v) represent a danger to the security of the United States. 8 U.S.C. § 1231(b)(3)(B). Withholding of removal is mandatory; the government may not deny withholding to anyone who satisfies the statutory conditions.

### 3.    The Convention Against Torture

40.    The United States became a signatory to CAT on April 18, 1988, and ratified the treaty on October 21, 1994. By signing and ratifying CAT, the United States accepted an obligation "not to expel, extradite, or otherwise effect the involuntary return of any person to a country in which there are substantial grounds for believing that the person would be in danger of being subjected to torture." FARRA § 2242.

41.    Federal law codifies CAT's definition of torture as "any act by which severe pain or suffering, whether physical or mental, is intentionally inflicted on a person . . . when such pain or suffering is inflicted by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity." 8 C.F.R. § 208.18(a)(1).

42.    To receive protection under CAT, an individual in removal proceedings must show that "it is more likely than not that he or she would be tortured if removed to the proposed country of removal." 8 C.F.R. § 208.16(c)(2).

43.    Once this showing is made, withholding is granted under CAT unless one of the bars to withholding of removal under § 1231(b)(3) applies. 8 C.F.R. § 208.16(d). An individual who is eligible for CAT relief but ineligible for withholding receives a "deferral of removal,"

which is terminated only if an immigration judge finds, on the basis of new evidence, that the individual has not shown the required likelihood of torture.  *Id.* § 208.17.

44.     Unlike asylum and withholding of removal, CAT protection does not require an applicant to show harm on account of a statutorily protected ground.  Like withholding of removal, CAT relief is mandatory; if an individual meets the requirements, the immigration judge cannot consider any subjective or discretionary factors and instead must grant protection.

45.     Both the withholding of removal statute, 8 U.S.C. § 1231(b), and the provisions implementing CAT codify the United States' international-law duty of *non-refoulement*.  Congress has provided that "it shall be the policy of the United States not to expel, extradite, or otherwise effect the involuntary return of any person to a country in which there are substantial grounds for believing that the person would be in danger of being subjected to torture" and directed "the appropriate agencies" to "prescribe regulations to implement the obligations of the United States under Article 3 of [CAT]."  FARRA § 2242(a), (b).

### 4.     The Asylum Application Process

46.     Asylum claims may be adjudicated by either by USCIS or EOIR.

47.     A non-citizen who has not been placed in removal proceedings may file an "affirmative" application for asylum with USCIS that is adjudicated by a USCIS asylum officer.  *See* 8 C.F.R. §§ 208.2(a), 208.9.  This avenue is also available to all designated unaccompanied immigrant children; even if they are subject to removal proceedings, unaccompanied children are able to seek asylum affirmatively before the asylum office in a non-adversarial setting.  8 U.S.C. § 1158(b)(3)(C).

48.     A non-citizen in ordinary removal proceedings, *see* 8 U.S.C. § 1229a, including a non-citizen who has been referred to removal proceedings after demonstrating a "credible fear of

persecution" in a screening interview with a USCIS asylum officer, 8 U.S.C. § 1225(b)(1), may file an asylum application with the EOIR immigration judge as a form of relief from removal, 8 C.F.R. § 208.2(b). A non-citizen in removal proceedings may also apply for withholding of removal and protection under CAT before the EOIR immigration judge. These applications are referred to as "defensive" asylum applications.

49.     A non-citizen applies for asylum, withholding of removal, and/or CAT protection by filing Form I-589, Application for Asylum and Withholding of Removal with the immigration judge. 8 U.S.C. § 1158(d)(1); 8 C.F.R. §§ 208.2(b), 1208.3(a)-(b).

50.     The applicant is entitled to submit "additional supporting evidence" in support of the asylum application. 8 C.F.R. § 1208.3(a). This evidence often includes articles, studies, and expert declarations concerning the conditions in applicant's home country.

51.     If an individual files a defensive asylum application with EOIR, an immigration judge holds a hearing on the application. The applicant may testify and call additional witnesses at the hearing. 8 C.F.R. §§ 1003.25, 1003.34.

52.     If the immigration judge denies relief, the applicant may file an appeal with the Board of Immigration Appeals ("BIA"). *See* 8 C.F.R. §§ 1003.1.(b), 1003.38(a). If the BIA denies relief in whole or in part, the applicant may file a petition for review "with the court of appeals for the judicial circuit in which the immigration judge completed the proceedings." 8 U.S.C. § 1252(b)(2).

53.     If an asylum seeker's application is denied and EOIR issues a final order of removal, the asylum seeker may file a motion to reopen proceedings within 90 days. 8 U.S.C. § 1229a(c)(7)(A), (C)(i). This time limitation is extended to one year for domestic and family violence survivors who are seeking certain forms of relief. *Id.* § 1229a(c)(7)(C)(iv). And if a

motion to reopen proceedings is based on changed country conditions, it may be filed at any time.  *Id.* § 1229a(c)(7)(C)(ii).

54.    Although asylum seekers in removal proceedings may apply for all three forms of relief by filing Form I-589, a grant of asylum entails significant benefits not afforded to those who receive withholding of removal or protection under CAT.  Congress provided asylees with the ability to become lawful permanent residents and, eventually, U.S. citizens, 8 U.S.C. §§ 1159(b), 1427, a path unavailable for those receiving only withholding of removal or CAT relief.  Individuals who are granted asylum are able to work without restriction in the United States, 8 C.F.R. § 274a.12(a)(5), whereas recipients of withholding of removal must apply for work authorization annually, 8 C.F.R. § 274a.12(a)(10), and there are lengthy delays in processing those renewal applications.  Further, the INA makes asylum available to the spouse and children of a person granted asylum, 8 U.S.C. § 1158(b)(3), a benefit not available to recipients of withholding of removal or CAT protection.

**B.    Background on the Appointments Clause, the Federal Vacancies Reform Act, and the Homeland Security Act**

**1.    The Appointments Clause**

55.    "Officers of the United States" must generally be appointed by the President with "the Advice and Consent of the Senate."  U.S. Const. art. II, § 2, cl. 2.  "By 'limiting the appointment power' in this fashion," the Constitution seeks to make federal officers "accountable to political force and the will of the people."  *Fin. Oversight & Mgmt. Bd. for Puerto Rico v. Aurelius Inv., LLC*, 140 S. Ct. 1649, 1657 (2020) (citation omitted).  And because the Framers "thought it would tend to secure the liberties of the people, if they prohibited the President from the sole appointment of all officers," 3 Max Farrand, *The Records of the Federal Convention of 1787*, at 357 (Max Farrand ed., 1911), they empowered the Senate to "check the

action of the executive by rejecting the officers he selects," *Myers v. United States*, 272 U.S. 52, 119 (1926).

56.     "The Senate's advice and consent power is a critical 'structural safeguard [ ] of the constitutional scheme,'" *NLRB v. SW Gen., Inc.*, 137 S. Ct. 929, 935 (2017) (quoting *Edmond v. United States*, 520 U.S. 651, 659 (1997)), and is "designed first and foremost not to look after the interests of the respective branches, but to protect individual liberty," *id.* at 949 (Thomas, J., concurring).  Indeed, "'the power of appointment to offices' was deemed 'the most insidious and powerful weapon of eighteenth century despotism,'" and "[t]he 'manipulation of official appointments' had long been one of the American revolutionary generation's greatest grievances against executive power." *Freytag v. Comm'r*, 501 U.S. 868, 883 (1991) (citation omitted).  By tempering the President's authority to select the people who exercise "significant authority pursuant to the laws of the United States," *Lucia v. SEC*, 138 S. Ct. 2044, 2051 (2018) (quoting *Buckley v. Valeo*, 424 U.S. 1, 126 (1976)), the Appointments Clause "helps to preserve democratic accountability," *Fin. Oversight & Mgmt. Bd.*, 140 S. Ct. at 1657.

## 2.     The Federal Vacancies Reform Act

57.     Because the process of Senate confirmation "can take time," Congress has, since the nation's earliest days, "given the President limited authority to appoint acting officials to temporarily perform the functions of a vacant . . . office without first obtaining Senate approval." *SW Gen.*, 137 S. Ct. at 935.  "[F]rom the beginning," however, Congress has placed limits on acting service to prevent circumvention of the Appointments Clause and the requirement of Senate confirmation.  *Doolin Sec. Sav. Bank, F.S.B. v. Off. of Thrift Supervision*, 139 F.3d 203, 210 (D.C. Cir. 1998); *see, e.g.*, Act of Feb. 13, 1795, ch. 21, 1 Stat. 415, 415 (prohibiting acting officials from serving "for a longer term than six months").

58.     In the mid-nineteenth century, "Congress repealed the existing statutes on the subject of vacancies and enacted in their stead a single statute," the Vacancies Act, which has remained in force, with modifications, since then.  *Doolin*, 139 F.3d at 210.  The FVRA is "the latest version of that authorization."  *SW Gen.*, 137 S. Ct. at 934.

59.     The FVRA was enacted "as a reclamation of the Congress's Appointments Clause power," *SW Gen., Inc. v. NLRB*, 796 F.3d 67, 70 (D.C. Cir. 2015), *aff'd*, 137 S. Ct. 929 (2017), in response to executive branch defiance of the existing Vacancies Act.  *See* S. Rep. No. 105-250, at 4-5 (1998) ("the Senate's confirmation power is being undermined as never before").  In the 1970s, the Justice Department adopted a narrow interpretation of the Vacancies Act that ultimately rendered its restrictions "largely toothless."  Thomas A. Berry, *S.W. General: The Court Reins in Unilateral Appointments*, 2017 Cato Sup. Ct. Rev. 151, 155.  Dismayed by "widespread" evasion of the Act's restrictions, *id.* at 154, and seeking to vindicate the Act's "fundamental purpose" of "limit[ing] the power of the President to name acting officials," S. Rep. No. 105-250, at 7-8 (1998), Congress passed the FVRA "to create a clear and exclusive process to govern the performance of duties of offices in the Executive Branch that are filled through presidential appointment by and with the consent of the Senate," *id.* at 1.

60.     Accordingly, the FVRA carefully limits who may serve as an acting officer when a vacancy arises.  By default, the "first assistant" to the vacant office must perform its functions and duties.  5 U.S.C. § 3345(a)(1).  Certain offices have first assistants designated by statute, and for other offices, departments have established first assistants by regulation.  S. Rep. No. 105-250, at 12 (1998).  The President, and only the President, "may override that default rule by directing [a different person] to become the acting officer instead," *SW Gen.*, 137 S. Ct. at

15

935, but the President's choice of whom to select in lieu of the first assistant is limited.  *See*
5 U.S.C. § 3345(a)(2), (3).

61.     To prevent acting officers from filling vacancies for "constitutionally
unacceptable" periods of time, S. Rep. No. 105-250, at 8 (1998), the FVRA also limits the length
of their service.  Unless the President sends a nomination to the Senate to fill a vacancy
permanently, acting officials may perform the functions and duties of the vacant office "for no
longer than 210 days beginning on the date the vacancy occurs."  5 U.S.C. § 3346(a)(1).  If the
President makes a nomination, acting officials may fill the position while the nomination is
pending.  *Id.* § 3346(a)(2), (b)(1).

62.     The FVRA is "the exclusive means for temporarily authorizing an acting official
to perform the functions and duties of any office" for which Senate confirmation is required, *id.*
§ 3347(a), with only two exceptions.  One exception accommodates recess appointments.  *See id.*
§ 3347(a)(2).  The other exception, relevant here, permits agency organic statutes to depart from
the FVRA if they "expressly" designate a particular official to temporarily perform the functions
and duties of a vacant office, *id.* § 3347(a)(1)(B), or if they "expressly" authorize the head of the
department to make such a designation, *id.* § 3347(a)(1)(A).

63.     If an office is not validly filled pursuant to the FVRA or one of its exceptions,
however, "the office shall remain vacant."  *Id*. § 3348(b)(1).  Agency actions, as defined in the
APA, "shall have no force or effect" if taken by a person performing a function or duty of a
vacant office without authorization by the FVRA or one of its exceptions.  *Id.* § 3348(d)(1); *see*
*SW Gen.*, 137 S. Ct. at 938 n.2 ("the general rule" is that "actions taken in violation of the FVRA
are void *ab initio*").  These void actions "may not be ratified."  5 U.S.C. § 3348(d)(2).

### 3.      The Homeland Security Act

64.      The Homeland Security Act ("HSA") establishes the office of DHS Secretary. Reflecting the constitutional requirements for appointing "principal" federal officers, *see Edmond*, 520 U.S. at 659, the Secretary must be "appointed by the President, by and with the advice and consent of the Senate," 6 U.S.C. § 112(a)(1).

65.      The HSA also provides for the temporary filling of the Secretary's office when it is vacant.  In doing so, the HSA both incorporates and supplements the FVRA.

66.      Consistent with the FVRA, the HSA establishes a Deputy Secretary of Homeland Security who is deemed "the Secretary's first assistant" for purposes of the FVRA.  6 U.S.C. § 113(a)(1)(A).

67.      Under the FVRA, only this "first assistant" (the Deputy Secretary) would be able to serve automatically as the Acting Secretary during a vacancy.  *See* 5 U.S.C. § 3345(a)(1).  The HSA modifies this rule, providing that in the absence of a Deputy Secretary, the Department's Under Secretary for Management should serve automatically as the Acting Secretary.  6 U.S.C. § 113(g)(1).

68.      The HSA also empowers the Secretary to extend this line of succession further, to account for situations in which the Department's top three positions are all vacant: notwithstanding the FVRA, it provides, "the Secretary may designate such other officers of the Department in further order of succession to serve as Acting Secretary."  *Id.* § 113(g)(2).

69.      In short, the HSA prescribes a specific order of succession that automatically applies when the Secretary's office is vacant—first the Deputy Secretary, then the Under Secretary for Management—and it empowers the Secretary to expand upon that list by establishing a "further" line of succession beyond those two officials.

70.     It therefore violates the HSA if a person assumes the position of Acting Secretary contrary to an order of succession adopted under 6 U.S.C. § 113(g)(2).

71.     Furthermore, because a person unlawfully serving in that manner is filling a Senate-confirmed office in an acting capacity without authorization from the FVRA or a statutory alternative to the FVRA, that person's service as Acting Secretary violates the FVRA as well.  *See* 5 U.S.C. §§ 3347(a), 3348(b)(1).

72.     Actions taken by an illegally serving Acting Secretary are "in excess of statutory jurisdiction, authority, or limitations" and "not in accordance with law."  5 U.S.C. § 706(2)(A), (C).  For that reason, they must be set aside as "unlawful" under the APA.  *Id.* § 706(2); *see SW Gen.*, 796 F.3d at 79–81; *Hooks v. Kitsap Tenant Support Servs., Inc.*, 816 F.3d 550, 564 (9th Cir. 2016); *L.M.-M. v. Cuccinelli*, 442 F. Supp. 3d 1, 34-35 (D.D.C. 2020).  When such actions are taken in furtherance of a "function or duty" assigned specifically to the Secretary's office, they are also "void *ab initio*" under the FVRA, *SW Gen.*, 137 S. Ct. at 937, 938 n.2, and "may not be ratified," 5 U.S.C. § 3348(d)(2).

## C.     The Issuance of the Rule

73.     On June 15, 2020, Defendants issued a Joint Notice of Proposed Rulemaking titled "Procedures for Asylum and Withholding of Removal; Credible Fear and Reasonable Fear Review," 85 Fed. Reg. 36,264 ("the NPRM").  The NPRM proposed significant, parallel changes to the regulations administered by USCIS and EOIR regarding asylum, statutory withholding of removal, and withholding and deferral of removal under CAT.

74.     The NPRM spanned 43 pages and proposed changes to more than 30 sections of the regulations.

18

75.     Defendants required any comments on the NPRM to be submitted within 30 days, by July 15, 2020.

76.     Commenters submitted more than 87,000 comments during the 30-day period, many of which commented on the insufficiency of the time to provide comments on so sweeping a set of changes.

77.     Defendants published the final version of the Rule on December 11, 2020. Despite having received over 87,000 comments, the Defendants made "few substantive changes," Rule, 85 Fed. Reg. at 80,274, to the proposal set forth in the NPRM.

78.     The final version of the Rule does not address significant comments provided by Plaintiffs.

79.     At a very high level of generalized description, the changes in the Rule include, but are not limited to, the following:

> (a)     Restricting the groups that qualify as "particular social groups" ("PSGs") and identifying nine categories of groups that, as a general matter, purportedly cannot qualify as PSGs;
>
> (b)     Mandating that all particular social groups that are not initially defined "before the immigration judge" be forever waived;
>
> (c)     Identifying eight categorical bases on which claims "in general" will be denied as assertedly lacking any nexus to a protected ground under INA;
>
> (d)     Preventing the introduction of evidence that purportedly "promote[s] cultural stereotypes";
>
> (e)     Redefining the protected ground of "political opinion" to exclude many opinions universally viewed as political;
>
> (f)     Sharply narrowing what counts as "persecution";
>
> (g)     Altering the inquiry whether an asylum seeker may reasonably relocate within a country, including by repealing the well-settled list of factors governing that inquiry, and articulating a list of new purported factors;

(h)    Dramatically expanding the bar to asylum for those who are firmly resettled in another country;

(i)    Listing a set of three factors that will be "significantly adverse" to a discretionary grant of asylum;

(j)    Listing nine factors that operate as general bars to a discretionary grant of asylum; and

(k)    Significantly narrowing eligibility for relief under CAT.

80.    Every change encompassed in the Rule makes obtaining asylum more difficult.

81.    The final Rule was signed by former Attorney General William Barr and Defendant Mizelle, the latter on the authority of the former purported Acting Secretary of Homeland Security, Chad Wolf.

## GENERAL ALLEGATIONS

### A.    The Defendants Lacked Authority To Promulgate the Rule

82.    As a joint-agency effort, the Rule was promulgated under the direction of Chad Wolf, in his role as the purported Acting Secretary of Homeland Security, and it was signed by Defendant Mizelle, the purported Senior Official Performing the Duties of the General Counsel of DHS.  Because Wolf was never a validly serving Acting Secretary of DHS—as held by every court to consider the matter and the Government Accountability Office—Wolf lacked authority to approve or sign the Rule.  He therefore could not delegate such authority to Mizelle, who lacked any inherent authority to sign or approve the Rule.  Agency actions taken by illegally serving officials are "in excess of statutory jurisdiction, authority, or limitations" and "not in accordance with law," and for that reason must be set aside as "unlawful" under the APA. 5 U.S.C. § 706(2)(A), (C).  The FVRA also requires that such actions "shall have no force or effect."  *Id.* § 3348(d)(1).  Therefore, the Rule must be set aside as unlawful under the APA and void under the FVRA.

### 1.    Chad Wolf Lacked Authority To Propose or Issue the Rule Because He Was Not the Lawful Acting Secretary of DHS

83.    Chad Wolf approved the Rule by invoking his purported status as Acting Secretary of Homeland Security under the HSA. *See* Rule, 85 Fed. Reg. at 80,381–82. But as every court to consider the matter has concluded, Wolf was never the lawful Acting Secretary. In occupying that position without legal authority, Wolf was violating the HSA, the FVRA, and the Appointments Clause. He therefore had no power to approve the Rule.

84.    Wolf ostensibly became the Acting Secretary in November 2019 by virtue of an order signed by the outgoing Acting Secretary, Kevin McAleenan.

85.    Citing the Secretary's power under the HSA to establish an order of succession for the Secretary's office, McAleenan purported to amend the Department's existing order of succession shortly before resigning from government. Specifically, McAleenan altered the previously established order of succession by elevating the Under Secretary for Strategy, Policy, and Plans to be third in line. Chad Wolf held that position when McAleenan later resigned, and on that basis Wolf purported to become the new Acting Secretary. *See* Rule, 85 Fed. Reg. at 80,381 (justifying Wolf's ascension based exclusively on McAleenan's order).

86.    McAleenan's order did not lawfully make Wolf the Acting Secretary, however, for three independent reasons.

87.    First, McAleenan's own tenure as Acting Secretary was in violation of both the HSA and the FVRA, and thus invalid from the start. Under the order of succession that was in place when the Secretary's office became vacant in April 2019, McAleenan was ineligible to become the Acting Secretary because other DHS officials who were higher in the line of succession were available to serve. By skipping ahead of those officials, McAleenan deviated

from the line of succession established under 6 U.S.C. § 113(g)(2), as multiple courts and the Government Accountability Office ("GAO") have concluded.

88.     Second, even if McAleenan had lawfully become the Acting Secretary in April 2019, he still could not have changed the line of succession to elevate Wolf because only a Senate-confirmed Secretary, not an Acting Secretary, may designate an order of succession under 6 U.S.C. § 113(g)(2).

89.     Third, even if McAleenan had been lawfully serving as Acting Secretary, and even if Acting Secretaries could alter the line of succession under § 113(g)(2), McAleenan was no longer the Acting Secretary by the time he purported to do so.  Under the 210-day limit on acting service imposed by the FVRA, McAleenan's tenure as Acting Secretary expired in early November, before he issued his order.

90.     Thus, for three separate reasons, Kevin McAleenan had no power to alter DHS's order of succession, a power reserved exclusively to the Secretary.  *See* 6 U.S.C. § 113(g)(2). His attempt to install Wolf as his successor was therefore void and without effect.

91.     Because Wolf became the Acting Secretary contrary to the Department's order of succession under § 113(g)(2), his assumption of that role violated the HSA.  And because he served as Acting Secretary without authorization from either the HSA or the FVRA, his performance of the Secretary's functions or duties had "no force or effect" under the FVRA. 5 U.S.C. § 3348(d)(1).

92.     Wolf's tenure as Acting Secretary remained illegal when he proposed the Rule in June 2020 and purported to approve the final Rule in December 2020.

93.     Although President Trump nominated Wolf to become DHS Secretary in September 2020, the Senate did not confirm Wolf to that office, and his nomination was returned

at the end of the 116th Congress on January 3, 2021.  President Trump immediately renominated Wolf, but then withdrew that nomination three days later on January 6, 2021.

94.     In response to decisions by the courts and the GAO concluding that Wolf was serving as Acting Secretary illegally, the government twice attempted to legitimize his status through creative administrative maneuvering.  For numerous reasons, however, these efforts did not make Wolf the lawful Acting Secretary.

95.     Because Wolf was not the Acting Secretary of DHS and had no power to approve the Rule, he also could not "delegate" the Secretary's authority to sign the Rule to Chad Mizelle, the purported "Senior Official Performing the Duties of the General Counsel for DHS."  Rule, 85 Fed. Reg. at 80,385.  And Mizelle had no inherent power to sign or approve the Rule.

**(a)     Because Former Acting Secretary Kevin McAleenan Held His Position Unlawfully, He Lacked Power To Install Wolf as His Successor**

**(i)     The Order of Succession for the Secretary's Office**

96.     The HSA prescribes an order of succession that automatically goes into effect when the Secretary's office is vacant.

97.     The Deputy Secretary, as the "first assistant" to the Secretary for FVRA purposes, is first in line to become Acting Secretary.  6 U.S.C. § 113(a)(1)(A).

98.     If no Deputy Secretary is available, "the Under Secretary for Management shall serve as the Acting Secretary."  *Id.* § 113(g)(1).

99.     Finally, to prepare for situations in which the top three positions are all vacant, "the Secretary may designate such other officers of the Department in further order of succession to serve as Acting Secretary."  *Id.* § 113(g)(2).

100.     The Secretary's power to establish a "further order of succession" was added to the HSA in December 2016 by legislation that amended § 113 to insert subsection (g).  *See* Nat'l Def. Auth. Act for Fiscal Year 2017, Pub. L. No. 114-328, § 1903(a), 130 Stat. 2000, 2672 (2016).

101.     Exercising this new power, Secretaries have established a further order of succession for the Secretary's office in the administrative document that governs vacancies in the Department's various offices.  *See* Exhibit A, DHS Delegation No. 00106 (Revision No. 08.5), *DHS Orders of Succession and Delegations of Authorities for Named Positions* (Apr. 10, 2019). Delegation 106 is the Department's "repository for changes to the order of succession for the office of the Secretary and twenty-eight other [Senate-confirmed] positions within the agency." *CASA de Maryland, Inc. v. Wolf*, No. 20-cv-2118, 2020 WL 5500165, at *20 (D. Md. Sept. 11, 2020), *appeal filed*, 20-2217 (4th Cir. Nov. 12, 2020).

102.     Delegation 106 provides different rules for two types of scenarios in which the Secretary's office is vacant.  If the Secretary dies, resigns, or otherwise becomes unable to perform the office's functions, "the orderly succession of officials is governed by Executive Order 13753, amended on December 9, 2016."  Exhibit A, at § II.A (the "standard scenario"). For vacancies that follow a Secretary's resignation, therefore, Delegation 106 incorporates by reference the line of succession for the office that was originally provided in a 2016 executive order.  *See* Exec. Order No. 13753, § 1, 81 Fed. Reg. 90,667 (Dec. 14, 2016).

103.     Delegation 106 has a separate line of succession for scenarios in which the Secretary is "unavailable to act during a disaster or catastrophic emergency."  Exhibit A, at § II.B (the "emergency scenario").  The line of succession for that scenario is set forth in Annex A to Delegation 106.  *See id.*

24

104.     Between December 2016, when the DHS Secretary gained the power to designate a further order of succession under 6 U.S.C. § 113(g)(2), and April 2019, when the most recent Senate-confirmed Secretary left office, Secretaries amended Delegation 106 multiple times.  *See* Exhibit A, at 1-1 (indicating dates of revisions).  Each time, the Secretary preserved the same two-track system under which standard-scenario vacancies caused by death or resignation are governed by Executive Order 13753, while emergency-scenario vacancies caused by an inability to act during a disaster or catastrophic emergency are governed by Annex A.

### (ii)     Kevin McAleenan's Unlawful Assumption of the "Acting Secretary" Role

105.     The last Senate-confirmed DHS Secretary was Kirstjen Nielsen.

106.     In April 2019, President Trump engaged in a "near-systematic purge" of the Department, starting with the forced resignation of Secretary Nielsen.  *See* Priscilla Alvarez et al., *Trump Overseeing 'Near-Systematic Purge' at Department of Homeland Security*, CNN Politics (Apr. 8, 2019), https://www.cnn.com/2019/04/08/politics/miller-nielsen-trump-immigration-homeland-security/index.html; Matthew Yglesias, *Trump's Flailing Shake-up of the Department of Homeland Security, Explained*, Vox (Apr. 8, 2019), https://www.vox.com/policy-and-politics/2019/4/8/18300319/trump-dhs-kirstjen-nielsen-kevin-mcaleenan.  The President and Nielsen announced her resignation on April 7, 2019, and Nielsen's final day at the Department was April 10, 2019.

107.     Because the Secretary's office became vacant due to a resignation, the standard scenario applied, and Section II.A of Delegation 106 provided the applicable line of succession.

108.     When Nielsen resigned, the first three positions listed in Executive Order 13753's line of succession were vacant.  The top available official in the line of succession was Christopher Krebs, the Under Secretary for National Protection and Programs, *see* Exec. Order

No. 13753, § 1, a position later renamed as Director of the Cybersecurity and Infrastructure Security Agency.

109.     Upon Nielsen's resignation, therefore, Director Krebs should have become the Acting Secretary of DHS, according to Delegation 106 and Executive Order 13753.

110.     At the time, Kevin McAleenan was the Commissioner of CBP.  Under Executive Order 13753, and therefore under Section II.A of Delegation 106, the Commissioner is *seventh* in line to become Acting Secretary following a resignation.  *See* Exec. Order No. 13753, § 1.

111.     Although Director Krebs and another available DHS official were both higher in the line of succession than Kevin McAleenan when the Secretary's office became vacant, McAleenan nevertheless purported to take over as Acting Secretary upon Nielsen's departure.

112.     In doing so, McAleenan unlawfully deviated from the Department's "further order of succession to serve as Acting Secretary," 6 U.S.C. § 113(g)(2), because he was not the next official in line under Delegation 106.

113.     McAleenan therefore assumed the role of Acting Secretary without lawful authority and in violation of the HSA.

114.     Because McAleenan was not authorized to become Acting Secretary by the HSA, his performance of the Secretary's functions and duties also violated the FVRA, which is "the exclusive means for temporarily authorizing an acting official to perform the functions and duties of any office" unless an alternative succession statute like the one in the HSA authorizes the appointment.  5 U.S.C. § 3347(a); *see id.* § 3348(b)(1) (unless an official is filling a position in conformity with the FVRA or an alternative statute, "the office shall remain vacant"); *id.* § 3348(d)(1) (if "any person" performs a function or duty of the vacant office in that situation, that action "shall have no force or effect").

26

### (iii)   The Government's Post-Hoc Explanation of McAleenan's Tenure

115.    In response to challenges to McAleenan's legitimacy as Acting Secretary, the government has asserted that he validly assumed that position upon Secretary Nielsen's resignation based on an order she signed on April 9, 2019.

116.    According to the government, Nielsen's order changed the line of succession under 6 U.S.C. § 113(g)(2) for vacancies caused by a Secretary's resignation, making McAleenan's position of CBP Commissioner the top post that had a sitting official when Nielsen resigned.  *See* Rule, 85 Fed. Reg. at 80,381.

117.    However, Nielsen's order plainly states that it is revising only Annex A to Delegation 106, which does not govern the standard scenario, but only the emergency scenario. *See* Exhibit B, *Memorandum for the Secretary from John M. Mitnick, General Counsel, Department of Homeland Security*, at 1 (Apr. 9, 2019) (memorializing Nielsen's "approval of the attached document," which is identified as "Annex A").  As the order states: "Annex A of DHS Orders of Succession and Delegations of Authorities for Named Positions, Delegation No. 00106, is hereby amended by striking the text of such Annex in its entirety and inserting the following in lieu thereof."  *Id.* at 2.

118.    Nielsen's order does not direct that any other changes be made.

119.    The day after Nielsen signed this order, Delegation 106 was updated accordingly. Consistent with Nielsen's order, Annex A—which governed only the emergency scenario, and has never governed the standard scenario—now contained a revised sequence of officials.  In that list, the CBP Commissioner was third in the line of succession.  *See* Exhibit A, Annex A.

120.   Also consistent with Nielsen's order, the updated Delegation 106 left intact the order of succession for standard-scenario vacancies, which were still "governed by Executive Order 13753." *Id.* § II.A.

121.   Just as Nielsen ordered, therefore, DHS replaced Annex A and made no other changes to Delegation 106.

122.   Thus, under the clearly written line of succession for standard-scenario vacancies that existed at the time Nielsen resigned, Kevin McAleenan was not entitled to become Acting Secretary, and he assumed that position unlawfully.

123.   Every court to address the matter has reached this conclusion, as has the Government Accountability Office.  *See CASA de Maryland*, 2020 WL 5500165, at *20–23; *Immigrant Legal Res. Ctr. v. Wolf*, No. 20-cv-5883, 2020 WL 5798269, at *7 (N.D. Cal. Sept. 29, 2020); *Batalla Vidal v. Wolf*, No. 16-cv-4756, 2020 WL 6695076, at *8–9 (E.D.N.Y. Nov. 14, 2020); *La Clínica de La Raza v. Trump*, No. 19-cv-4980, 2020 WL 6940934, at *12–14 (N.D. Cal. Nov. 25, 2020); *Pangea Legal Servs. v. DHS*, No. 20-cv-9253, 2021 WL 75756, at *3–5 (N.D. Cal. Jan. 8, 2021); U.S. Gov't Accountability Office, B-331650, *Legality of Service of Acting Secretary of Homeland Security and Service of Senior Official Performing the Duties of Deputy Secretary of Homeland Security* (Aug. 14, 2020), https://www.gao.gov/assets/ 710/708830.pdf.

### (iv)   McAleenan's Attempt To Make Wolf His Successor

124.   Notwithstanding his lack of authority to do so, Kevin McAleenan purported to serve as Acting Secretary from April 2019 to November of that year, when he resigned from government.

125.    During this time, President Trump did not nominate anyone to become the new Secretary of Homeland Security.

126.    Before resigning, McAleenan invoked the authority of the Secretary under 6 U.S.C. § 113(g)(2) and purported to amend the order of succession for the Secretary's office. *See* Exhibit C, Kevin K. McAleenan, *Amendment to the Order of Succession for the Secretary of Homeland Security* (Nov. 8, 2019).  Specifically, McAleenan purported to amend Delegation 106 so that the standard-scenario line of succession would no longer be governed by Executive Order 13753.  Instead, it would be governed by Annex A to Delegation 106.  *See id.* at 1 ("Section II.A of DHS Delegation No. 00106 . . . is amended hereby to state as follows: 'In case of the Secretary's . . . resignation, . . . the order of succession of officials *is governed by Annex A*.'" (emphasis added)).

127.    Unlike Nielsen, therefore, McAleenan purported to alter the line of succession for standard-scenario vacancies—replacing the list of officials set forth in Executive Order 13753 with the list in Annex A.

128.    Delegation 106 was then updated accordingly.  *See* Exhibit D, DHS Delegation No. 00106 (Revision No. 08.6), *DHS Orders of Succession and Delegations of Authorities for Named Positions* (Nov. 14, 2019).  Because of McAleenan's change, both standard-scenario vacancies *and* emergency-scenario vacancies were now both "governed by Annex A."  *Id.* §§ II.A, II.B.

129.    McAleenan also amended Annex A itself, elevating the Under Secretary for Strategy, Policy, and Plans to fourth in the line of succession.  *See* Exhibit C, at 1.

130.    By virtue of holding that position, Chad Wolf purported to become the new Acting Secretary when McAleenan resigned the following week.

131.    Establishing a new order of succession under the HSA is a power reserved exclusively to the Secretary.  *See* 6 U.S.C. § 113(g)(2).  Because McAleenan never lawfully became the Acting Secretary, his attempt to establish a new order of succession violated the HSA and had "no force or effect" under the FVRA.  5 U.S.C. § 3348(d)(1).

132.    Aside from McAleenan's purported order, there was no legal basis for Wolf to become the Acting Secretary.  *See* Rule, 85 Fed. Reg. at 80,381 (asserting that Wolf "has been serving as the Acting Secretary pursuant to an order of succession established under 6 U.S.C. 113(g)(2)," not pursuant to a presidential designation under the FVRA, *see* 5 U.S.C. § 3345(a)).

133.    Wolf therefore never became the lawful Acting Secretary of DHS.

134.    Despite his lack of authority to do so, Wolf purported to serve as Acting Secretary from November 2019 to January 2021.  President Trump did not make a nomination to fill the Secretary's office until September 2020, after courts began ruling that Wolf was not a valid Acting Secretary and more than 500 days after the vacancy began.

**(b)    Even a Lawful Acting Secretary Cannot Appoint the Next Acting Secretary**

135.    Even if Kevin McAleenan had lawfully become the Acting Secretary of DHS in April 2019, he still would have lacked the power to make Wolf his successor.  Under the HSA, only a Senate-confirmed Secretary, not an *Acting* Secretary, may establish an order of succession for the Secretary's office under 6 U.S.C. § 113(g)(2).  That result follows from "the text, structure, and purpose of the statute."  *Northwest Immigrant Rights Project v. USCIS*, No. 19-cv-3283, 2020, 2020 WL 5995206, at *23 (D.D.C. Oct. 8, 2020).

136.    The FVRA is normally "the exclusive means" for authorizing "the functions and duties" of a vacant office to be performed.  5 U.S.C. § 3347(a).  Setting aside recess

appointments, deviations from the FVRA are permitted only where a statute "expressly" authorizes an official "to perform the functions and duties" of a vacant office. *Id.* § 3347(a)(1).

137.    The text of § 113(g)(2) does not authorize Acting Secretaries to establish an order of succession, expressly or otherwise.  Instead, it explicitly gives this authority to "the Secretary," while distinguishing the Secretary's role from that of an "Acting Secretary." 6 U.S.C. § 113(g)(2).

138.    Moreover, permitting Acting Secretaries to appoint future Acting Secretaries under § 113(g)(2) would raise "serious constitutional concerns," *Batalla Vidal*, 2020 WL 6695076, at *7 n.9, among them whether the HSA unconstitutionally lodges appointment power in someone other than "the Heads of Departments," U.S. Const. art. II, § 2, cl. 2; *see Northwest*, 2020 WL 5995206, at *19–23.

139.    Because an Acting Secretary cannot establish a new order of succession under § 113(g)(2), McAleenan's November 2019 order purporting to do so would have been contrary to law even if McAleenan were a valid Acting Secretary.

### (c)    The FVRA's Time Limits on Acting Service Expired Before McAleenan Purported To Change the Department's Order of Succession

140.    Even if Kevin McAleenan lawfully became the Acting Secretary in April 2019, and even if holding that position empowered him to establish an order of succession under 6 U.S.C. § 113(g)(2), he was no longer the Acting Secretary at the time he purported to change the order of succession in November 2019.  For this third, independent reason, McAleenan's order was contrary to law and provides no basis for Chad Wolf's tenure as Acting Secretary.

141.    The FVRA limits the time in which vacant offices may be filled by acting officials.  Except when a vacancy is caused by sickness, acting service is permitted "for no

longer than 210 days beginning on the date the vacancy occurs," 5 U.S.C. § 3346(a)(1), unless the President nominates someone to fill the office permanently, *see id.* § 3346(a)(2).

142.    The FVRA's time limits apply to an Acting DHS Secretary who is serving pursuant to an order of succession under 6 U.S.C. § 113(g)(2).  Those time limits govern anyone who is "serving as an acting officer as described under section 3345" of the FVRA, 5 U.S.C. § 3346(a), that is, anyone who "perform[s] the functions and duties of [an] office temporarily in an acting capacity," *id.* § 3345(a)(1), (2), (3).  A person who becomes Acting Secretary under § 113(g)(2) fits that description.

143.    Even if the FVRA's time limits applied more narrowly to a person serving *pursuant to* § 3345, an Acting DHS Secretary would still qualify, because the HSA incorporates § 3345 as the means of authorizing acting service for the Secretary's office.

144.    Specifically, § 113(a)(1)(A) makes the Deputy Secretary the "first assistant" to the Secretary for FVRA purposes, allowing the Deputy to become Acting Secretary by default. 6 U.S.C. § 113(a)(1)(A).  Subsection (g)(1) then modifies and extends this "first assistant" rule: if no Deputy Secretary is available, the Under Secretary for Management automatically takes his place.  6 U.S.C. § 113(g)(1).  And if no Under Secretary is available, a "further order of succession" established under subsection (g)(2) fills out the scheme.  6 U.S.C. § 113(g)(2). Thus, an order of succession adopted under § 113(g)(2) is an extension of the FVRA's "first assistant" rule.

145.    The HSA does not displace the FVRA's time limits.  Provisions like § 113(g)(2) may depart from the FVRA's rules, but only if they "expressly" authorize a department head "to designate an officer or employee to perform the functions and duties of [the] office temporarily." 5 U.S.C. § 3347(a)(1)(A).  Where such express authorization is lacking, the FVRA's procedures,

32

including its time limits, remain "the exclusive means" for permitting acting service, *id.* § 3347(a).

146.    Nothing in the HSA authorizes the designation of Acting Secretaries to serve beyond the FVRA's 210-day time limit—much less does so "expressly."  Section 113(g)(2) departs from the FVRA only with respect to *who* may serve as Acting Secretary under the FVRA's first assistant rule.  It does not address how long the Acting Secretary may serve or refer to time limits at all.  There is accordingly no conflict between § 113(g)(2) and the application of the FVRA's time limits.

147.    The office of DHS Secretary became vacant by April 10, 2019, and President Trump did not nominate anyone to fill that office until the following year.  As a result, the FVRA's time limits for the office expired by November 6, 2019.

148.    McAleenan did not issue his order purporting to establish a new line of succession for the Secretary's office until two days later.  *See* Exhibit C, at 1.  When he approved this order, therefore, McAleenan was no longer the Acting Secretary—even if he previously had been.  He therefore lacked authority to issue it.  *See* 5 U.S.C. § 3348(b)(1) (unless an acting officer is serving within the time limits of § 3346, "the office shall remain vacant"); *id.* § 3348(d)(1) (actions taken in violation of those time limits "shall have no force or effect").

149.    McAleenan's order thus provided no basis for Chad Wolf to be Acting Secretary, even if McAleenan had been a lawful Acting Secretary and even if an Acting Secretary could alter the Department's order of succession under § 113(g)(2).

### (d)    The Government's Belated Attempts To Legitimize Wolf's Tenure Are Futile

150.    In response to the consensus of courts and the GAO that neither Kevin McAleenan nor Chad Wolf ever validly held the position of Acting Secretary, the government

33

has attempted to legitimize Wolf's tenure through a series of administrative maneuvers. Those measures, however, "are dead letter" and "have no legal significance." *Batalla Vidal v. Wolf*, No. 16-cv-4756, 2020 WL 7121849, at *1 n.2 (E.D.N.Y. Dec. 4, 2020).

151.    On September 10, 2020, after the office of DHS Secretary had been vacant for nearly a year and a half without a nomination, President Trump nominated Wolf to that office. Rule, 85 Fed. Reg. at 80,382.

152.    The transmittal of a nomination to the Senate restarts the FVRA's time limits, permitting acting officers to perform the functions of a vacant office while the nomination is pending. *See* 5 U.S.C. § 3346(a)(2).

153.    Even with the restarting of these time limits, however, Wolf could not serve as Acting Secretary under the FVRA after his nomination. Wolf was never the "first assistant" to the Secretary's office, 5 U.S.C. § 3345(a)(1), and the President could not direct him to serve as Acting Secretary under § 3345(a)(2) or (a)(3) because the FVRA prohibits Wolf from simultaneously serving as the Acting Secretary and the nominee. *See id.* § 3345(b); *SW Gen., Inc.*, 137 S. Ct. at 935–36.

154.    The government therefore devised a more elaborate maneuver intended to keep Wolf in place running DHS without Senate confirmation.

155.    According to the government, if McAleenan and Wolf never became Acting Secretary pursuant to the Department's order of succession under 6 U.S.C. § 113(g)(2), "then the FVRA would have applied, and Executive Order 13753 would have governed the order of succession." Rule, 85 Fed. Reg. at 80,382.

156.    At the time of Wolf's nomination, the highest-ranking available official listed in Executive Order 13753 was Defendant Gaynor, the Administrator of the Federal Emergency

Management Agency ("FEMA"), who was confirmed to that office in January 2020.  *See* Exec.

Order No. 13753, § 1 (listing the FEMA Administrator one position higher than the office held

by Christopher Krebs, Director of the Cybersecurity and Infrastructure Security Agency).

157.    According to the government, upon Wolf's nomination and the restarting of the

FVRA's time limits, Gaynor "would have—by operation of Executive Order 13753—become

eligible to exercise the functions and duties of the Secretary temporarily in an acting capacity."

Rule, 85 Fed. Reg. at 80,382.

158.    On the same day that Wolf was nominated, Gaynor signed a document that

supposedly "exercised the authority" he "would have had" as Acting Secretary under "this

alternate scenario," while maintaining that this scenario did not reflect "an accurate view of the

law."  *Id.*

159.    The document Gaynor signed purported to "designate a new order of succession

under 6 U.S.C. 113(g)(2)."  *Id.; see also* Exhibit E, Peter T. Gaynor, *Order Designating the*

*Order of Succession for the Secretary of Homeland Security* (Sept. 10, 2020).  The sequence of

officials in this document matched the one that McAleenan purported to approve in November

2019—i.e., it elevated Wolf's position of Under Secretary for Strategy, Policy, and Plans to the

highest occupied position, above Gaynor's own position as FEMA Administrator.  *Id.*

160.    According to the government, Gaynor's document had legally operative effect: it

"superseded any authority Mr. Gaynor may have had," thereby divesting Gaynor of his own

position and conferring on Wolf the "authority to continue to serve as the Acting Secretary."

Rule, 85 Fed. Reg. at 80,382.

161.    Despite claiming that Gaynor's document carried the force of law that an action

taken by an Acting Secretary would have, the government has never asserted that Gaynor

35

actually served as Acting Secretary, was vested with the power of that office, or took any other steps as Acting Secretary besides signing this document.  Indeed, government counsel recently conceded that Gaynor was "never" the Acting Secretary in 2020.  *Pangea*, 2021 WL 75756, at *5.  And consistent with that concession, DHS never submitted a notice to Congress or the GAO indicating that Gaynor began serving as Acting Secretary, as required by the FVRA and as the Department has done for its past Acting Secretaries.  Nor did DHS send any such notice concerning Wolf's service as Acting Secretary after Gaynor supposedly turned over the reins to him.

162.    Instead, the government maintains that Gaynor exercised power that he "may have had" based on "erroneous contentions" that are not "legally correct," and it contends that this exercise of theoretical legal power confirmed Wolf's entitlement to be Acting Secretary of DHS.  Rule, 85 Fed. Reg. at 80,382.

163.    After the completion of this maneuver, Wolf purported to ratify various actions that he and McAleenan had taken as Acting Secretary, *see* NPRM, 85 Fed. Reg. 59,651 (Sept. 23, 2020); Rule, 85 Fed. Reg. 65,653 (Oct. 16, 2020), and the government promptly cited those ratifications in pending legal challenges to these actions.

164.    In November, however, the government notified the courts "that it had learned that Mr. Gaynor's September 10, 2020 succession order may have been signed approximately one hour before Mr. Wolf's nomination was formally submitted to the Senate."  Defs. Letter at 1, *Batalla Vidal*, No. 16-cv-4756 (E.D.N.Y. Nov. 13, 2020) (Dkt. 341); *see* Rule, 85 Fed. Reg. at 80,382 n.90 (stating "it appears he signed that order before the nomination was received by the Senate").

165.    Attempting to fix this new problem, Gaynor signed a second, identical document, once again purporting to establish a new order of succession for the Secretary's office under which Wolf would become the legitimate Acting Secretary.  *See* Exhibit F, Peter T. Gaynor, *Order Designating the Order of Succession for the Secretary of Homeland Security* (Nov. 14, 2020).

166.    As before, DHS never notified Congress or the GAO that Gaynor began serving in an acting capacity.  And as before, the document signed by Gaynor asserted that Wolf was the Acting Secretary, disclaiming Gaynor's status as such.  *See* Exhibit  F, at 1 (stating that, "without casting doubt on the continued validity" of Wolf's status, "I am relying on any authority I may have been granted by the FVRA").

167.    Thus, Gaynor was never the Acting Secretary or vested with the powers of that position.  Even if he were entitled to become Acting Secretary, "DHS cannot recognize his authority only for the sham purpose of abdicating his authority to DHS's preferred choice, and only in the alternative."  *Batalla Vidal*, 2020 WL 6695076, at *9.

168.    Moreover, even if Gaynor actually became the Acting Secretary in September or November 2020, his purported succession orders would still have no effect.  As explained above, an Acting Secretary may not amend the Department's order of succession under the HSA, and therefore "Gaynor could not amend the order of succession to put Wolf next in line."  *Northwest*, 2020 WL 5995206, at *24.

169.    In sum, Gaynor's hypothetical exercise of legal authority that he denies ever possessing did not make Wolf the Acting Secretary of Homeland Security.  The Appointments Clause "is more than a matter of 'etiquette or protocol'; it is among the significant structural

safeguards of the constitutional scheme," *Edmond*, 520 U.S. at 659 (quoting *Buckley*, 424 U.S. at 125), and its restrictions cannot be evaded by such ploys.

> **2.     Chad Mizelle Had No Inherent Authority To Sign or Approve the Rule**

170.    The Rule was "reviewed and approved" by Chad Wolf, Rule, 85 Fed. Reg. at 80,385, but was signed by Chad Mizelle, who purports to hold a position in DHS called "Senior Official Performing the Duties of the General Counsel," *id.* at 80,401.

171.    The government does not claim that Mizelle had inherent authority to sign or approve the Rule, but rather that Wolf delegated to Mizelle the Secretary's statutory authority to do so.  *See id.* at 80,385 (stating that Wolf, "having reviewed and approved this document, has delegated the authority to electronically sign this document to Chad R. Mizelle . . . for purposes of publication in the Federal Register"); *id.* at 80,382 (stating "the designation of the signature authority from Acting Secretary Wolf to Mr. Mizelle is validly within the Acting Secretary's authority").

172.    Because Wolf was not the Acting Secretary and possessed none of the Secretary's powers, he had no authority to "delegate" any of the Secretary's authority, including the authority to sign or approve federal regulations.

173.    Mizelle himself lacked any inherent power to sign or approve the rule, for two reasons.

174.    First, the General Counsel of DHS does not have the authority to approve Department regulations that interpret and implement the immigration laws.  That power belongs to the Secretary, who is "charged with the administration and enforcement of . . . all . . . laws relating to the immigration and naturalization of [non-citizens]," 8 U.S.C. § 1103(a)(1), and with "[e]stablishing national immigration enforcement policies and priorities," 6 U.S.C. § 202(5).

The law expressly directs the Secretary to "establish such regulations . . . as he deems necessary for carrying out his authority."  8 U.S.C. § 1103(a)(3); *see* 6 U.S.C. § 112(e) (governing "[t]he issuance of regulations *by the Secretary*" (emphasis added)).  The General Counsel, by contrast, is "the chief legal officer of the Department," *id.* § 113(a)(1)(J), and is nowhere vested with decisionmaking authority to approve DHS regulations.

175.    Second, even if the General Counsel did have the requisite authority, Mizelle is not the General Counsel and has no right to exercise the powers of that office.  The General Counsel must be "appointed by the President, by and with the advice and consent of the Senate," *id.* § 113(a)(1), but the office has been vacant since September 17, 2019, and no nominee has been submitted to the Senate.[1]  Under the FVRA, acting officials could "perform the functions and duties of the office" for "no longer than 210 days beginning on the date the vacancy occur[red]."  5 U.S.C. § 3345(a), § 3346(a)(1).  The time period in which an Acting General Counsel could fill that office therefore expired on April 14, 2020.  After that date, the FVRA required that the General Counsel's office "remain vacant" and prohibited anyone but the Secretary from performing "any function or duty" of the General Counsel's office.  *Id.* § 3348(b).  Mizelle, according to his own job title, is "Performing the Duties of the General Counsel," Rule, 85 Fed. Reg. at 80,401, and is therefore violating the FVRA.

176.    Because Mizelle had no power to sign or approve the Rule, and because Wolf had no power to delegate such authority to him, the Rule's approval and publication were unlawful.

---

[1]    *See Federal Vacancies Reform Act*, U.S. Government Accountability Office, https:// www.gao.gov/legal/other-legal-work/federal-vacancies-reform-act (search for "general counsel" under "Position Title" and "Department of Homeland Security" under "Agency").

177.    Indeed, because Mizelle was illegally performing the functions and duties of the General Counsel in violation of the FVRA, his signing of the Rule was unlawful, and the Rule must be struck down, even if Chad Wolf had been the valid Acting Secretary of DHS.

### 3.    Wolf's Purported Ratification of the Rule Has No Effect

178.    In January 2021, Defendants tried yet another bureaucratic maneuver to legitimize the actions that Wolf took while unlawfully purporting to be the Acting Secretary of Homeland Security.  Defendants' latest gambit, however, is no more successful than their previous efforts, and the Rule remains invalid.

179.    On January 11, 2021, Wolf announced to DHS personnel that he would be "stepping down" as Acting Secretary, effective at midnight.  *See* Chad F. Wolf, *A Message from Acting Secretary Chad F. Wolf* (Jan. 11, 2021), *available at* https://beta.documentcloud.org/documents/20447898-wolfresigns.

180.    Under the November 2019 succession order signed by McAleenan and the November 2020 succession order signed by Gaynor, the next DHS official in the line of succession for the Secretary's office is the Administrator of the Transportation Security Administration ("TSA").  *See* Exhibit C, at 1; Exhibit F, at 1.  Gaynor's position, FEMA Administrator, is ranked below the TSA Administrator in both of these orders.  *See id.*

181.    Therefore, according to the orders of succession under 6 U.S.C. § 113(g)(2) that Defendants maintain govern the Secretary's office, the next official in line to become Acting Secretary after Wolf was David P. Pekoske, the Senate-confirmed Administrator of TSA.  *See* Transp. Security Admin., *Administrator*, https://www.tsa.gov/leader-bios/administrator.

182.    Before purporting to step down as Acting Secretary, however, Wolf claims to have exercised "my authority in § 113(g)(2)" to designate yet another "new order of succession

for the Secretary of Homeland Security, effective January 11, 2021 at 11:59 p.m." Exhibit G,

Chad F. Wolf, *Ratification*, at 2 (Jan. 13, 2020). Wolf's new order purportedly "designated the

Administrator of FEMA as the most senior eligible successor for the Secretary of Homeland

Security." *Id.* Thus, "upon the effectiveness of that order of succession," according to Wolf,

"my authority as the Acting Secretary terminated," and Gaynor became the Acting Secretary

while Wolf "returned to my duties as the Under Secretary for Strategy, Policy, and Plans." *Id.*

183.    The following day, Gaynor purported to "delegate" various powers of the

Secretary back to Wolf, including "the authority . . . to ratify my past policy actions as Acting

Secretary," as well as to ratify various actions taken by McAleenan. *Id*; *see* Exhibit H, DHS

Delegation No. 23028, *Delegation to the Under Secretary for Strategy, Policy, and Plans to Act*

*on Final Rules, Regulations, and Other Matters* (Jan. 12, 2021).

184.    Wolf then ostensibly wielded the authority that Gaynor gave to him (on January

12, 2021), which derived from the authority that Wolf had previously given to Gaynor (on

January 11, 2021), an authority that was originally given to Wolf by McAleenan (on November

8, 2019) or possibly given to Wolf by Gaynor himself (on September 10, 2020, and—if not

then—on November 14, 2020). Specifically, Wolf purported to "ratify any and all prior

regulatory actions involving delegable duties that I have taken from November 13, 2019, through

January 11, 2021." Exhibit G, at 2.

185.    Defendants' attempt to rearrange the deck chairs on the Titanic is in vain. For a

variety of reasons, Wolf's "ratification" of his own decision to approve the Rule has no legal

effect.

186.    First, as explained above, Wolf was not the lawful Acting Secretary of Homeland

Security on January 11, 2021. He therefore had no authority to exercise the Secretary's powers

under 6 U.S.C. § 113(g)(2) to designate a new order of succession that placed Gaynor in the highest occupied position.

187.    Second, as also explained above, even a valid Acting Secretary cannot designate an order of succession under § 113(g)(2), as Wolf purported to do, and for this independent reason Wolf's January 11 order had no effect.

188.    Third, even if § 113(g)(2) permitted Acting Secretaries to designate orders of succession under § 113(g)(2) as a general matter, it does not allow them to use such orders to "terminat[e]" their own status as Acting Secretary, Exhibit G, at 2, in favor of a hand-picked replacement while retaining their underlying positions within the Department. That interpretation of § 113(g)(2) would give Acting Secretaries even greater discretion to override the choices previously made by Senate-confirmed Secretaries about who should run DHS during a vacancy, and would thus only heighten the statutory and constitutional flaws of allowing a series of Acting Secretaries to name their own successors indefinitely.

189.    Fourth, even if Wolf could have lawfully transferred the Acting Secretary role to Gaynor and then been delegated certain powers by Gaynor in return, the FVRA's anti-ratification penalty prohibited Wolf or anyone else from ratifying the Rule. As explained above, when Wolf approved the proposed and final Rule, he was performing a "function or duty" of the Secretary's office within the meaning of the FVRA's penalty provision, 5 U.S.C. § 3348(a)(2), because the power to approve DHS regulations that interpret and implement the immigration laws is exclusively vested in the Secretary, *see supra* para. 174. Because Wolf gave that approval while lacking the authority to be Acting Secretary under the FVRA or any alternative succession statute, *see* 5 U.S.C. § 3348(d)(1), his illegal approval of the Rule "may not be ratified," *id.* § 3348(d)(2), even by a validly serving officer.

190.    For these and other reasons, Defendants' eleventh-hour attempt to breathe validity into Wolf's actions as Acting Secretary has no legal effect.  The Rule remains unlawful under the APA and void under the FVRA.

**B.    The Rule as a Whole Is Unlawful Under the APA**

191.    The Rule as a whole is invalid under the APA, because (i) it provides insufficient rational explanation and factual support for its purported goals; and (ii) Defendants did not provide sufficient time to provide comments on the NPRM.

### 1.    The Rule Does Not Provide Facts, Evidence or Rational Explanations To Support Its Stated Objections

192.    Agency action is valid only if it rationally implements the agency's specified goals and choices.  The agency must "examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made."  *Motor Vehicle Mfrs Ass'n v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 43 (1983) (quotation marks omitted).  It is the agency's burden to set out the essential facts on which its decision was made and explain its justification with actual evidence, not just conclusory statements.  *United States v. Dierckman*, 201 F.3d 915, 926 (7th Cir. 2000); *Allied-Signal, Inc. v. Nuclear Reg. Comm'n*, 988 F.2d 146, 152 (D.C. Cir. 1993).

193.    The Rule asserts that it has two goals: (1) "aiding those in true need of protection from harm," and (2) protecting U.S. "resources and citizens."  Rule, 85 Fed. Reg. at 80,274; *see also* NPRM, 85 Fed. Reg. at 36,265.  In fact, the Rule does neither, and Defendants fail to provide information or explanation to support either objective.

194.    Far from aiding them, the Rule closes the doors of the United States on those needing protection from harm.  Although the changes to asylum law made by the Rule are variegated, they share one feature: they uniformly narrow access to asylum and related relief.

43

195.    Furthermore, although Defendants suggest that the Rule will help those with meritorious claims by weeding out frivolous or fraudulent applications, *see, e.g.*, Rule, 85 Fed. Reg. at 80,284–85, Defendants did not, because they could not, either provide evidence to show that fraudulent applications are a problem or that their rule was narrowly targeted at such applications.  Instead, Defendants provided only conclusory statements about the effect of the rule—and such statements are patently insufficient under the APA.

196.    The record is replete with comments pointing out that the Rule would sharply curtail grants of asylum.  *See* Catholic Legal Immigration Network, Comment Letter on Proposed Rule, at 38 (July 15, 2020) [hereinafter CLINIC Comment Letter], https:// beta.regulations.gov/comment/EOIR-2020-0003-4754 ("It is clear that the only goal of this section of the proposed rules is to give adjudicators a laundry list of reasons to swiftly deny applications."); Safe Passage Project, Comment Letter on Proposed Rule, at 4 (July 15, 2020), https://beta.regulations.gov/comment/EOIR-2020-0003-6116 ("This regulation will encourage immigration judges, in the name of efficiency, to abandon their roles as impartial adjudicators and instead look for reasons to dismiss asylum applications in order to manage their dockets."); Ayuda, Comment Letter on Proposed Rule, at 7 (July 15, 2020) [hereinafter Ayuda Comment Letter], https://beta.regulations.gov/comment/EOIR-2020-0003-6076 ("The proposals would turn this 'gatekeeping' stage on its head, raising the threshold while reducing legal rights—all in the name of efficiency and denying asylum seekers their day in court."); Texas Law Immigration Clinic, Comment Letter on Proposed Rule, at 7 (July 15, 2020), https://beta.regulations.gov/ comment/EOIR-2020-0003-85085 ("The assertion that this proposal is motivated by efficiency is belied by the reality that the proposal would further complicate the proceedings in order to deny protection whereas other possible procedures that would streamline the proceedings in order to

*grant* asylum were altogether ignored.").  The record is also replete with stories of individuals who are eligible for asylum under the INA, and who actually received asylum, but who would be barred from relief under the Rule.  *See, e.g.*, Tahirih Comment at 19–20, 21–22, 32, 41–42, 56, 74.

197.    Defendants did not provide any reasoned analysis in response to these claims. Instead, they derided commenters who raised these issues as "unsubstantiated and exaggerated melodramatic views of the rule," Rule, 85 Fed. Reg. at 80,329 and "a hypothetical and speculative 'parade of horribles.'"  *Id*. at 80,299.

198.    Such derision—and the fact that the rule, taken as a whole, *only* makes asylum more difficult rather offering "aid"—are wholly consistent with the many anti-asylum statements of President Trump, Chad Wolf, and former Attorney General Barr.  *See* Tahirih Justice Center, Comment Letter on Proposed Rule, at 9–11 (July 15, 2020) [hereinafter Tahirih Comment Letter], https://beta.regulations.gov/comment/EOIR-2020-0003-4756; *see also President Trump Mocks Asylum Seekers, Calls Program a Scam*, C-SPAN (April 9, 2019), https://tinyurl.com/ y7fry7gf.  (During remarks in Las Vegas in April 2019, Trump called the asylum system a "scam" and described asylum seekers as "having face tattoos and looking like UFC fighters." The President proceeded to state that "we don't love the fact that [asylum seekers] are carrying the flag of Honduras, Guatemala, or El Salvador.")  Chad F. Wolf, *Remarks as Prepared by Acting Secretary Chad F. Wolf Highlighting Border Security and Immigration Policies of the Trump Administration* (Oct. 22, 2020), https://tinyurl.com/ycw4wowg.  (Wolf described the U.S. immigration system as "loopholes that incentivize illegal behavior."  He also stated his efforts "to weed out fraudulent and meritless asylum claims," including "[t]ightening up standards for asylum applicant employment authorization; [e]levating legal standards of proof for asylum and

statutory withholding of removal screening; and [i]nstituting new mandatory bars to asylum.")
*Attorney General William P. Barr Delivers Remarks at the National Sheriffs' Association Winter Legislative and Technology Conference* (Feb. 10, 2020), https://tinyurl.com/y5hqywc7 (Then-Attorney General Barr denounced sanctuary city policies, calling them "dangerous and unlawful policies.").

199.    The Rule rationally implements the animus inherent in these statements by making it nearly impossible to receive a grant of asylum—but it does not bear any rational relationship to its stated purpose of aiding those in need of protection.

200.    The Rule also does not rationally implement its goal of protecting U.S. resources and citizens.  The Rule provides no facts or reasoning to suggest either that U.S. citizens require "protection" from individuals fleeing persecution and torture or that the Rule supplies any such protection.  And a comment from the Attorneys General of 22 States and the District of Columbia—to which the Rule provides no response—explains that the Rule will have the opposite effect: It would make it more difficult for the States and the District of Columbia to protect their residents by enforcing their own laws.  Off. Att'y Gen. State of Cal., Comment Letter on Procedures for Asylum and Withholding of Removal; Credible Fear and Reasonable Fear Review ("Proposed Rule") 28–29 (July 15, 2020) [hereinafter Becerra Comment Letter], https://beta.regulations.gov/comment/EOIR-2020-0003-82829.

201.    Finally, Defendants provide only insufficient conclusory statements in support of the notion that the Rule protects U.S. resources.  In particular, although Defendants assert that they completed an analysis of the costs and benefits of the Rule for the Office of Management and Budget, *see* Rule, 85 Fed Reg. at 80,377, the Defendants failed to provide any quantitative information from this analysis or any explanation of how the provisions of the Rule were related

to decreasing costs and increasing benefits.  The Becerra Comment Letter provides detailed data identifying potential harm to state economies from the proposed rule.  This includes a 2017 DHS report stating that "over the past decade, refugees, including asylees, have contributed $63 billion more in tax revenue than they cost in public benefits."  Becerra Comment Letter, at 18. Defendants wholly failed to analyze, or respond to, this data.

### 2.     Defendants Provided Insufficient Time for Public Comment

202.    The APA requires an agency proposing a new rule to provide public notice and "give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments with or without opportunity for oral presentation."  5 U.S.C. § 553(c).

203.    The government's internal orders state that "a comment period . . . should generally be at least 60 days."  Exec. Order No. 13563, 76 Fed. Reg. 3821, 3821–22 (Jan. 18, 2011); *see* also Exec. Order 12866, 58 Fed. Reg. 51735, 51,740 (Oct. 4, 1993).

204.    As described above, the Rule makes complex, technical, and dramatic changes to almost every aspect of asylum law.  The proposed version of the Rule consumed 43 Federal Register pages—the equivalent of over 160 pages in standard double-spaced format.  NPRM, 85 Fed. Reg. 36,264–36,306.

205.    Any one of the many topics covered by the Rule would, standing alone, be significant and complicated enough to warrant a 60-day comment period.

206.    Until recently, Defendants provided for a 60-day comment period on all asylum-related rules.  *See, e.g.*, Asylum Application, Interview, and Employment Authorization for Applicants, 84 Fed. Reg. 62,374 (June 26, 2020) (proposed rule) (60-day comment period); Inadmissibility on Public Charge Grounds, 83 Fed. Reg. 51,114 (Oct. 10, 2018) (proposed rule)

(60-day comment period).  This includes rules that were substantially narrower and less complex

that the Rule at issue here.  *See, e.g.*, Removal of 30-Day Processing Provision for Asylum

Applicant-Related Form I-765 Employment Authorization Applications, 84 Fed. Reg. 47,148

(June 2, 2020) (proposed rule) (60-day comment period).

207.    Defendants gave the public a mere 30 days to comment on the Rule in its entirety.

208.    Defendants received, and ignored, numerous requests to extend the comment

period to 60 days.  Ayuda Comment Letter at 5; Tahirih Comment Letter at 13–14; N.Y.C.B.

Committee on Immigr. & Nat'lity L., Comment Letter on Proposed Rule, at 1 (July 14, 2020),

[hereinafter N.Y.C.B. Immigr. Committee Comment Letter], https://beta.regulations.gov/

comment/EOIR-2020-0003-6157; Vill. U. Clinic for Asylum, Refugee & Emigrant Servs.,

Comment Letter on Proposed Rule, at 3 (July 15, 2020) [hereinafter Vill. Asylum Clinic

Comment Letter], https://beta.regulations.gov/comment/EOIR-2020-0003-5987; Nat'l Ass'n of

Immigr. Judges, Comment Letter on Proposed Rule, at 2 (July 15, 2020), https://

beta.regulations.gov/comment/EOIR-2020-0003-4751; Oxfam Am. Inc., Comment Letter on

Proposed Rule, at 2 (July 15, 2020) [hereinafter Oxfam Comment Letter], https://

beta.regulations.gov/comment/EOIR-2020-0003-4758; UCLA L. Williams Inst., Comment

Letter on Proposed Rule, at 2 (July 15, 2020), https://beta.regulations.gov/comment/EOIR-2020-

0003-82179.

209.    One request for more time was signed by 502 interested non-profit organizations.

Request to Provide a Minimum of 60 days for Public Comment in Response to RIN 1615-AC42 /

1125-AA94 / EOIR Docket No. 18-0002/ A.G. Order No. 4714-2020 (https://www.tahirih.org/

wp-content/uploads/2020/06/Request-for-Extension-of-Asylum-Rule-Comment-Period-from-

502-organizations.pdf).  Defendants received a total of 311 comments from organizations or

groups.  Rule, 85 Fed. Reg. at 80,284.

210.    Many would-be commenters were unable to submit any comment on the rule

because of the foreshortened period.

211.    A number of commenters filed comments that addressed only the 30-day

comment period, because that period left them unable to comment on the substantive provisions

of the Rule.  *See, e.g.*, City B. Just. Ctr., Comment Letter on Proposed Rule, at 2 (July 15, 2020)

[hereinafter CBJC Comment Letter], https://beta.regulations.gov/comment/EOIR-2020-0003-

5997; Immigrant Just. Network, Comment Letter on Proposed Rule, at 4–5 (July 15, 2020)

[hereinafter IJN Comment Letter], https://beta.regulations.gov/comment/EOIR-2020-0003-6090;

Make the Road N.J., Comment Letter on Proposed Rule, at 2–3 (July 15, 2020), https://

beta.regulations.gov/comment/EOIR-2020-0003-81636; N.Y.C. B. Immigr. Committee

Comment Letter at 5–7.

212.    Still other commenters, including Plaintiffs, noted that the 30-day period

prevented them from fully analyzing all of the issues raised by the Rule.  *See* Ayuda Comment

Letter at 5; Tahirih Comment Letter at 14 & n.54; CBJC Comment Letter at 2; Immigrant Legal

Resource Ctr., Comment Letter on Proposed Rule, at 2 (July 15, 2020), https://beta.regulations.

gov/comment/EOIR-2020-0003-4836; IJN Comment Letter at 4–5; Lambda Legal, Comment

Letter on Proposed Rule, at 29–30 (July 15, 2020) [hereinafter Lamda Legal Comment Letter],

https://beta.regulations.gov/comment/EOIR-2020-0003-5999**;** Pol. Asylum Immigr.

Representation (PAIR) Project, Comment Letter on Proposed Rule, at 2 (July 15, 2020),

https://beta.regulations.gov/comment/EOIR-2020-0003-6009; Vill. Asylum Clinic Comment

Letter at 3; Young Center for Immigrant Children's Rights, Comment Letter on Proposed Rule,

at 2 (July 13, 2020) [hereinafter Young Center Comment Letter], https://beta.regulations.gov/
comment/EOIR-2020-0003-4739.

213.    By their actions, Defendants violated the APA by failing to provide a meaningful
and sufficient opportunity for the public to "participate in the rule making."  5 U.S.C. § 553(c).

## C.    The Rule's List of Claims Purportedly Barred on Nexus Grounds Is Contrary to Law and Arbitrary and Capricious

214.    Under the INA, asylum applicants must show a nexus to a protected ground—i.e.,
that they were persecuted, or fear persecution, "on account of race, religion, nationality,
membership in a particular social group, or political opinion."  8 U.S.C. § 1101(42)(A).

215.    Congress has specifically recognized that persecution often involves more than
one motive, and therefore requires an applicant to show only "that race, religion, nationality,
membership in a particular social group, or political opinion was or will be at least *one central
reason* for persecuting the applicant."  8 U.S.C. § 1158(b)(1)(B)(i) (emphasis added).

216.    Consistent with Congress's "one central reason" standard, asylum seekers have
long been granted asylum based on persecution inflicted both on account of a protected ground
and as a result of other motives, including personal animosity.  *See, e.g.*, *Bi Xia Qu v. Holder*,
618 F.3d 602, 608 (6th Cir. 2010); *Oliva v. Lynch*, 807 F.3d 53, 60 (4th Cir. 2015).

217.    The Rule upends this long-settled framework by substituting a disfavored list of
nexus grounds which it directs will not be favorably adjudicated.  The Rule's list constitutes a
frontal assault on the longstanding right of women, girls, LGBTQ individuals, and individuals
fleeing gender-based violence and gang persecution to a full and fair asylum process.  The list
also violates the APA for numerous reasons—not least that it tacitly overrides the longstanding
requirement that asylum applications be adjudicated on a case-by-case basis.

### 1.    The Entire List of Claims Barred on Nexus Grounds Violates the APA

218.    The Rule creates a new list of nexus grounds that asylum officers and

immigration judges will, in general, "not favorably adjudicate." 8 C.F.R. §§ 208.1(f), 1208.1(f)

(2021). That list consists of (1) "[i]nterpersonal animus or attribution"; (2) "[i]nterpersonal

animus in which the alleged persecutor has not targeted, or manifested an animus against, other

members of an alleged particular social group in addition to the member who has raised the

claim at issue"; (3) "[g]eneralized disapproval of, disagreement with, or opposition to criminal,

terrorist, gang, guerilla, or other non-state organizations," absent certain "expressive behavior";

(4) "[r]esistance to recruitment or coercion by guerilla, criminal, gang, terrorist, or other non-

state organizations"; (5) being targeted "for criminal activity for financial gain based on wealth

or affluence or perceptions of wealth or affluence"; (6) "criminal activity"; (7) "perceived, past

or present, gang affiliation"; and (8) "gender." *Id.*

219.    The Rule asserts that the list of disfavored nexus grounds is merely a "general

rule." Rule, 85 Fed. Reg. at 80,329. But it provides no discussion of a single exception to the

Rule. Nor does the Rule ever discuss any claim raising one of the forbidden grounds that would

*not* be subject to denial based on the nexus provisions of the Rule. Thus, like the list of

disfavored PSGs, the list of claims that "generally" will be rejected on nexus grounds will

function as an effectively categorical bar.

220.    The Defendants also have failed to provide a reasoned justification for the list,

which has nothing to do with nexus. The Rule does not even attempt to explain how any entry

on the list interprets the phrase "on account of" or the "one central reason" standard in the INA,

because the list cannot rationally be seen as an interpretation of those statutory provisions.

Rather, the "nexus" list seeks to remove certain types of persecution from protection under the

INA.  Doing so is contrary to the statute, which entitles *anyone* persecuted on account of one of the five protected grounds to relief, regardless of the specific nature of the claim.  *See* 8 U.S.C. § 1101(a)(42)(A).

221.    The Rule's bare assertion that Defendants are "codifying the circumstances that are generally insufficient to support a nexus finding," Rule, 85 Fed. Reg. at 80,329, does not provide a reasoned basis.  The rule fails to elaborate on that ipse dixit, cites no prior court opinions that impose such a general rule, and offers no basis from which any such general rule could be rationally derived.

222.    The Rule also asserts that the list will "reduce the amount of time that adjudicators must spend evaluating claims."  *Id.*  But if, as the Rule claims, *id.*, adjudicators must engage in exactly the same case-by-case adjudication as they did before the Rule—so as to determine when the purported general rule applies *and when it does not*—the list of barred nexuses will not reduce the time spent evaluating claims.  The list of claims assertedly barred on nexus grounds is therefore arbitrary and capricious because the solution it proposes does not reasonably address the problem it identifies.

223.    Of course, the Rule could improve adjudicatory efficiency if its items functioned as categorical bars.  That, however, would constitute a sea change in the law that the agencies have failed to acknowledge.  The Rule itself concedes that nexus determinations must be made, and have been made, on a case-by-case basis.  Rule, 85 Fed. Reg. at 80,329.  Erecting a categorical bar against certain claims on purported "nexus" grounds is inconsistent with that approach—and the agencies deny, rather than acknowledge, that effect of the list.  *Id.*

224.    Even if the Rule's list could rationally advance judicial efficiency, the list would remain arbitrary because it failed to consider the additional burdens on efficiency it creates for

attorneys and asylum seekers raised by commenters.  *E.g.*, U.D.C. Immigr. and Human Rights Clinic, Comment Letter on Proposed Rule, at 29–30 (July 15, 2020) [hereinafter U.D.C. Immigr. Clinic Comment Letter], https://beta.regulations.gov/comment/EOIR-2020-0003-68633.  It would be unreasonable to create a rule focused only on efficiency without at least considering the efficiency of all parties to the system.

225.    Finally, the list of claims barred on nexus grounds is contrary to law because it violates the *non-refoulement* principle.  Given the complete absence of any exceptions to the list, and the arbitrary nature of the specific bars imposed by the list, as discussed below, there can be no question that the nexus list will result in the refoulement of asylum seekers who are eligible for relief under the INA.

### 2.    The Rule's "Gender" Bar Is Arbitrary and Capricious

226.    As noted above, the INA requires that an applicant establish persecution on account of a protected ground, including membership in a PSG.  8 U.S.C. § 1101(42)(A). Gender has long been considered an immutable characteristic that can give rise to PSGs that are cognizable under the INA.  *See, e.g.*, *De Pena-Paniagua v. Barr*, 957 F.3d 88 (1st Cir. 2020); *Cece v. Holder*, 733 F.3d 662 (7th Cir. 2013); *Sarhan v. Holder*, 658 F.3d 649, 654–57 (7th Cir. 2011); *Perdomo v. Holder*, 611 F.3d 662 (9th Cir. 2010); *Agbor v. Gonzales*, 487 F.3d 499 (7th Cir. 2007); *Hassan v. Gonzales*, 484 F.3d 513, 517–18 (8th Cir. 2007); *Barry v. Gonzales*, 445 F.3d 741, 745 (4th Cir. 2006); *Gao v. Gonzales*, 440 F.3d 62, 70 (2d Cir. 2004), *vac'd on other grounds sub nom. Keisler v. Gao*, 552 U.S. 801 (2007); *Niang v. Gonzales*, 422 F.3d 1187 (10th Cir. 2005); *Mohammed v. Gonzales*, 400 F.3d 785, 795–98 (9th Cir. 2005); *Balogun v. Ashcroft*, 374 F.3d 492,

499 (7th Cir. 2004); *Abay v. Ashcroft*, 368 F.3d 634, 639–42 (6th Cir. 2004); *Yadegar-Sargis v. INS*, 297 F.3d 596, 603–04 (7th Cir. 2002); *Fatin v. INS*, 12 F.3d 1233, 1241 (3d Cir. 1993) (Alito, J.).

227.    The Rule turns this settled law on its head.  The Rule states that Defendants will "not favorably adjudicate . . . the claims of [individuals] who claim persecution . . . based on . . . gender."  8 C.F.R. §§ 208.1(f), 1208.1(f) (2021).  Thus, by its plain terms, the Rule enacts a bar on asylum claims based on gender.  Under this new nexus bar, Plaintiffs' clients, and many other asylum seekers across the country, will now be functionally ineligible for asylum under the Rule, in contravention of 25 years of BIA and circuit court precedent.  *See, e.g.*, Ayuda Comment Letter at 30–31; Tahirih Comment Letter at 30–31.

228.    The Rule cannot further its stated justification for barring gender-based claims.  The asserted purpose of the bar is to achieve "increased clarity and more uniform adjudication."  Rule, 85 Fed. Reg. at 80,334.  But Defendants have not even tried to point to confusion, improper determinations, or other conditions that require more clarity or uniformity.  Moreover, the bar on gender-based claims, like the entire list of claims barred on "nexus" grounds, will improve clarity and uniformity if, and only if, it functions as a categorical bar.  Otherwise, it will require adjudicators to discern whether a particular claim falls into some unspecified exception the content of which have been left completely unexamined by the agencies.  And the multiple, competing interpretations of the bar offered by the agencies confirm that the Rule will cause much more confusion than it dispels.

229.    The gender bar is also arbitrary and capricious because it creates a nonsensical presumption about causation.  The Rule does not expressly preclude using gender to define PSGs.  By then seeking to bar claims on the basis of gender, the Rule adopts a presumption that persecution is not inflicted on account of gender even if it is directed against individuals who are

part of PSGs defined by gender.  *See* Rule, 85 Fed. Reg. at 80,334.  Defendants make no attempt to defend that result, which is singularly irrational.

230.    Furthermore, the Rule's express bar on all gender-based claims is contrary to the evidence before the agency.  Plaintiffs and others provided significant comments demonstrating that persecution does occur "on account of" gender—as research, case law, UNHCR guidance and agency training have long recognized.  *See, e.g.*, Ayuda Comment Letter at 30–33; Tahirih Comment Letter at 6–7, 30–31; ASISTA, Comment Letter on Proposed Rule, at 6–9 (July 15, 2020) [hereinafter ASISTA Comment Letter], https://beta.regulations.gov/comment/EOIR-2020-0003-5985; CLINIC Comment Letter at 42–43; DC Volunteer Lawyers Project, Comment Letter on Proposed Rule, at 13–14 (July 15, 2020), https://beta.regulations.gov/comment/EOIR-2020-0003-6099; Harv. Immigr. and Refugee Clinical Program, Comment Letter on Proposed Rule, at 6–8 (July 15, 2020) [hereinafter HIRC Comment Letter], https://beta.regulations.gov/comment/EOIR-2020-0003-74314; Human Rights Initiative of North Texas, Comment Letter on Proposed Rule, at 2–3 (July 15, 2020), https://beta.regulations.gov/comment/EOIR-2020-0003-81732; UNHCR, Comment Letter on Proposed Rule, at 27–28 (July 15, 2020) [hereinafter UNHCR Comment Letter], https://beta.regulations.gov/comment/EOIR-2020-0003-5471.  The agencies failed to engage meaningfully with that evidence.  They also fail to acknowledge their specific departure from prior USCIS guidance that expressly allows claims based on female genital mutilation/cutting.  *See* HIRC Comment Letter at **7** & n.33 (citing USCIS, *Female Genital Mutilation or Cutting (FGM/C)*, https://www.uscis.gov/fgmc (last modified June 15, 2018)).

231.    In the preamble to the Rule, Defendants treat the Rule as doing something other than what it says.  The preamble includes statements suggesting that the bar is actually based not on nexus considerations but on the agencies' view that gender cannot be the basis for PSGs.  *See*

Rule, 85 Fed. Reg. at 80,334 (quoting *Niang v. Gonzales*, 422 F.3d at 1200, for the proposition that "the question is whether the protesting women constitute a social group," and asserting that this "tracks the rule"); *id.* at 80,335 (suggesting that the INA contains no protection against gender-based persecution). It also contains statements suggesting that the bar applies only to claims premised *solely* on gender. *See id.* (stating that "gender, without more, will not generally result in favorable adjudication" and that "a claim based on gender alone will generally be insufficient"). Even if those readings were consistent with the plain text of the regulations promulgated by the Rule, they would not bring the gender bar into compliance with the APA.

232. Even under Defendants' limiting interpretations, the gender bar would not bear any rational relationship to its stated purpose of improving judicial efficiency.

233. Further, a "gender" bar based on PSG requirements instead of nexus would remain arbitrary and capricious. Gender forms a quintessential basis for a PSG because it is, like the other protected grounds in the INA, immutable and widely recognized. *See, e.g.*, *De Pena-Paniagua*, 957 F.3d at 96; *Matter of Acosta*, 19 I. & N. Dec. at 233. Precluding gender-based PSGs would accordingly constitute an unreasonable interpretation of the INA. In addition, any attempt to limit PSGs under the heading of nexus is categorically arbitrary and capricious because it represents an unacknowledged change in the law. The agencies also failed to respond to commenters who objected on this ground. *See, e.g.*, Tahirih Comment Letter at 30.

234. Defendants' attempt to limit the ambit of the bar to claims based on gender alone also could not save the bar even if it were a permissible interpretation of the Rule's plain text. The Rule's stated rationale for this construction is that PSGs based on gender can "encompass[ ] millions of individuals." Rule, 85 Fed. Reg. at 80,334 (citation omitted). But Defendants do not, because they cannot, enunciate any reason why the size of a PSG means that a finding of nexus

will generally be barred.  Further, commenters noted that precluding asylum claims simply because a group is large unreasonably interprets the INA, which allows claims based on race, religion, and other grounds that can place an individual in a sizeable minority—or even the majority—in her country.  Tahirih Comment Letter 30–32.  And Defendants failed to respond.

### 3. The Rule's "Gender" Bar Violates the Equal Protection Clause

235.    The Equal Protection Clause provides that no State shall "deny to any person within its jurisdiction the equal protection of the laws."  U.S. Const. amend. XIV, § 1.  This prohibition extends to the federal government through the Fifth Amendment's Due Process Clause.  *See, e.g.*, *Bolling v. Sharpe*, 347 U.S. 497, 499–500 (1954) ("The Fifth Amendment . . . does not contain an equal protection clause as does the Fourteenth Amendment, which applies only to the states," but "it would be unthinkable that the same Constitution would impose a lesser duty on the Federal Government.").

236.    Courts have generally regarded federal legislation that differentiates on the basis of gender as presumptively invalid: "classifications based on gender also call for a heightened standard of review.  That factor generally provides no sensible ground for differential treatment." *City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 440 (1985); *see also Sessions v. Morales-Santana*, 137 S. Ct. 1678, 1690 (2017) ("Successful defense of legislation that differentiates on the basis of gender, we have reiterated, requires an 'exceedingly persuasive justification.'")  The federal courts apply heightened scrutiny to regulations that draw distinctions on the basis of gender.  To withstand that scrutiny, "classifications by gender must serve important governmental objectives and must be substantially related to achievement of those objectives."  *Craig v. Boren*, 429 U.S. 190, 197 (1976).  Defendants neither identify the

important governmental objectives served by the gender bar nor explain how the bar is substantially related to achievement of those objectives.

### 4.     The Rule's Bars on Claims Involving Interpersonal Animus Are Contrary to Law and Arbitrary and Capricious

237.     The provisions of the Rule generally requiring adjudicators to deny claims involving "interpersonal animus or retribution" and "interpersonal animus in which the alleged persecutor has not targeted, or manifested in animus against, other members of alleged particular social group in addition to the member who raised the claim at issue," Rule, 85 Fed. Reg. at 80,385, violate the APA for several reasons.

238.     First, the Rule is contrary to law.  The INA nowhere suggests that a persecutor's "interpersonal animus" or his failure to target others can disqualify a survivor from eligibility for asylum.  To the contrary, there can be no doubt that a person can be a victim of violence that qualifies both as interpersonal animus *and* persecution on account of a protected ground.  Similarly, a victim can suffer persecution on account of a protected ground even if the persecutor has not inflicted similar violence on others.  Thus, under the guise of the nexus standard, the Rule bars claims that satisfy the statutory prerequisites to asylum.  8 U.S.C. §§ 1101(a)(42)(A), 1158(b)(1)(A).

239.     The rule also violates the INA's "one central reason" standard.  The preamble to the Rule expressly states that, to elide the Rule's bar, the asylum seeker must show that her "dispute with the persecutor is in fact on account of the protected ground *and not on account of a non-protected personal concern*."  Rule, 85 Fed. Reg. at 80,331 (emphasis added).  This language flatly precludes claims based on mixed motives—and does so despite Defendants' repeated insistence that the Rule does not have that effect, *see*, *e.g.*, *id.* at 80,330.

240.    Second, the Rule is arbitrary and capricious because it fails to reasonably consider the harms it would entail.  For example, as commenters noted, the Rule would require survivors of persecution to undertake the impossible task of determining whether their persecutors have also harmed others—while fleeing for their lives.  *See* Ayuda Comment Letter at 31–32; CLINIC Comment Letter at 40.  Defendants' response—that individuals "should already have evidence about the persecutor's motives in order to advance a valid asylum claim in the first instance, especially in cases where the alleged persecutor is the government," Rule, 85 Fed. Reg. at 80,331—is a blatant non-sequitur.  Evidence of motive takes many forms, including country-conditions evidence and statements toward the asylum seeker, that have nothing to do with whether the persecutor has harmed others.  And the agencies provide no evidence or justification for their absurd ipse dixit that "it is reasonable to expect" asylum seekers to know "whether the alleged persecutor has sought to harm other[s]."  *Id.*

241.    Third, the Rule is contrary to the evidence before the agencies.  Persecutors often commit violence against those they know best—and such violence is frequently inflicted at least in part because of a protected characteristic.  Commenters submitted extensive evidence demonstrating that "interpersonal animus" may well co-exist with persecution.  *E.g.*, Tahirih Comment Letter at 19–25; Catholic Charities Community Services, Archdiocese of New York, Comment Letter on Proposed Rule, at 41 (July 15, 2020) [hereinafter Catholic Charities Comment Letter], https://beta.regulations.gov/comment/EOIR-2020-0003-5021; Ayuda Comment Letter at 32–33; Center Global, Comment Letter on Proposed Rule, at 4–5 (July 15, 2020), https://beta.regulations.gov/comment/EOIR-2020-0003-82120; Ctr. for Gender & Refugee Studies, Comment Letter on Proposed Rule, at 25 (July 15, 2020) [hereinafter CGRS Comment Letter], https://beta.regulations.gov/comment/EOIR-2020-0003-6004.  They also

submitted evidence that decades of research make clear that gender-based violence, including

domestic violence, inflicted by partners or family members is not generally a private matter

based on personal animosity.  *E.g.*, Tahirih Comment Letter at 23; Human Rights Watch,

Comment Letter on Proposed Rule, at 2–4 (July 14, 2020) [hereinafter HRW Comment Letter],

https://beta.regulations.gov/comment/EOIR-2020-0003-4755; Oxfam Comment Letter at 26–27.

The Defendants simply ignored this evidence.

242.     Fourth, the Rule would arbitrarily and capriciously preclude the first victim of a

persecutor from asylum *because* she is the first victim.  *E.g.*, CLINIC Comment Letter at 40.

Unsurprisingly, the agencies make no effort to defend this result.  Instead, they mischaracterize

comments as "necessarily presum[ing] both that there are other victims and that the [asylum

seeker] knows or will know of them."  Rule, 85 Fed. Reg. at 80,331 n.52.  Not so: The victim of

a persecutor who persecutes no one else at all, or who never learns of the persecutors'

victimization of others, is still entitled to asylum under the INA—but not under the Rule.

243.     Fifth, the Rule is arbitrary because it represents an unacknowledged departure

from USCIS's previous practice, under which "evidence that the persecutor seeks to harm others

is relevant" but "not required."  *See* USCIS, *RAIO Directorate – Officer Training: Nexus And

The Protected Grounds*, 19 (2019), https://www.uscis.gov/sites/default/files/files/

nativedocuments/Nexus_minus_PSG_RAIO_Lesson_Plan.pdf.  While agencies have some

authority to interpret the law where Congress has left the room to do so, they cannot reverse

course without reasoned analysis.  Here, they have done just that.

244.     Finally, Defendants have not rationally explained their use of the word

"interpersonal."  The Rule does not formally define "interpersonal," which means that it must be

given its plain meaning of "between people."  *Interpersonal*, Merriam-Webster, https://

www.merriam-webster.com/dictionary/interpersonal (last visited Jan. 10, 2021).  Thus, under the

plain meaning of the word, *all* animus is interpersonal.  In responding to comments to that effect,

Defendants disclaim the plain meaning of the term—and they do so in inconsistent ways.  In

discussing the general "interpersonal" bar, the agencies state that "interpersonal" means "a

personal dispute between two people," such as "a property dispute that causes some sort of

altercation."  Rule, 85 Fed. Reg. at 80,330.  In discussing the bar on "interpersonal" claims

absent evidence that the persecutor victimized others, however, Defendants state that

"interpersonal" covers any "dispute between two private parties" as opposed to disputes

"between a private party and a government official."  *Id.* at 80,331.  Defendants' use of two non-

standard meanings of the same word in the same regulatory provision is both illogical and

unexplained—and therefore arbitrary and capricious.

> 5.     **The Rule's Bars on Claims Related to Resisting Gang Recruitment and Political Opposition to Gangs Are Arbitrary and Capricious**

245.    The Rule forecloses asylum claims based on "resistance to [gang] recruitment" or

"generalized disapproval, disagreement, or opposition to" gangs and similar non-state actors

absent "expressive behavior in furtherance of a discrete cause against organizations related to

control of a state or expressive behavior that is antithetical to the State or a legal unit of the

State."  8 C.F.R. §§ 208.1(f), 1208.1(f) (2021).

246.    The bars are arbitrary and capricious because they do not further their stated goal:

to "provide clearer guidance on situations in which alleged acts of persecution would not be on

account of one of the five protected grounds" and to "further the expeditious consideration of

asylum and statutory withholding claims."  Rule, 85 Fed. Reg. at 80,320; NPRM, 85 Fed. Reg. at

36,281.  For example, the Rule does not explain what counts as "expressive behavior" against a

gang or "generalized opposition."  Thus, contrary to its purported purpose of leading to more "expeditious" adjudication, the Rule will create confusion and a lack of clarity for adjudicators.

247.    The gang-opposition bar is contrary to recent precedents in multiple circuits, recognizing that opposition to non-state actor violence can constitute a political opinion or form the basis of a particular social group.  *See, e.g.*, *Alvarez Lagos v. Barr*, 927 F.3d 236 at 254–55 (4th Cir. 2019); *Regalado-Escobar v. Holder*, 717 F.3d 724, 729 (9th Cir. 2013).  The Rule fails to acknowledge these cases or justify a departure from them.

248.    The Rule further deviates substantially, and without explanation, from USCIS's own recent training guidelines that emphasize the need for an individualized analysis of political opinion cases involving opposition to gangs.  *See* USCIS*, RAIO Directorate – Officer Training: Nexus And The Protected Grounds*, 19 (2019).  In response to comments raising these concerns, the Departments provided no rationale for the departure.

249.    Finally, the Rule is arbitrary and capricious because Defendants fail to respond at all to significant comments raising all these points.  *E.g.*, Ayuda Comment Letter at 34–35 (discussing case law to the contrary, substantial vagueness questions, and neutrality as political opinion).  In its response, Defendants failed to even register any of these issues in its summary of comments, let alone respond to or engage meaningfully with any of them.  Rule, 85 Fed. Reg. at 80,331–32.

## 6.    The Rule's Nexus Ban on Perceived Gang Affiliation Is Contrary to Law and Arbitrary and Capricious

250.    The Rule provides that claims based on "[p]erceived, past or present, gang affiliation" generally will not be favorably adjudicated.  8 C.F.R. §§ 208.1(f), 1208.1(f) (2021).

251.    This bar is contrary to the INA; Congress has already enumerated the specific types of past conduct that would bar otherwise eligible individuals from receiving asylum.  8

U.S.C. § 1158(b)(2).  Actual or perceived gang affiliation is not among those bars, and expanding those statutory categories exceeds Defendants' authority.

252.    Defendants seek to justify this bar by appealing to prior case law.  Defendants, however, rely only on one circuit court case, and that case, which rejects a particular social group and does not rely on a nexus analysis, cannot support a general bar on claims of perceived gang affiliation.  Rule, 85 Fed. Reg. at 80,333.  Moreover, Defendants failed to consider or discuss the significant case law cited in the comments, and the Rule otherwise provides no rational justification to the bar.

253.    The gang-affiliation bar is arbitrary and capricious because it offers no guidance to the "rare" exceptions on which it depends.  Indeed, Defendants refused to state even that a child forced into prostitution or drug smuggling as part of a criminal gang would be one of those rare exceptions, suggesting only that they "*may present argument* that their case sufficiently meets the nexus requirements based upon the specific facts in their application."  Rule, 85 Fed. Reg. at 80,333 (emphasis added).  In the absence of any guidance as to exceptions, the rule will neither advance efficiency nor be applied uniformly.

254.    Finally, the gang-affiliation bar is arbitrary and capricious because Defendants failed to consider the extensive case law and Congressional intent that are contrary to the bar. *See* Ayuda Comment Letter at 35–36; Asylum Seeker Advocacy Project, Comment Letter on Proposed Rule, at 25 (July 15, 2020) [hereinafter ASAP Comment Letter], https:// beta.regulations.gov/comment/EOIR-2020-0003-6043; Nat'l Immigrant Just.  Ctr., Comment Letter on Proposed Rule, at 47 (July 15, 2020) [hereinafter NIJC Comment Letter], https:// beta.regulations.gov/comment/EOIR-2020-0003-77333.

**D.**    **The Rule's Changes to PSGs Are Contrary to Law and Arbitrary and Capricious**

255.    Asylum seekers are eligible for relief if they demonstrate past persecution, or a fear of future persecution, on account of their membership in a particular social group ("PSG"). 8 U.S.C. §§ 1101(a)(42)(A), 1158(b)(a)(A).

256.    Both the BIA and international law have long recognized that a PSG is a group defined by an immutable characteristic.  *See, e.g.*, *Matter of Acosta*, 19 I. & N. Dec. at 233–34 (BIA 1985); UNHCR, "Guidelines on International Protection No. 2: 'Membership of a Particular Social Group' Within the Context of Article 1A(2) of the 1951 Convention and/or its 1967 Protocol Relating to the Status of Refugees," 7 May 2002, HCR/GIP/02/02 ( "UNHCR, Guidelines on Social Group"), http://www.unhcr.org/refworld/docid/3d36f23f4.html, para. 11.

257.    Decades later, the BIA imposed additional requirements on PSGs, mandating that they be "particular" and "socially distinct" in addition to being based on immutable characteristics.  *See Matter of S-E-G-*, 24 I. & N. Dec. 579, 582 (BIA 2008) (citing *Matter of A-M-E- & J-G-U-*, 24 I. & N. Dec. 69 (BIA 2007), and *Matter of C-A-*, 23 I. & N. Dec. 951 (BIA 2006)).  In the BIA's view, a PSG is "particular" if it is not "amorphous" but instead "sufficiently distinct" to "be recognized . . . as a discrete class of persons." *Id.* at 584.  The "social distinction" requirement requires the PSG "to be perceived as a group by society." *Matter of M-E-V-G-*, 26 I. & N. Dec. 227, 240 (BIA 2014).

258.    The BIA has also stated that PSGs cannot be impermissibly circular, meaning that the group cannot be "defined exclusively by the fact that its members have been subjected to harm." *Matter of M-E-V-G-*, 26 I. & N. Dec. at 242.

259.    Under both longstanding BIA precedent and international law, the PSG analysis must be conducted "on a case-by-case basis." *Matter of Acosta*, 19 I. & N. Dec. at 233; *see also,*

*e.g.*, *Matter of M-E-V-G-*, 26 I. & N. Dec. at 251; UNHCR, *Guidelines on International Protection No. 2: "Membership of a Particular Social group" within the context of Article 1A(2) of the 1951 Convention and/or its 1967 Protocol relating to the Status of Refugees* ¶ 3 (May 7, 2002), https://www.unhcr.org/en-us/publications/legal/3d58de2da/guidelines-international-protection-2-membership-particular-social-group.html.

260.    The Rule (i) states that claims based on PSGs involving an enumerated set of characteristics will generally be barred; (ii) creates a new, two-part definition of "circularity," and (iii) codifies the particularity and social distinction requirements.  All three changes violate the APA.

### 1.    The Rule Illegally Creates a New List of Disfavored PSGs

261.    The Rule establishes a new list of PSGs that immigration judges and asylum officers will, "in general, not favorably adjudicate."  Rule, 85 Fed. Reg. at 80,394.  Under the Rule, PSGs defined by the following characteristics are generally barred: (1) "past or present criminal activity or association (including gang membership)"; (2) "presence in a country with generalized violence or a high crime rate"; (3) "being the subject of a recruitment effort by criminal, terrorist, or persecutory groups"; (4) "the targeting of the applicant for criminal activity for financial gain based on perceptions of wealth or affluence"; (5) "interpersonal disputes of which governmental authorities were unaware or uninvolved"; (6) "private criminal acts of which governmental authorities were unaware or uninvolved"; (7) "past or present terrorist activity or association"; (8) "past or present persecutory activity or association"; or (9) "status as a[ non-citizen] returning from the United States."  *Id.*

262.    The Rule's list of generally barred PSGs is contrary to law.  Although it acknowledges that that an adjudicator must "determine whether the facts and evidence of each

individual case ultimately establish that the proposed particular social group is cognizable,"
Rule, 85 Fed. Reg. at 80,313, the Rule singles out the listed groups for uniquely unfavorable
treatment.  Doing so is contrary to the INA's "nondiscriminatory definition of refugee," *Bringas-Rodriguez v. Sessions*, 850 F.3d 1051, 1060 (9th Cir. 2017), which entitles anyone persecuted on
the basis of a PSG to relief regardless of the specific content of the group (*see* 8 U.S.C.
§ 1101(a)(42)(A)).

263.    Defendants have also failed to provide a reasoned justification for the list.
Instead, they rest on the bare assertion that groups based on the listed characteristics "generally
will not meet the particularity and social distinction requirements for particular social group,"
Rule, 85 Fed. Reg. at 80,314, and on citations to prior court opinions that do not impose a
general rule, *id.* at 80,313.

264.    Even if it were a reasoned justification, the Rule's assertion that the listed groups
generally do not satisfy PSG requirements would remain entirely implausible.  The assertion is
flatly belied by the Rule's own recognition that an adjudicator must "determine whether the facts
and evidence of each individual case ultimately establish that the proposed particular social
group is cognizable." *Id*.

265.    Defendants have also failed to acknowledge that the Rule's list of barred PSGs
constitutes a stark departure from preexisting law.  The Rule repeatedly asserts that its "general"
bar against PSGs defined by the listed characteristics is not a "categorical" bar.  *See* Rule, 85
Fed. Reg. at 80,287, 80,314, 80,315, 80318, 80,321.  The Rule, however, provides no exceptions
to its general rules and provides no description of any situation in which a PSG defined by any of
those characteristics could serve as the basis for asylum or withholding of removal.  *See* Rule, 85
Fed. Reg. at 80,310–18, 80,385, 80,394.  And a general rule with no exceptions is, and will

function as, a categorical rule.  The Rule therefore makes applicants who rely on PSGs defined by the listed characteristics categorically ineligible for asylum.[2]  The list thus constitutes a dramatic, but unrecognized, departure from the longstanding practice of adjudicating PSGs, and asylum claims more generally, on a case-by-case basis.

266.    Moreover, Defendants arbitrarily and capriciously failed to respond to comments that the list would function as a "near-dispositive presumption" against certain PSGs because it lacks any defined exceptions.  Tahirih Comment Letter at 17.

267.    The Rule specifically bars PSGs based on either "interpersonal disputes" or "private criminal acts" of which "governmental authorities were unaware or uninvolved."  The Rule states that these bars would apply to almost all claims of gender-based violence, Rule, 85 Fed. Reg. at 80,323, which are generally perpetrated by intimate partners (as in the case of domestic violence) or family members (as in the case of so-called "honor" killings and female genital mutilation/cutting).

268.    As an initial matter, the "interpersonal" category is contrary to law.  The Rule contains no definition of "interpersonal," and the plain and ordinary meaning of that term is so broad as to sweep in all disputes between and among people.[3]  *See supra* para. 244.  Further, there is no reasonable way to interpret the term "particular social group" as limited to situations in which the state was involved in violence or knew the violence was occurring.  The

---

[2]    In fact, because the Rule permits the "pretermission" of asylum applications that do not state a prima facie claim for relief, Rule, 85 Fed. Reg. at 80,302–10, any applicant who relies on PSGs defined by the listed characteristics will have her application denied without a hearing.

[3]    Defendants attempt to narrow the term in the preamble to the Rule, but they do so in different and contradictory ways.  *Compare* Rule, 85 Fed. Reg. at 80,330, *with id.* at 80,331.

"interpersonal" category thus bars claims in which a person has been persecuted on account of membership in a particular social group and is unable or unwilling to return to the country, in violation of the INA's definition of "refugee."

269. Defendants' use of "unaware or uninvolved," meanwhile, is arbitrary and capricious. As stated above, there is no way to reasonably interpret "particular social group" as containing a state-action or state-knowledge requirement.

270. Further, this standard wreaks an unacknowledged change in the definition of "persecution." For decades, it has been a settled principle that "persecution" may involve governmental "unwillingness or inability to control private conduct." *Matter of Acosta*, 19 I. & N. Dec. 211, 222 (BIA 1985). The Rule, however, substitutes "unaware or uninvolved" for "unwillingness or inability to control." 8 C.F.R. §§ 208.1(c), 1208.1(c) (2021). Defendants argue that this change makes no difference, because "social groups defined by private criminal acts of which governmental authorities were unaware or uninvolved" have never been cognizable. Rule, 85 Fed. Reg. at 80,323. But that statement is belied by decades of case law making clear that gender- and gang-based violence can give rise to claims for asylum—even if the government was not involved or notified about the violence. *See, e.g.*, *Aldana-Ramos v. Holder*, 757 F.3d 9, 17 (1st Cir. 2014); *Paloka v. Holder*, 762 F.3d 191, 195 (2d Cir. 2014). Defendants' failure to display awareness of the change in law or to explain is arbitrary and capricious.

271. Defendants' specific application of the "interpersonal" and "private" bars to claims premised on gender-based violence is also arbitrary and capricious. Commenters noted that such violence is *not* merely private or personal, and backed their comments with ample evidence that gender-based violence has deep social and cultural roots. *See, e.g.*, Tahirih

Comment Letter at 23–24; Ayuda Comment Letter at 31–32; ASISTA Comment Letter at 7; U.D.C. Immigr. Clinic Comment Letter at 9–10. Defendants, however, chose to ignore those comments and that evidence entirely.

272. Moreover, Defendants' stated rationales for the "interpersonal" and "private" bars are illogical. Citing the Attorney General's discussion of a specific PSG in *Matter of A-B-*, 27 I. & N. Dec. at 335, the Rule suggests that claims in the "interpersonal" and "private" categories are circularly "defined by the group members' vulnerability to private criminal activity." Rule, 85 Fed. Reg. at 80,323. Commenters, however, submitted evidence showing that the group discussed in *Matter of A-B-* is *not* defined circularly, Tahirih Comment Letter at 16—and Defendants failed to consider, much less respond to, that evidence.

273. Defendants also failed to respond to other significant comments. Defendants, for example, assert that claims premised on gender-based violence "likely lack the requisite particularity" because women and girls constitute a large proportion of every society. Rule, 85 Fed. Reg. at 80,323. Commenters, however, noted that precluding asylum claims simply because a group is large runs afoul of both the INA—which expressly permits claims brought by broad, sizeable groups of individuals—and international law. Tahirih Comment Letter at 30–31. Defendants failed to respond to these comments.

274. Commenters also told Defendants that the "unaware or uninvolved" requirement would perversely require survivors of persecution by non-state actors to report persecution to authorities—and expose themselves to the possibility of life-threatening retaliation—even where laws against gender-based violence are limited or non-existent. Tahirih Comment Letter at 23. Defendants ignored those comments and the inevitable effects of applying the "interpersonal" and "private" bars to survivors of gender-based violence. At least one commenter also noted the

effect the "unaware or uninvolved" requirement would have on those fleeing persecution perpetrated by gangs whom the state is unable or unwilling to control.  Requiring individuals fleeing gang-based violence to report that violence to authorities, who are often in corrupt relationships with and/or themselves physically threated by the gangs, will require those fleeing such violence to expose themselves to still greater risk of serious harm and even death prior to flight.  Roundtable of Former Immigr. Judges, Comment Letter on Proposed Rule, at 13 (July 13, 2020) [hereinafter IJ Roundtable Comment Letter], https://beta.regulations.gov/comment/EOIR-2020-0003-4734.  Defendants similarly ignored those comments and the inevitable effects of applying the "interpersonal" and "private" bars to survivors of gang violence.

275.    The Rule also specifically bars PSGs based on "past or present gang membership," which commenters noted was a severe departure from case law.  Ayuda Comment Letter at 35–36; Catholic Charities Comment Letter at 42.  Moreover, commenters noted that the effect of the "past or present gang membership" bar would preclude cases brought by individuals who show that their disassociation from the gang is rooted in their beliefs, including their religion, which often render the PSG even more particular and distinct, to the extent such requirements apply.  Although Defendants address these comments briefly, they ignore case law cited in the comments that holds that imposing such a requirement is "untenable as a matter of statutory interpretation and logic."  Ayuda Comment Letter at 35 (citation omitted); Rule, Fed. Reg. at 80,319.  Defendants likewise failed to consider or address comments that this part of the Rule uniquely harms survivors of human trafficking and does not address commenters' proposed alternative to mitigate the harm to such survivors.  Alliance to End Slavery & Trafficking, Comment Letter on Proposed Rule, at 7 (July 15, 2020) [hereinafter ATEST Comment Letter], https://beta.regulations.gov/comment/EOIR-2020-0003-78657; Loyola U. Chi. Ctr. for Human

Rights, Comment Letter on Proposed Rule, at 6 (July 15, 2020), https://beta.regulations.gov/comment/EOIR-2020-0003-4767.  Defendants also ignored comments that this limitation would also be uniquely harmful to children fleeing persecution.  Oxfam Comment Letter at 20; Young Center Comment Letter at 7–8.

276.    The Rule bars PSGs based on "being the subject of a recruitment effort" by a criminal group, such as a gang.  8 C.F.R. §§ 208.1(c); 1208.1(c).  Commenters repeatedly raised concerns about the effect of this dramatic change in law and pointed to evidence both of the significant departure from existing law and its detrimental effects on bona fide asylum seekers.  Ayuda Comment Letter at 33–34.  Here too, Defendants' primary response was to say that the bar is not a "blanket rule," without providing any detail as to what might constitute a showing of "more" such that an individual fleeing forced recruitment by a criminal enterprise might remain eligible for asylum.  Rule, 85 Fed. Reg. at 80,320.  Defendants failed completely to address commenters' concerns that the rule runs roughshod over complex PSGs that may be defined in part by being the subject of a recruitment effort but also by other factors of an individual's identity such as gender or family group.  Catholic Charities Comment Letter at 40–41.

### 2.    The Rule's Changes to the Anti-Circularity Principle Are Arbitrary and Capricious

277.    The Rule now sets out a novel, two-part test for "circularity," which requires that a PSG both (1) "exist independently of the alleged persecutory acts" and (2) "not be defined exclusively by the alleged harm" giving rise to the asylum claim.  Rule, 85 Fed. Reg. at 80,280.

278.    These two separate articulations of the circularity standard have previously been treated as interchangeable—each simply meant that a PSG could be defined in part, but not solely, by harm.  Commenters therefore noted that it was unclear how Defendants believed the formulations differ, and whether the Rule would depart from prior law by barring PSGs that are

only partially defined by harm.  Tahirih Comment Letter at 15–16.  Defendants did not respond to those comments and did not clarify the scope of the Rule.[4]

279.    The Rule is arbitrary and capricious to the extent that its two-part test broadens the definition of "circularity" to encompass PSGs that are not defined exclusively by harm.  The final Rule contains no reasoned justification for imposing a conjunctive two-part test.  *See* Rule, 85 Fed. Reg. at 80,316.  And although the proposed Rule suggested that the re-definition was necessary because of prior inconsistencies in case law, NPRM, 85 Fed. Reg. at 36,278 n.38, commenters pointed out, Tahirih Comment Letter at 15—and the final Rule does not dispute— that no such inconsistency exists.

280.    Commenters also pointed out that barring any PSG defined in part by harm would have absurd results.  Under that test, "'an unfreed slave in first century Rome' who is 'persecuted precisely because he had been enslaved' would [not] be able to seek relief."  Tahirih Comment Letter 15 (quoting *De Pena-Paniagua*, 957 F.3d at 94).  The Rule fails to address these absurd results.

281.    Commenters further noted that the rule is contrary to the evidence to the extent it would treat the PSG used by many survivors of domestic violence—i.e., women from a particular place or group who are unable to leave their relationship, *Matter of A-R-C-G-*, 26 I. & N. Dec. 388 (BIA 2014)—as categorically circular.  Tahirih Comment Letter at 16.  Such groups are, in some cases, defined in part by harm, because physical abuse can make it difficult to leave

---

[4]    The Rule's statement that it "codifies the Attorney General's analysis" in *Matter of A-B-*, 27 I. & N. Dec. at 334, does nothing to clarify matters, because it is unclear whether *Matter of A-B-* treats groups defined partly by persecution as circular (*De Pena-Paniagua v. Barr*, 957 F.3d 88, 93 (1st Cir. 2020)) or is "flatly inconsistent with" that approach (*Grace v. Barr*, 965 F.3d 883, 905 (D.C. Cir. 2020)).

a relationship.  But an inability to leave can also be caused by factors, such as economic

dependence and social or cultural norms, that are unrelated to physical abuse.  *See, e.g.*, *De*

*Pena-Paniagua*, 957 F.3d at 94.  Defendants again failed to respond.

### 3. The Rule's Particularity and Social Distinction Requirements Are Arbitrary and Capricious

282.    The Rule would require a PSG to be not only "based on an immutable or

fundamental characteristic" but also "defined with particularity" and "recognized as socially

distinct in the society at question."  8 C.F.R. §§ 208.1(c), 1208.1(c) (2021).

283.    These requirements cut against each other by forcing an asylum seeker to

"identify a group that is broad enough that the society as a whole recognizes it, but not so broad

that it fails particularity."  *W.G.A. v. Sessions*, 900 F.3d 957, 964 n.4 (7th Cir. 2018).  This

"create[s] a conceptual trap that is difficult, if not impossible, to navigate," and that has led the

BIA to effectively end grants of asylum based on PSGs that have not been previously approved.

*Id.*

284.    Commenters informed Defendants of this conceptual trap.  Tahirih Comment

Letter at 26.  Defendants, however, violated the APA by failing to mention, much less respond

to, those comments.

### E. The Rule's Restrictions on "Political Opinion" Violate the INA and the APA

285.    The INA makes eligible for asylum those persecuted on account of a "political

opinion."  8 U.S.C. §§ 1101(a)(42)(A), 1158(b)(1)(A).

286.    The Rule interprets the term "political opinion" to mean only an opinion

"expressed by or imputed to an applicant in which the applicant possesses an ideal or conviction

in support of the furtherance of a discrete cause related to political control of a state or a unit

thereof."  8 C.F.R. §§ 208.1(d), 1208.1(d) (2021).

287.     The Rule also specifies that Defendants will generally deny claims based on a "generalized disapproval of, disagreement with, or opposition to criminal, terrorist, gang, guerilla, or other non-state organizations" in the absence of "expressive behavior in furtherance of a cause against such organizations related to efforts by the State to control such organizations or behavior that is antithetical to or otherwise opposes the ruling legal entity of the State or a legal sub-unit of the State."  *Id*.

288.     Both of the Rule's restrictions on political opinion claims are contrary to law as well as arbitrary and capricious.

### 1.     The Rule's Restrictions on Political Opinion Claims Are Contrary to the INA

289.     The Rule interprets "political opinion" in a way that contradicts the plain, unambiguous meaning of that term.  "Political" opinions are not limited to questions over who should control the machinery of government.  The currently available definition of that term, to which Defendants cited in the Rule Discussion, 85 Fed. Reg. at 80,326, includes anything "of or relating to government, a government, or the conduct of government" and "of, relating to, involving, or involved in politics and especially party politics," among other possible definitions. *Political*, Merriam-Webster, https://www.merriam-webster.com/dictionary/political (last visited Jan. 12, 2021).  It is not limited to "political control of a state or a unit thereof."  And both the uniform decisions of the federal courts and international law confirm that "political" has its usual, plain meaning in this context.  *See, e.g.*, *Saldarriaga v. Gonzales*, 402 F.3d 461, 466 (4th Cir. 2005); *Fatin*, 12 F.3d at 1242; UNHCR, Gender Guidelines, at 8.

290.     The Rule's general bar on claims involving anti-gang opinions, meanwhile, is contrary to both the plain meaning of "political" and the plain meaning of "opinion."  In many countries, gangs and opinions about gangs directly implicate the machinery of the state, because

the government condones gang activity—or because gangs or other non-state actors serve as the de facto government and law enforcement.  *See, e.g.*, Al Otro Lado, Comment Letter on Proposed Rule, at 4 (July 15, 2020), https://beta.regulations.gov/comment/EOIR-2020-0003-5132; ABA Comment Letter on Proposed Rule, at 12 n.38 (July 15, 2020) [hereinafter ABA Comment Letter], https://beta.regulations.gov/comment/EOIR-2020-0003-84797; HIRC Comment Letter at 10; Am. Immigr. Council & Am. Immigr. Lawyers Ass'n, Comment Letter on Proposed Rule, at 7–8 (July 15, 2020) https://beta.regulations.gov/comment/EOIR-2020-0003-6023; Central Am. Legal Assistance, Comment Letter on Proposed Rule, at 10–11, https://beta.regulations.gov/comment/EOIR-2020-0003-5468; CGRS Comment Letter at 21; Int'l Refugee Assistance Project, Comment Letter on Proposed Rule, at 22–24 (July 15, 2020) [hereinafter IRAP Comment Letter], https://beta.regulations.gov/comment/EOIR-2020-0003-5998.  Furthermore, according to Defendants' own dictionary, an "opinion" is not tied to "expressive activity"; rather, it is simply "a view, judgment, or appraisal formed in the mind about a particular matter."  *Opinion*, Merriam-Webster, https://www.merriam-webster.com/dictionary/opinion (last visited Jan. 12, 2021).  Thus, as the Rule itself recognizes, 8 C.F.R. §§ 208.1(d), 1208.1(d) (2021), an individual can be eligible for asylum on the basis of *imputed* political opinions—i.e., opinions that a persecutor believes the individual holds, whether she actually does or not.  *See also, e.g.*, *Gao v. Gonzales*, 424 F.3d 122 (2d Cir. 2005); *Lopez Ordonez v. Barr*, 956 F.3d 238 (4th Cir. 2020); *Sangha v. INS*, 103 F.3d 1482 (9th Cir. 1997).

291.    Even if the term "political opinion" were ambiguous—and it is not—both the Rule's general interpretation of that term and its general bar on anti-gang opinions would be unreasonable.  Both restrictions would exclude opinions that are inarguably political in nature. As applied to the United States, for instance, the NPRM's cramped definition of "political"

would exclude opinions on quintessentially political topics such as criminal justice and civil

rights.  Tahirih Comment Letter at 37; ASAP Comment Letter at 30–33.  It would also exclude

advocacy for LGBTQ rights in countries where "'[h]omosexuality' is punished as a crime"

(N.Y.C. Anti-Violence Project, Comment Letter on Proposed Rule, at 26 (July 14, 2020);

Immigr. Equality, Comment Letter on Proposed Rule, at 16–18 (July 15, 2020) [hereinafter

Immigr. Equality Comment Letter], https://beta.regulations.gov/comment/EOIR-2020-0003-

85541) or opposition to female genital mutilation/cutting where that practice is sanctioned by the

state (Asian Pacific Institute on Gender-Based Violence, Comment Letter on Proposed Rule, at

7–8 (July 15, 2020), https://beta.regulations.gov/comment/EOIR-2020-0003-80316).

### 2. The Rule's Restrictions on Political Opinion Claims Are Arbitrary and Capricious

292.    The Rule asserts that "the purpose behind the amendments surrounding political

opinion is to provide clarity to adjudicators, avoid further strain on the INA's definition of

'refugee,' and to acknowledge that the statutory requirements and general understanding of

political opinion is intended to advance or further a discrete cause related to political control of a

state."  Rule, 85 Fed. Reg. at 80,325.

293.    The agencies, however, have provided no evidence that "political opinion" has

been the subject of any confusion in this country.  Commenters noted that the federal court

opinions applying the term are both striking in their uniformity and consistent with international

law.  Tahirih Comment Letter at 36; ABA Comment Letter at 10–12; Am. Gateways, Comment

Letter on Proposed Rule, at 36–38 (July 15, 2020) [hereinafter Am. Gateways Comment Letter],

https://beta.regulations.gov/comment/EOIR-2020-0003-5991; Nat'l Citizen and Immigr. Servs.

Council 119, Comment Letter on Proposed Rule, at 13–14 (July 15, 2020) [hereinafter Council

119 Comment Letter], https://beta.regulations.gov/comment/EOIR-2020-0003-6096; Capital

Area Immigrants' Rights Coalition, Comment Letter on Proposed Rule, at 45–46 (July 15, 2020), https://beta.regulations.gov/comment/EOIR-2020-0003-6001; CLINIC Comment Letter at 25–33.  The Rule notably fails to provide even a single domestic counterexample.

294.    Further, the agencies did not explain how the Rule would promote clarity.  And they failed to respond to comments noting that the Rule will promote confusion, rather than clarity, because it introduces undefined and novel terms and concepts, such as "discrete cause," "expressive behavior," and "political control of the state."  *See, e.g.*, Ayuda Comment Letter at 26; Am. Gateways Comment Letter at 39; ASAP Comment Letter at 30–31.

295.    Even if additional clarity were necessary—which it is not—and the Rule promoted clarity—which it does not—the agencies failed to consider any method of achieving clarity other than sharply narrowing the definition of political opinion.  Moreover, while acknowledging that they were changing the law, Rule, 85 Fed. Reg. at 80,325 & n.49, the agencies failed to consider the consequences of that change—namely, the severe human cost associated with curtailing asylum eligibility.

296.    The agencies also failed to explain how the Rule either eases "strain on the INA's definition of 'refugee'" or advances the "statutory requirements and general understanding of political opinion."  *Id.*  It does neither.  To the contrary, the Rule conflicts both with the plain meaning of "political opinion" and with Congress's intent in passing the Refugee Act to "eliminate[ ] the geographical and ideological restrictions" that applied to political opinion claims under prior U.S. law.  S. Rep. No. 96-256, *reprinted in* 1980 U.S.S.C.A.N. 141, 144 (1979); *see also, e.g.*, CLINIC Comment Letter at 25–26.

297.    The agencies' purported rationale for singling out claims based on anti-gang opinion for particularly unfavorable treatment is that, in their view, "the appropriate redress" for

gang violence "is not to broadly grant asylum on the basis of political opinion."  Rule, 85 Fed. Reg. at 80,326.  Congress could, of course, enact a statute embodying the agencies' view if it wished.  But the agencies' unexplained and unreasoned statement cannot justify a rule precluding claims that satisfy the plain language of the INA.

298.    The agencies' rationale for adding an "expressive behavior" requirement in cases involving anti-gang opinions is equally arbitrary and capricious.  The Rule states only that the agencies "are unaware of any claim rooted in political opinion that did not contain some type of expressive behavior" or of "how an opinion never uttered or conveyed could be recognized as a political opinion."  *Id*.  That statement is belied by comments—to which the agencies did not respond—noting the numerous cases in which asylum has been granted on the basis of imputed opinions.  *See, e.g.*, ASAP Comment Letter at 33–34; CLINIC Comment Letter at 32; Haitian Bridge Alliance, Comment Letter on Proposed Rule, at 10 n.42 (July 15, 2020), https:// beta.regulations.gov/comment/EOIR-2020-0003-79679.  It is also belied by comments pointing to UNHCR's guidance on political opinion claims, which makes clear that where it is reasonable "'to assume that [an individual's] opinions will sooner or later find expression,'" the individual "'can be considered to have a fear of persecution for reasons of political opinion.'"  *E.g.*, Am. Gateways Comment Letter at 38 & n.60 (quoting UNHCR, *Handbook* ¶ 82).

## F.    The Rule's Restrictions on the Definition of Persecution Are Contrary to Law and Arbitrary and Capricious

299.    The word "persecution" is not defined in the INA; it has been understood for decades to mean "threat[s] to the life or freedom of, or the infliction of suffering or harm upon, those who differ in a way regarded as offensive."  *Matter of Acosta*, 19 I. & N. Dec. at 222.

300.    It is well-settled that whether harm rises to the level of persecution must be resolved on a case-by-case basis.  *See, e.g.*, *Panoto v. Holder*, 770 F.3d 43, 46 (1st Cir. 2014);

*Herrera-Reyes v. Att'y Gen. of U.S.*, 952 F.3d 101, 110 (3d Cir. 2020); *Singh v. I.N.S.*, 94 F.3d
1353, 1359 (9th Cir. 1996).  The same principle governs under international law.  *See* UNHCR,
The UN Refugee Agency, Handbook on Procedures and Criteria for Determining Refugee Status
and Guidelines on International Protection (2019), https://www.unhcr.org/en-us/publications/
legal/5ddfcdc47/handbook-procedures-criteria-determining-refugee-status-under-1951-
convention.html.

301.    The Rule drastically narrows the definition of persecution, transforming it into an
"extreme concept" that includes only harm so severe that it "constitute[s] an 'exigent' threat."  8
C.F.R. §§ 208.1(e), 1208.1(e) (2021).

302.    The Rule also identifies a "non-exhaustive" list of circumstances that will not
constitute "persecution": (1) "generalized harm that arises out of civil, criminal, or military strife
in a country"; (2) "treatment that the United States regards as unfair, offensive, unjust, or even
unlawful or unconstitutional"; (3) "intermittent harassment, including brief detentions"; (4)
"threats with no actual effort to carry out the threats, except that particularized threats of severe
harm of an immediate and menacing nature made by an identified entity may constitute
persecution"; (5) "non-severe economic harm or property damage"; or (6) "laws or government
policies that are unenforced or infrequently enforced . . . unless there is credible evidence that
those laws or policies have been or would be applied to an applicant personally."  *Id.*

303.    The Rule's restrictive definition of "persecution" as covering only "extreme" and
"exigent" events is inconsistent with Congress's intent in enacting the Refugee Act and
arbitrarily and capriciously discards 35 years of law without either acknowledging or explaining
that change, *see* Rule, 85 Fed. Reg. at 80,327–28.  Further, the agencies promulgated the

restrictive definition without responding to significant comments criticizing the change, *e.g*, Ayuda Comment Letter at 27.

304.    By listing types of harm that categorically fail to rise to the level of persecution, meanwhile, the Rule impermissibly narrows the definition of "refugee" and contravenes the flexible, case-specific analysis required by the INA.  The Rule concedes that "Congress used the term persecution prior to the Refugee Act, and, accordingly, it is presumed that Congress intended for that pre-Refugee Act construction to continue to apply."  Rule, 85 Fed. Reg. at 80,327 (citing *Matter of Acosta*, 19 I. & N. Dec. at 222).  The Defendants ignore, however, that the definition Congress incorporated includes a requirement for case-by-case assessment of a claim of persecution.  *See Matter of Acosta*, 19 I. & N. Dec. at 223.  A list carving out categorical exclusions from the definition of "persecution" is accordingly contrary to law.

305.    The list in its entirety is also arbitrary and capricious.  The agencies have offered no rational justification for the list as a whole.  *See* Rule, 85 Fed. Reg. at 80,327–28.  Instead, the Rule contains the generalized and meaningless statement that there are a "wide range of cases interpreting 'persecution' for the purposes of the asylum laws," such that it was necessary to "define persecution and to better clarify what does and does not constitute persecution."  Rule, 85 Fed. Reg. at 80,327 (quoting NPRM, 85 Fed. Reg. at 36,280).  But even assuming existing law was unclear—a conclusion for which the Rule provides no basis—that fact does not require the agency to carve out categorical exclusions from persecution.  Further, none of the cases relied on in the NPRM as support for creating categorical bars abandon the longstanding case-by-case analysis.  *See* NPRM, 85 Fed. Reg. at 36,280.  Yet the agencies considered no other alternatives.

306.    The Defendants' only other purported justification is that "[s]ome of the standards implemented by this rule involve matters that the Federal courts have adjudicated inconsistently."  Rule, 85 Fed. Reg. at 80,327.  But the Defendants have not even attempted to show inconsistency relevant to any item on the list except for threats.  *See id.*; NPRM, 85 Fed. Reg. at 36,281 n.32.  Further, commenters pointed out that the case law on threats is in no way inconsistent, Tahirih Comment Letter at 39, and Defendants did not respond.

307.    The Defendants have also failed to acknowledge that their categorical list represents a sea change from the case-by-case requirement under prior law, much less to explain that departure.  *See* Rule, Fed. Reg. at 80,328.  They have also failed to acknowledge that the Rule departs from prior DHS policy, which likewise required a case-by-case assessment, and which contemplated inclusion of types of harms that the Rule bars.  *See* USCIS Training Module: Definition of Persecution and Eligibility Based on Past Persecution, AILA Doc. No. 17051034 (June 12, 2015), https://www.aila.org/infonet/uscis-training-module-definition-of-persecution.  And they have failed to meaningfully answer the many comments objecting to the Rule on these very grounds.  *See, e.g.*, Ayuda Comment Letter at 29; Catholic Legal Immigration Network, Inc., Comment Letter on Proposed Rule, 36 (July 15, 2020), https://beta.regulations.gov/comment/EOIR-2020-0003-4754; IRAP Comment Letter at 25; IJ Roundtable Comment Letter at 12; Am. Gateways Comment Letter at 39; ATEST Comment Letter at 9; Kids in Need of Defense, Comment Letter on Proposed Rule, at 13 (July 15, 2020) [hereinafter KIND Comment Letter], https://beta.regulations.gov/comment/EOIR-2020-0003-4763.

308.    In addition, the Rule's list arbitrarily changes the law with respect to cumulative harm.  Before the rule, the cumulative effect of repeated harm could always amount to persecution, even if none of the individual instances of harm rose to that level.  *See, e.g.*, *Karki v.*

*Holder*, 715 F.3d 792, 805 (10th Cir. 2013); *Fei Mei Cheng v. Att'y Gen. of the U.S.*, 623 F.3d

175, 192–94 (3d Cir. 2010).  The Rule, by contrast, precludes judges from holding that repeated

instances of its listed harms constitute persecution.  For example, by its plain language, the Rule

would require an adjudicator to find there was not persecution of an asylum seeker who was

detained repeatedly over the course of months or years, if each detention was considered "brief."

8 C.F.R. §§ 208.1(e), 1208.1(e) (2021).  The agencies failed to acknowledge as much, *see* Rule,

85 Fed. Reg. at 80,327, and also failed to address comments on this point, *see* IJ Roundtable

Comment Letter at 12; Immigr. Equality Comment Letter at 19; Lambda Legal Comment Letter

at 5; UnLocal Inc., Comment Letter on Proposed Rule, at 6 (July 15, 2020), https://beta.

regulations.gov/comment/EOIR-2020-0003-6059.

> 309.    Finally, the Rule's list of exclusions arbitrarily and capriciously sets the same

standard of persecution for all asylum seekers.  Widespread precedent acknowledges that the

characteristics of the victim contribute to whether conduct constitutes persecution.  For instance,

experiences that might not rise to the level of persecution when perpetrated against adults can

nevertheless constitute persecution when perpetrated against children.  *See, e.g.*, IJ Roundtable

Comment Letter at 12; Tahirih Comment Letter at 38.  The Rule's list eliminates that distinction,

categorically stating that persecution "does not include" the items it enumerates.  8 C.F.R.

§§ 208.1(e), 1208.1(e) (2021).  The agencies once again failed to acknowledge, or provide a

reasoned explanation for, this change.  *See* Rule, 85 Fed. Reg. at 80,328.  And by treating

children as adults for purposes of the persecution analysis, DHS has departed from its past

policies without explanation.  *Compare* Guidelines for Children's Asylum Claims, *Asylum Office

Basic Training Course* 36–37, USCIS (March 21, 2009), http://www.refworld.org/pdfid/

4f3e30152.pdf., *with RAIO Combined Training Program: Children's Claims* 44–45, USCIS

(Dec. 20, 2019), https://www.uscis.gov/sites/default/files/document/foia/Childrens_Claims_

LP_RAIO.pdf.

G.      **The Rule's Bar on Evidence that "Promotes Cultural Stereotypes" Excludes Relevant Country-Conditions Evidence and Is Arbitrary and Capricious**

310.    The INA requires applicants for asylum to carry the burden of showing their

eligibility for asylum.  8 U.S.C. § 1158(b)(1)(B)(i).  To do so, it provides that an applicant may

"present evidence on the [applicant's] own behalf and to cross-examine the witnesses presented

by the Government."  8 U.S.C. § 1229a(b)(4)(B) (emphasis added).  By regulation, immigration

judges "shall receive and consider material and relevant evidence."  8 C.F.R. § 1240.1(c).

311.    For decades, asylum seekers have submitted and adjudicators have accepted

evidence relating to country conditions and, more specifically, evidence relating to cultures and

subcultures in a country and the general treatment of particular groups in a country.  Such

evidence is often necessary to demonstrate the existence of a particular social group, which—

under BIA precedent—must be particular and distinct within a given society.  It is also often

required to, among other things, show nexus or to rebut the government's evidence concerning

the reasonableness of internal relocation within a given country.  Tahirih Comment Letter at 35.

312.    The Rule purports to bar "evidence in support of" an asylum application "which

promotes cultural stereotypes about a country, its inhabitants, or an alleged persecutor, including

stereotypes based on race, religion, nationality, or gender."  8 C.F.R. §§ 208.1(g), 1208.1(g)

(2021).

313.    This evidentiary bar is arbitrary and capricious.  The agencies seek to justify their

bar by stating that "stereotypes are not subject to verification and have little intrinsic probative

value" and that their use is "inconsistent with the individualized consideration asylum claims

require."  Rule, 85 Fed. Reg. at 80,336; *see also* NPRM, 85 Fed. Reg. at 80,336–37 (referring to

the portion of *Matter of A-B-* that disapproved "conclusory assertions").  The Rule's justification thus goes to problems with stereotypes themselves.  But this justification is both too broad and too narrow to fit the Rule: On one hand, the Rule does not bar all stereotypes; by barring only evidence "in support of asylum applications," it allows DHS to rely on stereotypes.  On the other hand, the Rule's restriction on asylum seekers does not bar only stereotypes; rather, it bars any evidence that—in an adjudicator's view—"promotes cultural stereotypes."  There are accordingly two mismatches between the Rule's content and its justification.

314.    In fact, the Rule will bar the presentation of legitimate country-conditions evidence that does not consist of mere stereotypes but is instead grounded in data and experience.  The Rule declines to define the term "cultural stereotypes" or the term "promotes." *See* Rule, 85 Fed. Reg. at 80,337–38.  Defendants, however, have drawn a distinction between evidence of countrywide "laws or policies" and evidence of countrywide culture.  *Id.* at 80,337. And they cite as their only example a statement—that "Guatemala had a culture of machismo and family violence" (*id.*)—that can be, and is, verified by significant data about conditions and prevailing beliefs in that country.  *See, e.g.*, Tahirih Comment Letter at 34–35.  There can thus be little question that the intent of the Rule is therefore to preclude any and all evidence about beliefs, norms, and mores in a country, in favor of an incomplete and often misleading focus solely on official laws and policies.

315.    That result is arbitrary and capricious.  The Rule never acknowledges or justifies a bar on all evidence of countrywide social and cultural conditions—or a bar on anything beyond actual stereotypes.  Moreover, Defendants did not consider or respond to comments pointing out that the Rule would reach well beyond stereotypes.  *See, e.g.*, Am. Gateways Comment Letter at 49–51; Tahirih Comment Letter at 34–35; Ayuda Comment Letter at 36–37; CLINIC Comment

84

Letter at 45; Asylum Works, Comment Letter on Proposed Rule, at 13–14 (July 15, 2020),

https://beta.regulations.gov/comment/EOIR-2020-0003-6132.  And Defendants did not consider

the important question of what evidence an asylum seeker could supply to meet her various

burdens in lieu of evidence about the society and culture from which she came—especially

where widespread practices are not enshrined in law or official policy.  *See* Tahirih Comment

Letter at 33–35; HRW Comment Letter at 6–8; CLINIC Comment Letter at 44–45.

**H.**     **The Rule's Changes to Internal Relocation Are Contrary to Law and Arbitrary and Capricious**

316.     When an asylum applicant demonstrates past persecution on account of a

protected ground, the government may attempt to rebut the resulting presumption that the

applicant has a well-founded fear of future persecution by presenting evidence that internal

relocation within the applicant's home country would be reasonable.  8 C.F.R.

§§ 208.13(b)(1)(i)(B); 1208.13(b)(1)(i)(B).

317.     Similarly, where an applicant claims asylum solely on the basis of a fear of future

persecution, the government may use evidence that internal relocation is reasonable to

demonstrate that the fear is not well-founded.  8 C.F.R. §§ 208.13(b)(2)(ii), 1208.13(b)(2)(ii).

318.     Any analysis of internal relocation must turn on "whether, under all the

circumstances of a particular case, internal relocation is a reasonable solution."  *Silva v. Ashcroft*,

394 F.3d 1, 8 (1st Cir. 2005); *accord, e.g.*, *Gambashidze v. Ashcroft*, 381 F.3d 187, 192 (3d Cir.

2004); *Eduard v. Ashcroft*, 379 F.3d 182, 194 (5th Cir. 2004); *Mohamed v. Ashcroft*, 396 F.3d

999, 1006 (8th Cir. 2005).  The former Immigration and Nationality Service adopted this broad

reasonableness standard to "compl[y] with our international obligations" under the Refugee

Convention.  DOJ, *Asylum Procedures*, 65 Fed. Reg. 76,121, 76,127 (Dec. 6, 2000); *see also,*

*e.g.*, UNHCR, Handbook on Procedures and Criteria for Determining Refugee Status ¶ 91 (1979, reissued 2019) [hereinafter UNHCR Handbook].

319.    The Rule replaces the factors that govern the internal relocation inquiry with factors that have little bearing on whether internal relocation is a reasonable solution in a given case.  In many cases, it also places the burden of proof on asylum seekers to provide evidence that their persecutors would have followed them to another part of their home country—evidence that is generally available only if a persecutor has already done so.  Both changes violate the APA.

### 1.    The Rule Arbitrarily and Capriciously Overhauls the Internal Relocation Analysis

320.    Under current law, "adjudicators should consider" five non-exhaustive factors when determining whether internal relocation is reasonable: (1) "whether the applicant would face other serious harm in the place of suggested relocation"; (2) "any ongoing civil strife in the country"; (3) "administrative, economic, or judicial infrastructure"; (4) "geographical limitations"; and (5) "social and cultural constraints, such as age, gender, health, and social and familial ties."  8 C.F.R. §§ 208.13(b)(3), 1208.13(b)(3).

321.    The Rule eliminates those factors and replaces them with four new considerations: (1) "the size of the country of nationality or last habitual residence"; (2) "the geographic locus of the alleged persecution"; (3) "the size, reach, or numerosity of the alleged persecutor"; and (4) "the applicant's demonstrated ability to relocate to the United States in order to apply for asylum."  Rule, 85 Fed. Reg. at 80,339 (citation omitted).

322.    This complete overhaul of the meaning of "internal relocation" is arbitrary and capricious.  The previous factors rationally recognized that relocation might, for a variety of reasons, be unreasonable even if an individual might be free from persecution in another area of

her home country.  *E.g.*, KIND Comment Letter at 19–20; UNHCR Comment Letter at 51–52.

Physical harm not inflicted on account of a protected ground provides a paradigmatic example.

So, too, do unaccompanied children and those who speak only local languages.

323.    The Rule effectively equates reasonableness with only the absence of persecution,

and it does so without providing any reasoned justification for that shift.  *See* Rule, 85 Fed. Reg.

at 80,338–40.

324.    The final Rule makes no attempt to explain either why Defendants eliminated the

previous factors or why they believe the new factors are more pertinent.  Instead, the Rule

repeatedly asserts, without reasoning, analysis, or evidence, that the new factors are more

relevant.  Rule, 85 Fed. Reg. at 80,338–39.

325.    They are not.  To the contrary, the Rule replaces factors that bear directly on that

inquiry with considerations that are far removed from it.

326.    The factors in current law reflect the on-the-ground realities faced by those

fleeing persecution.  It would, for example, be manifestly unreasonable to expect an asylum

seeker to relocate in her home country if she would "face other serious harm" in that location.

To take another example, the "administrative, economic, or judicial infrastructure" of a country

plays a significant role in determining whether officials in other parts of an asylum seeker's

home country have the ability to control persecutors.  *E.g.*, Tahirih Comment Letter at 40.

327.    In contrast, the new factors listed in the Rule lack relevance to the reasonableness

of internal relocation.  *E.g.*, Council 119 Comment Letter at 15–17.  For instance, the Rule

instructs adjudicators to consider an asylum seeker's "demonstrated ability to relocate to the

United States."  Rule, 85 Fed. Reg. at 80,281(citation omitted).  But an asylum seeker's ability to

transit to the United States says nothing about whether it would be reasonable for them to

87

permanently relocate within their country.  Further, because the INA requires that asylum

seekers be physically present in the United States to apply for relief, 8 U.S.C. § 1158(a)(1), this

factor will serve as a universal thumb on the scale against grants of asylum.  Asylum seekers will

automatically enter the asylum office or the immigration court with one strike already against

them.  Ayuda Comment Letter at 3.

328.    The agencies failed to take into account the realities faced by those who are

persecuted in their home countries.  A country is not safe because it is large—especially where

the persecution emanates from the state, which is by definition national in scope.  *E.g.*, ASAP

Comment Letter at 41.  The "'geographic locus' of the [alleged] persecution" is not meaningfully

connected to the reasonableness of internal relocation, because persecutors such as gangs

transcend local and even national boundaries.  Tahirih Comment Letter at 40–41; Human Rights

First, Comment Letter on Proposed Rule, at 17–18 (July 15, 2020), https://beta.regulations.gov/

comment/EOIR-2020-0003-6013.  Further, both the "geographic locus" factor and the "size"

factor assume that individuals or small groups who persecute others cannot, or will not, pursue

their victims.  In fact, intimate partners, families who commit crimes in the name of so-called

"honor," and other perpetrators routinely track down escaped victims—in order to inflict further

persecution as retribution for the escape.  Tahirih Comment Letter at 40–42, 50–51; Immigr.

Equality Comment Letter 30; Lambda Legal Comment Letter at 26–28; Legal Aid Justice

Center, Comment Letter on Proposed Rule, at 29–30 (July 15, 2020) [hereinafter LAJC

Comment Letter], https://beta.regulations.gov/comment/EOIR-2020-0003-6106; Oxfam

Comment Letter at 22–23; U.D.C. Immigr. Clinic Comment Letter at 16; UNHCR Comment

Letter at 52; Urban Just. Ctr. Domestic Violence Project, Comment Letter on Proposed Rule, at

10 (July 13, 2020), https://beta.regulations.gov/comment/EOIR-2020-0003-5974; Women's

Refugee Commission, Comment Letter on Proposed Rule, at 11 (July 15, 2020),

https://beta.regulations.gov/comment/EOIR-2020-0003-6061.

329.    Defendants also failed to meaningfully engage with comments pointing out that

the new factors bear no relationship to whether relocation is reasonable.  *See, e.g.*, Ayuda

Comment Letter at 37; Tahirih Comment Letter at 40.  In response to those comments,

Defendants concede "that persecutors may not be confined to political jurisdictions."  Rule, 85

Fed. Reg. at 80,339.  But Defendants then immediately dismiss any resulting concern by

repeating, without any rationale or supporting evidence, their belief that individual persecutors or

small organizations cannot or will not reach victims in other areas of a country.  *Id.*

## 2.    The Rule Impermissibly Shifts the Burden of Proof on Reasonableness of Internal Relocation

330.    Under current law, the government generally bears the burden of showing that

internal relocation would be reasonable in a given case.  8 C.F.R. §§ 208.13(b)(3)(i)–(ii),

1208.13(b)(3)(i)–(ii).  The only exception is for cases in which the applicant does not establish

past persecution and fears that future persecution will be inflicted by non-state actors.  *See id.*

331.    The Rule shifts the burden of proof, and forces asylum seekers to prove that

internal relocation would be unreasonable, in all cases in which "the persecutor is not the

government or a government-sponsored actor," even if the asylum seeker has shown past

persecution.  Rule, 85 Fed. Reg. at 80,389.

332.    Commenters explained that the only way for many asylum seekers to gather

objective evidence that a persecutor is willing to follow her, and continue persecution, is to

relocate internally and experience the continued persecution.  *E.g.*, Tahirih Comment Letter at

41–42.  The Rule thus effectively requires those fleeing gender- and gang-based harm to put their

lives at further risk in order to receive asylum in the United States.  The agency did not respond to these concerns or take into account this aspect of the problem.

333.    Moreover, the Rule's sole justification for shifting the burden of proof is contrary to the evidence before the agency and to other statements in the Rule.  The Rule asserts that "a private individual or organization would not ordinarily have [nationwide] reach."  Rule, 85 Fed. Reg. at 80,340.  As shown above, however, commenters provided evidence—including repeated statements by the agencies themselves—that persecutors *do* follow their victims within, and even between, countries.

334.    Finally, the burden-shifting provision in the Rule is arbitrary because the agencies failed to meaningfully engage with the evidence provided by commenters.  Instead, the agencies responded only with the ipse dixit that, "[w]hereas government or government- sponsored actors would generally be expected to have nationwide influence, a private individual or organization would not ordinarily have such reach."  Rule, 85 Fed. Reg. at 80,340.

I.    **The Rule's Changes to CAT Standards Are Contrary to Law and Arbitrary and Capricious**

335.    The Convention Against Torture obligates signatories never to "expel, return (refouler) or extradite" a person to a country "where there are substantial grounds for believing that he would be in danger of being subjected to torture."  CAT art. 3, adopted by U.N. General Assembly Dec. 10, 1984, S. Treaty Doc. No. 100-20 (1988), 1465 U.N.T.S. 85.  In 1998, Congress implemented CAT through the Foreign Affairs Reform and Restructuring Act of 1998 (FARRA).  See Pub. L. No. 105-277, div. G, § 2242, 112 Stat. 2681-761, 2681-822 (codified at 8 U.S.C. § 1231 note).

336.    To receive protection under CAT, an individual in removal proceedings must show that "it is more likely than not that he or she would be tortured if removed to the proposed

country of removal." 8 C.F.R. §§ 208.16(c)(2), 1208.16(c)(2). Torture is defined as "severe pain or suffering, whether physical or mental," when "intentionally inflicted on a person," for one of any number of purposes, including to extract a confession, to punish, to intimidate or coerce, or to discriminate. 8 C.F.R. §§ 208.18(a)(1), 1208.18(a)(1).

337. To qualify for CAT relief, an individual must show that torture would be "inflicted by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity." *Id*.

338. The Rule changes the definition of torture in two key ways: (1) it excludes acts of torture by an official not acting in an official capacity (i.e., under "color of law"), and (2) it heightens the pleading standard of "consent or acquiescence" to require "a finding of either actual knowledge or willful blindness," while he was also helping Rule define as awareness of "a *high probability* of activity constituting torture and deliberate[ ] avoid[ance]" of the truth. Rule, 85 Fed. Reg. at 80,284 (emphasis added).

### 1. The Rule Unlawfully Excludes Acts of Torture Conducted by Officials Who Are Not Acting in an Official Capacity

339. The Rule's requirement that an official be acting "under color of law" is contrary to the plain language of CAT and to federal law. CAT, and existing U.S. regulations, define torture as being perpetrated directly or indirectly by "a public official *or* other person acting in an official capacity." 8 C.F.R. §§ 208.18(a)(1), 1208.18(a)(1) (emphasis added). The Rule, however, would require that the perpetrators of torture be "public officials" *and* "acting in an official capacity," in order for the victim to qualify for CAT relief. The Rule would therefore deny relief to applicants who show that they are more likely than not to be tortured by officials who are using the cloak of their office for unofficial and even unlawful purposes. *See, e.g.*, *Barajas-Romero v. Lynch*, 846 F.3d 351 (9th Cir. 2017); *Khouzam v. Ashcroft*, 361 F.3d 161 (2d

Cir. 2004).  As an example, Plaintiff Ayuda commented that the new standard will deny asylum

to an individual who is the victim of government corruption so deep and entrenched that law

enforcement officials are using the authority of their position but acting contrary to their official

duties.  *See* Ayuda Comment Letter at 54.

340.    This is contrary to the plain language of CAT.  *Barajas-Romero v. Lynch*, 846

F.3d 351, 362–63 (9th Cir. 2017).  The Rule therefore also violates FARRA, which requires

agencies to implement regulations ensuring the United States complies with CAT.  FARRA §

2242(b).

341.    The Rule is arbitrary and capricious because it changes substantive policy without

justification.  As their purported explanation for overriding the language of CAT, the agencies

engage in a discombobulating seven-paragraph discussion of "rogue officials" and "under color

of law."  Rule, 85 Fed. Reg. at 80,368.  Those paragraphs amount to nothing more than a game

of vocabulary tag in which the terms "rogue officials," "under color of law," and "in an official

capacity" are each used to define the others without providing any other clarifying language.

Such word games cannot substitute for a reasoned explanation for the agencies' substantive

change to the law.

342.    To be sure, the agencies acknowledge this significant change in policy in a

footnote:

> The Departments recognize that this change departs from the language considered
> in Barajas-Romero v. Lynch, 846 F.3d 351, 362–63 (9th Cir. 2017), which
> allowed for the consideration of a CAT claim even when the alleged torture was
> carried out by a public official not acting in an official capacity.

Rule, 85 Fed. Reg. at 80,368 n.78.  But despite the agencies' claim to "have provided reasoned

explanations for this regulatory change," *id.*, the Rule never explains the agencies' "good

reasons" for the change or why they believe the change "is permissible under the statute." *See FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009).

> **2.      The Rule Arbitrarily and Capriciously Changes the Standard and Burden To Prove Acquiescence by a Public Official**

343.    Under current law, acquiescence has been broadly defined as "prior to the activity constituting torture, [the public official] hav[ing] awareness of such activity and thereafter breach[ing] his or her legal responsibility to intervene to prevent such activity."  8 C.F.R. §§ 208.18(a)(7), 1208.18(a)(7).  As the agencies concede, the "the purpose of requiring awareness, and not knowledge, 'is to make it clear that both actual knowledge and "willful blindness" fall within the definition of the term "acquiescence."'"  Rule, 85 Fed. Reg. at 80,369 (citing *Zheng v. Ashcroft*, 332 F.3d 1186, 1193 (9th Cir. 2003)); *see also* U.S. Senate Advice and Consent on Convention Against Torture, 101st Cong. (Oct. 27, 1990).  The federal courts have long construed awareness to include "willful blindness."  *See, e.g.*, *Silva-Rengifo v. Att'y Gen. of U.S.*, 473 F.3d 58 (3d Cir. 2007), *as amended* (Mar. 6, 2007); *De La Rosa v. Holder*, 598 F.3d 103 (2d Cir. 2010); *Lopez-Soto v. Ashcroft*, 383 F.3d 228 (4th Cir. 2004); *Hakim v. Holder*, 628 F.3d 151 (5th Cir. 2010); *Amir v. Gonzales*, 467 F.3d 921 (6th Cir. 2006); *Khystotodorov v. Mukasey*, 551 F.3d 775 (8th Cir. 2008); *Zheng v. Ashcroft*, 332 F.3d 1186 (9th Cir. 2003); *Cruz-Funez v. Gonzales*, 406 F.3d 1187 (10th Cir. 2005).  And under international law,

> where State authorities . . . know or have reasonable grounds to believe that acts of torture . . . are being committed by non-State officials or private actors and they fail to exercise due diligence to prevent, investigate, prosecute and punish [them] . . . , the State bears responsibility and its officials should be considered as . . . acquiescing in such impermissible acts.

U.N. Comm. Against Torture, General Comment No. 2: Implementation of article 2 by States parties ¶¶ 2, 4, 18, U.N. Doc CAT/C/GC/2 (2008), https://tbinternet.ohchr.org/_layouts/15/treatybodyexternal/Download.aspx?symbolno=CAT%2fC%2fGC%2f2&Lang=en.

344.    The Rule imposes a more restrictive definition of "acquiescence," requiring that the victim prove either actual knowledge or that a public official had awareness of "a *high probability* of activity constituting torture and *deliberately* avoided learning the truth," to qualify for CAT relief, Rule, 85 Fed. Reg. at 80,369 (emphases added).  The Rule emphasizes that "it is not enough that such a public official acting in an official capacity or other person acting in an official capacity was 'mistaken, recklessly disregarded the truth, or negligently failed to inquire.'"  *Id.*

345.    The Rule thus requires applicants to prove the state of mind of their torturer. CAT applicants, however, have no access to discovery from offending public officials to prove with records, documentary evidence, or witnesses the knowledge and motivations of the official. Even if they did, a mental state is difficult to establish.  As Plaintiff Ayuda explained in its comment, "unlike in the criminal context, the public official in a Torture Convention claim resides in another country and typically is not subject to cross examination and impeachment." Ayuda Comment Letter, at 54.  By requiring proof of matters that virtually no claimant will have access to, the Rule violates the language and purpose of CAT and Congress' implementing legislation.  8 U.S.C. § 1231 (1999).  *See* CAT art. 3(2) (requiring only substantial grounds for believing that an individual is in danger of being tortured, and further requiring taking into account all relevant considerations when making that determination).

346.    Comments to the NPRM made clear that the impact of this restrictive language will be profound.  The Rule's heightened "willful blindness" standard will cause great physical harm by closing off protection to victims of domestic violence in societies in which the government takes insufficient measures to protect these victims and in turn "insulate[s] many forms of gender-based torture [such as domestic violence] from the reach of [] the [CAT]."  *See*

Seton Hall U. Sch. of L. Ctr. for Social Just., Comment Letter on Proposed Rule, at 6 (July 15, 2020), https://beta.regulations.gov/comment/EOIR-2020-0003-6008 (alterations in original) (citation omitted); Innovation Law Lab, Comment Letter on Proposed Rule, at 14 (July 15, 2020), https://beta.regulations.gov/comment/EOIR-2020-0003-6022; WOLA, Comment Letter on Proposed Rule, at 4 (July 14, 2020), https://beta.regulations.gov/comment/EOIR-2020-0003-6113. Defendants acknowledged commenters' concerns regarding this heightened burden on torture victims but dismissed the concerns by making the nonresponsive point that current law requires a showing of willful blindness. Rule, 85 Fed. Reg. at 80,369. Defendants make no indication that they considered the harmful effects of their heightened standard on victims. They therefore failed to consider important aspects of the problem, in violation of the APA.

347. The Rule is also arbitrary and capricious because Defendants failed to address "obviously germane alternatives proposed by commenters during the notice-and-comment period." *Int'l Ladies Garment Workers' Union*, 722 F.2d, 795, 817–18 (D.C. Cir. 1983) (citing *Motor Vehicle Mfrs Ass'n v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 51 (1983)). Defendants acknowledge that there was a straightforward and reasonable solution to any ambiguity in the prior definition of "acquiescence": "Commenters asserted that the Departments, rather than creating a new definition for awareness, should instead codify the 'willful blindness' standard as articulated by the circuit courts of appeals." Rule, 85 Fed. Reg. at 80,369. Defendants' purport to adopt the comment but in fact replace the words "willful blindness" with a two-part test requiring showing (1) an awareness of a "high probability" of tortious conduct and (2) that the officer "deliberately avoided" learning the truth. Rule, 85 Fed. Reg. at 80,369; NPRM, 85 Fed. Reg. at 36,287. Defendants cannot claim they seriously considered the alternative posed by commenters, when they effectively dismiss the alternative without explanation.

348.     Where simply using the words "willful blindness" would have been consistent with prior policy and law, the new definition of "acquiescence" is longer, more ambiguous, and harder for an applicant to meet.  Indeed, in an attempt to justify the complex new two-part standard, Defendants are forced into a convoluted explanation of criminal law concepts of *mens rea* and *actus reus*, which are wholly inapposite in the immigration context.  Defendants provide no evidence that Congress intended for such a criminal law approach to applications for CAT relief.  The rejection of simple method to accomplish Defendants' stated goal without a rational articulation of the complex and restrictive method that Defendants adopt is arbitrary and capricious.

**J.     The Rule's New Discretionary Bars Are Contrary to Law and Arbitrary and Capricious**

349.     Congress has, by statute, specified carefully tailored exceptions to asylum eligibility.  These include (a) a one-year filing deadline (with exceptions), 8 U.S.C. § 1158(a)(2)(B), (b) a bar on those previously denied asylum in the United States (with exceptions), *id.* § 1158(a)(2)(C), and (c) a bar on those able to be removed to a safe third country with whom the United States has an agreement, *id.* § 1158(a)(2)(A).

350.     In addition, Congress has defined certain categories of individuals ineligible for asylum, which also function as bars to asylum, rendering ineligible those who (a) persecute others, (b) are convicted of a "particularly serious crime" in the United States, (c) have committed a "serious nonpolitical crime outside the United States," (d) represent a danger to U.S. security, (e) have engaged in "terrorist activity," or (f) have been firmly resettled in a third country prior to arrival in the United States.  *See id.* § 1158(b)(2)(A)(i)–(vi), (B)(2)(B)(i).

351.     Congress has also allowed adjudicators to exercise their discretion in granting or denying applications.  *See* 8 U.S.C. § 1158(b)(1)(A).  That discretion has been guided by case

law for decades, *see, e.g.*, *Matter of Pula*, 19 I. & N. Dec. 467 (BIA 1987), and requires

adjudicators to weigh adverse and favorable factors in adjudicating claims for asylum.

352.    The Rule contains new "discretionary" bars to asylum that reach far beyond, and

cannot be reconciled with, the narrow bars to asylum in the INA.

353.    The Rule sets forth three "significant adverse discretionary factors," which must

be considered and which would, if applicable, serve to bar an individual from asylum by

mandating a negative discretionary decision.  The significant adverse factors are (1) any

"unlawful entry or attempted unlawful entry" not "made in immediate flight from persecution in

a contiguous country" and not made "by [a non-citizen] under the age of 18 at the time the entry

or attempted entry was made" (the "unlawful entry bar"); (2) with trivial exceptions, "[t]he

failure . . . to apply for protection from persecution or torture in at least one" third country

through which an individual transited (together with "adverse discretionary factors" (1) and (2),

the "transit bars"); and (3) the "use of fraudulent documents to enter the United States" unless an

individual traveled to the United States directly from their home country (the "fraudulent

documents bar").  *See* 8 C.F.R. §§ 208.13(d)(1), 1208.13(d)(1) (2021).

354.    The Rule also sets forth nine additional "adverse factors," which would bar

asylum in all but "extraordinary circumstances."  These factors are (1) spending more than 14

days in almost any third country en route to the United States (with minor exceptions) (one of the

"transit bars"); (2) traveling through more than one country en route to the United States (with

minor exceptions) (one of the "transit bars"); (3) being subject to a criminal conviction or

sentence that would bar asylum "but for the reversal, vacatur, expungement, or modification of

[the] conviction or sentence" (the "convictions bar"); (4) accruing "more than one year of

unlawful presence" before applying for asylum (the "unlawful presence bar"); (5) failing to

timely file tax returns, satisfy outstanding tax obligations, or report "income that would result in a tax liability under section 1 of the Internal Revenue Code" (the "tax issues bar"); (6) the previous denial of two or more asylum applications (the "previous denial bar"); (7) a finding that the asylum seeker withdrew with prejudice or abandoned a prior asylum application (the "prior applications bar"); (8) failing to attend an asylum interview unless "exceptional" circumstances are present or "[t]he interview notice was not mailed to the last address provided . . . and neither the [non-citizen] nor the [non-citizen]'s representative received notice of the interview" (the "failure to attend an interview bar"); and (9) being "subject to a final order of removal, deportation, or exclusion" and failing to file a motion to reopen "based on changed country conditions within one year of those changes in country conditions" (the "failure to file a motion to reopen bar"). *See* 8 C.F.R. §§ 208.13(d)(2)(i)(A)–(I), 1208.13(d)(2)(i)(A)–(I) (2021).

355.   The Rule defines "extraordinary circumstances" to include "those involving national security or foreign policy considerations, or cases in which [a non-citizen], by clear and convincing evidence, demonstrates that the denial or referral (which may result in the denial by an immigration judge) of the application for asylum would result in exceptional and unusual hardship to the [non-citizen]." 8 C.F.R. §§ 208.13(d)(2)(ii), 1208.13(d)(2)(ii) (2021).  If such extraordinary circumstances are present, then the Secretary of Homeland Security "*may* favorably exercise discretion under section 208 of the [INA]." *Id.* (emphasis added). "Depending on the gravity of the [adverse factors], a showing of extraordinary circumstances might still be insufficient to warrant a favorable exercise of discretion under section 208 of the [INA]." *Id.*

1.      **The Discretionary Bars Are Contrary to Law and Exceed the Scope of the Agencies' Rulemaking Authority**

356.    Both the "significant adverse discretionary factors" and the "adverse factors" (each factor, a "discretionary bar," and collectively, the "discretionary bars") will function as categorical bars to asylum, despite Defendants' unsupported claims to the contrary.  The "adverse factors" have only exceedingly narrow exceptions and will "ordinarily result in the denial of asylum as a matter of discretion."  Rule, 85 Fed. Reg. at 80,282.  The "significantly adverse factors" have no defined exceptions at all—and are, on their face, entitled to more weight than the "adverse" factors.  It therefore appears that the "significantly adverse" factors can never be outweighed.  As a result, the discretionary bars are contrary to the statutory presumption in 8 U.S.C. § 1158(a)(1) that all refugees may apply for, and are eligible for, the remedy of asylum.

357.    The lists of discretionary bars exceed the scope of the Defendants' statutory authority.  Congress included in the INA eligibility bars, *see* 8 U.S.C. § 1158(b)(2)(A), and a provision permitting the Attorney General to establish, by regulation, "additional limitations and conditions, consistent with" § 1158, *see* 8 U.S.C. § 1158(b)(2)(C).  Defendants, however, do not have authority to impose their own list of additional eligibility bars.  *See Pangea Legal Servs. v. U.S. Dep't of Homeland Sec.*, No. 20-cv-07721-SI, 2020 WL 6802474, at *1 (N.D. Cal. Nov. 19, 2020).  Any attempt to do so exceeds the Defendants' authority afforded pursuant to the INA. *Id*.

358.    Moreover, the lists of discretionary bars are contrary to law because they conflict with the INA's statutory requirement of case-by-case adjudication.  The so-called discretionary bars labeled "significant adverse factors" that have no exceptions are not in practice

discretionary at all, and the narrow exceptions to the adverse factors do not provide sufficient leeway to allow for case-by-case consideration.

359.    Individually, many of the Rule's discretionary bars are also contrary to law and exceed Defendants' rulemaking authority.

360.    The unlawful entry bar (8 C.F.R. §§ 208.13(d)(1)(i), 1208.13(d)(1)(i) (2021)) violates the plain text of the INA.  Congress has specified in 8 U.S.C. § 1158(a)(1) that individuals are eligible for asylum "whether or not" they entered "at a designated port of arrival." Illegal Immigration Reform and Immigration Responsibility Act ("IIRIRA"), Pub. L. No. 104-208, 110 Stat. 3009-690 (1996).  The statute thus provides that anyone may apply for, and receive, asylum no matter their method of entry into the United States.  *See E. Bay Sanctuary Covenant*, 950 F.3d at 1275–76.  Given the statutory language, the bare fact of an unlawful entry cannot be given significant weight in the discretionary analysis, much less act as a bar to asylum.

361.    The increased weight given to illegal entries in the Rule is also contrary to the Refugee Convention, which precludes states from "impos[ing] penalties" on the basis of "illegal entry or presence."  Refugee Convention art. 31(1).  Further, the agencies fail to address the comments raised on this point.  *See* Amnesty Int'l, Comment Letter on Proposed Rule, at 13 (July 15, 2020) [hereinafter Amnesty Int'l Comment Letter], https://beta.regulations.gov/comment/EOIR-2020-0003-4760.

362.    The unlawful presence bar (8 C.F.R. §§ 208.13(d)(2)(i)(D), 1208.13(d)(2)(i)(D)) is also contrary to the INA.  Congress, in 8 U.S.C. § 1158(a)(2)(B), set a one-year filing deadline for asylum claims and, in 8 U.S.C. § 1158(a)(2)(D), created two notable exceptions to that time period.  The Rule would erase those exceptions and bar from asylum many if not most

individuals who could satisfy the statutory standard for exceptions to the one-year filing deadline.

363.    The transit bars (8 C.F.R. §§ 208.13(d)(1)(ii), 1208.13(d)(1)(ii) (2021), 8 C.F.R. §§ 208.13(d)(2)(i)(A)–(B), 1208.13(d)(2)(i)(A)–(B) (2021)) are inconsistent with Congress's judgment concerning the circumstances in which the United States may force individuals to apply for asylum in another country.  Congress enacted two statutory provisions on that topic: the "safe third country" bar and the "firm resettlement" bar.  The "[s]afe third country" bar states that an individual "may be removed, pursuant to a bilateral or multilateral agreement, to a [third] country . . . in which the [individual's] life or freedom would not be threatened on account of race, religion, nationality, membership in a particular social group, or political opinion, and where the [individual] would have access to a full and fair procedure for determining a claim to asylum or equivalent temporary protection."  8 U.S.C. § 1158(a)(2)(A).  The firm resettlement bar applies to any individual who "was firmly resettled in another country prior to arriving in the United States."  8 U.S.C. § 1158(b)(2)(A)(vi).  These statutory provisions are narrowly drawn and require asylum seekers to look to another country only if that country provides a "safe option," *see E. Bay Sanctuary Covenant v. Barr*, 964 F.3d 832 (9th Cir. 2020) (citing *Matter of B-R-*, 26 I. & N. Dec. 119, 122 (BIA 2013)), and take careful account of whether an asylum seeker has already received protection from the third country or, at the least, can avail himself of a full and fair asylum procedure in that country.  Therefore, to be consistent with the INA, any regulations requiring individuals to seek asylum in a third country must also be narrow and must take account of both the safety of those countries and the fairness of their asylum procedures. The transit bars meet none of these requirements set forth in the INA.

364.    The fraudulent documents bar (8 C.F.R. §§ 208.13(d)(1)(iii), 1208.13(d)(1)(iii) (2021)) is also contrary to the INA, which sets forth specific types of crimes that foreclose asylum, namely "aggravated felon[ies]."  8 U.S.C. § 1158(b)(2)(A)(ii), (B)(i).  Use of fraudulent documents to enter the United States is not defined as an aggravated felony in the INA.  This bar is also contrary to the INA because it all but forecloses the possibility of asylum based on how one enters the United States.  The INA permits an individual to apply for asylum without regard for how the individual enters the country and "irrespective of such [individual's] status."  8 U.S.C. § 1158(a)(1).

365.    Further, the Rule's convictions bar (8 C.F.R. §§ 208.13(d)(2)(i)(C), 1208.13(d)(2)(i)(C) (2021)) is contrary to the text of the INA.  The statute includes an explicit ineligibility bar for a non-citizen who "[has] been convicted by a final judgment of a particularly serious crime [and] constitutes a danger to the community of the United States."  8 U.S.C. § 1158(b)(2)(A)(ii).  The proposed bar, however, seeks to eliminate asylum based on a criminal conviction that has been vacated, expunged, or modified.  This cannot be squared with the text of the INA and, therefore, this proposed bar is contrary to law.

366.    The failure to file a motion to reopen bar (8 C.F.R. §§ 208.13(d)(2)(i)(I), 1208.13(d)(2)(i)(I) (2021)) is inconsistent with the text of 8 U.S.C. § 1229a(c)(7)(C)(ii), which expressly provides that "[t]here is no time limit on the filing of a motion to reopen" in an asylum proceeding.

### 2.    The Agencies Did Not Respond to Significant Comments

367.    As a general matter, the discretionary bars are arbitrary and capricious because the agencies failed to respond to significant comments concerning the bars as a whole.

368.     Defendants acknowledge voluminous comments and evidence demonstrating that the bars will preclude asylum grants in a huge percentage of cases, but utterly fail to consider or respond to this evidence.  *See, e.g.*, Rule, 85 Fed. Reg. at 80,342 ("Commenters expressed general concern that the [unlawful entry bar] would improperly lead adjudicators to deny 'virtually all' applications for asylum seekers who enter the United States between ports of entry.")  Defendants' bare statements that they disagree this outcome will occur, *see* Rule, 85 Fed. Reg. at 80,343, are insufficient to constitute reasoned decision-making.

369.     Further, commenters expressed "concern that the Departments seek to depart from the BIA's approach in *Matter of Pula*, 19 I. & N. Dec. 467 (BIA 1987)," in which the BIA held that "the danger of persecution should generally outweigh all but the most egregious of adverse factors."  Rule, 85 Fed. Reg. at 80,340–41; *see, e.g.*, Ayuda Comment Letter at 43.  The agencies' response was merely to state that "[t]he Departments clearly stated in the NPRM that the rule 'superseded' the BIA's approach in *Matter of Pula*, Rule, 85 Fed. Reg. at 36,285, which is squarely within their authority."  Rule, 85 Fed. Reg. at 80,342.  This is hardly a "reasoned explanation" for the change in policy as required by *Encino Motorcars, LLC v. Navarro.*

### 3.     The Agencies Failed to Consider Alternatives

370.     All of the discretionary bars are arbitrary and capricious because the Defendants failed to consider alternatives to the bars.  Most obviously, the agencies failed to consider simply allowing the immigration courts and the BIA to conduct a totality-of-the-circumstances analysis, as they have done for decades.  *See* Tahirih Comment Letter at 45; CLINIC Comment Letter at 51–52; LAJC Comment Letter at 18; Rule, 85 Fed. Reg. at 80,341 (acknowledging but then disregarding the BIA's practice).  In addition, the Defendants failed to meaningfully consider listing factors that weigh *in favor of* a grant of discretion, either instead of, or in addition to,

adverse factors.  *See* Tahirih Comment Letter at 45; IJN Comment Letter at 10; Rule, 85 Fed.

Reg. at 80,342 (stating in a conclusory fashion that "the rule does not preclude consideration of

positive factors" and "the rule allows for consideration of positive equities as part of an

adjudicator's discretionary analysis").

**4.      The Agencies Failed to Consider the Harm to Individuals**

371.    Several of the discretionary bars are arbitrary and capricious because the agencies

have failed to consider the real-world consequences of the bars.

372.    As to the unlawful presence bar, the Defendants have ignored ample and

uncontradicted evidence that the bar will penalize asylum seekers for the traumatic effects of the

persecution they suffered.  For example, an individual who has suffered trauma, either prior to or

once arriving in the United States, may require time to heal before he or she is sufficiently ready

to apply for asylum.  *See* Tahirih Comment Letter at 53–54.  The person may need to seek

medical assistance, treatment, and mental evaluations.  *Id.* at 54.  The Defendants failed to

respond to these considerations or otherwise address these scenarios.

373.    The unlawful presence bar, as well as the tax issues bar (8 C.F.R. §§

208.13(d)(2)(i)(E)(2021), 1208.13(d)(2)(i)(E)), the prior applications bar (8 C.F.R. §§

208.13(d)(2)(i)(F), 1208.13(d)(2)(i)(F) (2021)), the failure to attend an interview bar (8 C.F.R.

§§ 208.13(d)(2)(i)(H), 1208.13(d)(2)(i)(H) (2021)), and the failure to file a motion to reopen bar,

are particularly disadvantageous for survivors suffering from post-traumatic stress disorder or

intimate partner violence.  PTSD can severely disrupt day-to-day life and interfere with even

basic administrative tasks.  *See* Tahirih Comment Letter at 55 (citing Tahirih Justice Center,

*Precarious Protection: How Unsettled Policy and Current Laws Harm Women and Girls Fleeing*

*Persecution* (Oct. 2009)), https://www.tahirih.org/wp-content/uploads/2009/10/Precarious-

Protection_Tahirih-Justice-Center.pdf.; Alliance to End Slavery & Trafficking Comment at 11–

12.  Asylum-seeking survivors simultaneously experiencing intimate partner violence in the

United States constantly contend with their abusers' attempts to thwart their independence,

including preventing survivors from filing paperwork or paying bills, attending key appointments

with government agencies, or communicating with service providers trying to help them.

Tahirih Comment Letter at 55; *see also* Alliance to End Slavery & Trafficking Comment at 11–

12.  The Defendants entirely fail to consider this point or respond to the comments before them

374.    Further, the Defendants have not contemplated—as they must for a rational

determination—the possibility that people subject to the transit bars would be persecuted while

awaiting asylum adjudications in other countries.  Nor have they contemplated the possibility

that many countries through which asylum seekers pass lack asylum systems that are fair and

have the capacity to process more than a handful of claims.  *See* Tahirih Comment Letter at 51;

CLINIC Comment Letter at 55.

375.    Defendants have also failed to sufficiently consider, or respond to comments

about, the fact that the interaction of the transit bars with other DHS policies will cause arbitrary

denials of asylum.  For years, the agencies have "metered" entry at the U.S. southern border,

thereby forcing asylum seekers to wait in Mexico for months.  *See* Tahirih Comment Letter at

52.  Thus, even if an asylum seeker from Guatemala transited through Mexico in seven days and

approached a U.S. port of entry, U.S. government policy would render that person ineligible for

asylum by forcing her to remain present in Mexico for more than 14 days.  *Id.*  Defendants

simply state that such individuals may introduce evidence of metering as an extraordinary

circumstance.  Rule, 85 Fed. Reg. at 80,351.  However, given that evidence of an extraordinary

circumstance is by no means a guarantee that a discretionary bar can be overcome, the response

fails to consider the real-life harm presented by the transit bars.

376.    The Defendants also fail to address why the Rule does not provide special

protection or an exception for unaccompanied minors.  *E. Bay Sanctuary Covenant*, 964 F.3d at

853.  The agencies have thus "entirely failed to consider an important aspect of the problem."  *Id.*

at 854 (quoting *State Farm*, 463 U.S. at 43).

>    **5.    Many of the Bars Have No Rational Connection to Facts Identified by the Agencies**

377.    The multiple applications bar, the fraudulent documents bar, and the tax issues bar

are also arbitrary and capricious because Defendants have failed to articulate a rational

connection between the facts found and the choice to institute the bars.  *See Motor Vehicle Mfrs.*

*Ass'n v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 43 (1983).

378.    In fact, Defendants arbitrarily and capriciously failed to offer any justification

whatsoever for the multiple-applications bar.  *See* Rule, 85 Fed. Reg. at 80,358.

379.    Regarding the fraudulent documents bar, Defendants acknowledge that an

individual may need to use false documents to leave one's country.  Rule, 85 Fed. Reg. at

80,349; *see also* NPRM, 85 Fed. Reg. at 36,283 n.35 (recognizing that "the use of fraudulent

documents to escape the country of persecution should not itself be a significant adverse factor").

But they then make presenting fraudulent documents a "significantly adverse factor" unless the

individual arrives in the United States without transiting through a third country.  In doing so, the

Defendants recognize that an individual arriving "from a contiguous country . . . may simply be

carrying the documents he or she used to depart that country" but fail to acknowledge that the

same may very well be true for someone transiting through a third country whether on foot or by

plane.  Rule, 85 Fed. Reg. at 80,349.  Defendants also fail to recognize that an asylum seeker

using false documents to flee persecution does so no matter her country of origin, and that the use of fraudulent documents for the purpose of entry into the United States is different in kind from the use of false documents to file a fraudulent claim for relief. *See, e.g.*, *Gulla v. Gonzales*, 498 F.3d 911 (9th Cir. 2007); *Matter of Pula*, 19 I. & N. Dec. at 474. There is simply no rational basis for choosing to distinguish between individuals arriving from contiguous countries and those not; accordingly, the fraudulent documents bar is arbitrary.

380.    Regarding the tax issues bar, Defendants state that "all other individuals required to file tax returns in the United States are subject to negative consequences for failure to file required tax forms." Rule, 85 Fed. Reg. at 80,357. However, Defendants fail to acknowledge that, at worst, these individuals face penalties imposed by the U.S. Internal Revenue Services or state agencies. On the other hand, under the Rule, the "negative consequences" for asylum seekers include persecution, torture, and death. The two are not equivalent.

381.    Further, Defendants' justification fails to account for the fact that, unlike U.S. citizens, asylum seekers who fail to file taxes and report income are very likely do so because of DHS's own restrictions on Employment Authorization Documents ("EADs"), which have been tightened to such a degree that almost no asylum seeker is able to work legally while his or her case proceeds. *See* Tahirih Comment Letter at 54. DHS is therefore, at least to an extent, causing the application of this bar with another one of its rules. Further, DHS tightened the EAD restrictions knowing full well that depriving asylum seekers of work authorization would leave them destitute. *See id.* (citing DHS, *Asylum Application, Interview, and Employment Authorization for Applicants*, 85 Fed. Reg. 38,532, 38,567 (June 26, 2020) (advancing the chilling suggestion that "[a]sylum seekers who are concerned about homelessness . . . become familiar with the homelessness resources provided by the state where they intend to reside")).

### 6.     The Agencies' Justifications for the Discretionary Bars Are Contrary to the Evidence

382.     Defendants offer justifications for certain of the discretionary bars, including the unlawful entry bar and the transit bars, that are contrary to the evidence.  *See State Farm*, 463 U.S. at 43 (agency action is arbitrary and capricious if the agency "offer[s] an explanation for its decision that runs counter to the evidence before the agency").

383.     Defendants seek to justify the unlawful entry bar by stating that they "remain concerned by the immense strain on resources needed to process [non-citizens] who illegally enter the United States."  Rule, 85 Fed. Reg. at 80,343.  That statement is belied by DHS's own data, which shows that the number of people encountered by CBP along the Southwest border have plummeted: in fiscal year 2019, there were 977,509 encounters at the Southwest border, and in fiscal year 2020 there were 458,088, which is less than half of the prior year.  *See* CBP, *Southwest Border Migration*, https://www.cbp.gov/newsroom/stats/sw-border-migration.  And that drop cannot be written off as an artifact of COVID-19.

384.     Defendants also claim that "the Departments believe that there is a higher likelihood that [non-citizens] who fail to apply for protection in a country through which they transit en route to the United States are misusing the asylum system."  Rule, 85 Fed. Reg. at 80,346.  There is simply no evidence to support the Defendants' belief.  *See E. Bay Sanctuary Covenant*, 964 F.3d at 852–53.  There is a mountain of contrary evidence.  For example, there is ample evidence that Mexico is unsafe for many asylum seekers, including women, LGBTQI/H people, and anyone fleeing persecution in Central America.  Tahirih Comment Letter at 49–50  Similarly, there is ample evidence that women, LGBTQI/H people, and indigenous peoples are unsafe in all three Northern Triangle countries.  Tahirih Comment Letter at 50.  Persecution crosses borders.  This is certainly the case for survivors of gender-based and gang violence who

are often followed by their persecutors to wherever they try to escape, including neighboring

countries, where transnational criminal networks may make safety impossible.  Persecutors may

also enlist proxies to pursue, capture, punish, and return survivors to them.  A survivor of

gender-based violence might also face threats to her safety as a woman traveling alone in a

country of transit, or without permission from a male relative.  All of the available evidence thus

refutes the sole premise of the Rule's transit bars.

385.    Further, the Rule's transit bars are not tailored to prevent the kind of fraud the

agencies guess might occasionally occur.  A rule tailored in that way would, at a minimum,

include clear exceptions for anyone and everyone who might face persecution in countries

through which they traveled as well as categorical exceptions for third countries with asylum

systems that do not, or cannot, process significant numbers of applications.  The Rule has neither

feature.

**K.**    **The Rule's Changes to Firm Resettlement Are Contrary to Law and Arbitrary and Capricious**

386.    In 1996, Congress amended the INA to provide that an individual who "was

firmly resettled in another country prior to arriving in the United States" is ineligible for asylum.

IIRIRA, Pub. L. No. 104-208, 110 Stat. 3009-691 (1996) (codified at 8 U.S.C.

§ 1158(b)(2)(A)(vi)).

387.    The word "firm" means "fixed; stable," "continued steadily; remaining the same,"

or "unchanging; resolute; constant."  *Firm*, Webster's New World College Dictionary 509 (3d

ed. 1997).  And because to "settle" is "to establish as a resident or residents" (*id.* at 1228), to

"resettle" is to do so again.  To be "firmly resettled" in another country, then, is to become a

fixed, stable resident of that country.

388.     In keeping with the plain meaning of the statutory text, federal courts have interpreted "firm resettlement" to be "permanent resident status."  *See, e.g.*, *Sall v. Gonzales*, 437 F.3d 229, 235 (2d Cir. 2006); *Camposeco-Montejo v. Ashcroft*, 384 F.3d 814 (9th Cir. 2004). And federal regulation has long been in accord: Applicants could be "firmly resettled" only if they entered into a country with or received while there "an offer of permanent resident status, citizenship, or some other type of permanent resettlement."  8 C.F.R. § 208.15 (2020).

389.     The Rule vastly expands the definition of "firm resettlement" to include the following scenarios, if they occurred after the events giving rise to the individual's asylum claim:

> (1) The [non-citizen] resided in a country through which the [non-citizen] transited prior to arriving in or entering the United States and—
> (i) Received or was eligible for any permanent legal immigration status in that country;
> (ii) Resided in such a country with any non-permanent but indefinitely renewable legal immigration status . . . ; or
> (iii) Resided in such a country and could have applied for and obtained any non-permanent but indefinitely renewable legal immigration status in that country;
> (2) The [non-citizen] physically resided voluntarily, and without continuing to suffer persecution or torture, in any one country for one year or more after departing his country of nationality or last habitual residence and prior to arrival in or entry into the United States . . . ; or
> (3) (i) The [non-citizen] is a citizen of a country other than the one where the [non-citizen] alleges a fear of persecution and the [non-citizen] was present in that country after departing his country of nationality or last habitual residence and prior to arrival in or entry into the United States; or
> (ii) The [non-citizen] was a citizen of a country other than the one where the [non-citizen] alleges a fear of persecution, the [non-citizen] was present in that country after departing his country of nationality or last habitual residence and prior to arrival in or entry into the United States, and the [non-citizen] renounced that citizenship after arriving in the United States.

8 C.F.R. §§ 208.15(a), 1208.15(a) (2021).

390.     The Rule also shifts the burden of proof on firm resettlement from DHS to the asylum seeker whenever "the evidence of record indicates that the firm resettlement bar may apply."  *Id.* § 208.15(b)

### 1. The Rule Is Contrary to the Plain Meaning of "Firm Resettlement"

391. The Rule's redefinition of "firm resettlement" is contrary to the plain and unambiguous meaning of that term.

392. For instance, the Rule deems "firmly resettled" anyone who was theoretically eligible for, but had not received, permanent legal immigration status or who could have applied for, but does not have, non-permanent status.  In such cases, the individual lacks even an offer, let alone actual permission to reside under the laws of that country.  Such a status cannot, consistent with the English language, constitute "firm resettlement."

393. To take another example, the fact that a person has been in a country without facing persecution for one year or more says vanishingly little about whether that person is firmly resettled.

394. Because the Rule applies to individuals who have been in a given country for a year even if they have a well-founded fear of future persecution in that country, *see* Rule, 85 Fed. Reg. at 80,362, the Rule's attempt to redefine "firm resettlement" also contradicts the INA's definition of "refugee."

### 2. The Expansion of the Meaning of "Firm Resettlement" Is Arbitrary and Capricious.

395. Even if the phrase "firmly resettled" were ambiguous—and it is not—the Rule's definition of that term is both unreasonable and arbitrary and capricious.

396. The definitions do not rationally carry out the meaning of the statutory text, which bars asylum only when an applicant was "firmly settled in another country prior to arriving in the United States."  8 U.S.C. § 1158(b)(2)(A)(vi).  To the contrary, the new definitions undermine, rather than effect, the terms "firmly" and "resettled," and they remove entirely the key concepts

of an actual offer from the other country (which makes resettlement a legal possibility) and any hint of the permanence inherent in the idea of firmly or fixed.

397.    Moreover, the agencies' justifications for their dramatic expansions to this narrow asylum bar cannot pass muster.  The agencies invoke the "increased availability of resettlement opportunities," noting that "43 countries have signed the Refugee Convention since 1990."  Rule, 85 Fed. Reg. at 80,282 n.10.  As commenters pointed out, however, the fact that additional countries have signed the Refugee Convention since 1990 does not mean there are more meaningful opportunities for resettlement.  *See* Amnesty Int'l Comment Letter at 15; IRAP Comment Letter at 31.  Further, commenters provided evidence that the mere act of signing the Refugee Convention does not in fact mean that a country provides (1) actual and meaningful pathways to asylum or other status, (2) full and fair procedures, or (3) a safe haven that would permit refugees to avoid persecution.  *See* Tahirih Comment Letter at 43; Ayuda Comment Letter at 42; Amnesty Int'l Comment Letter at 15; IRAP Comment at 31.  The agencies did not respond to these comments, and their justification is contrary to the record evidence.

398.    The agencies' second justification for the expansion of "firm resettlement" is that the expansion purportedly advances the "interest of those genuinely in fear of persecution in attaining safety as soon as possible."  Rule, 85 Fed. Reg. at 80,282.  This justification, too, is contrary to the evidence.  As the comments and sources cited in comments make clear, passing through a country does not make it a safe or legal to settle there, and neither does the ability to stay in a country without authorization or status for a year.  To take just one example, a survivor of gender-based violence from Honduras who passes through Guatemala when fleeing Honduras is not likely to be safe from persecution in Guatemala.  Tahirih Comment Letter at 44

("[P]ersecutors are known to pursue survivors in neighboring countries after they try to escape.").

399.    The agencies also failed to consider an important aspect of the problem raised by commenters—namely, the interaction of their redefinition with the on-the-ground realities faced by asylum seekers.  Commenters made clear that asylum seekers—especially women and children—might be forced to take circuitous routes to the United States or to linger in unsafe countries through which they transit for reasons well beyond their control.  *See, e.g.*, Tahirih Comment Letter at 44.  Indeed, the Rule acknowledges that "[c]ommenters expressed concerns that the proposed provision does not include exceptions for individuals who are victims of trafficking, lack the financial means to leave a third country, or fear of persecution in the third country."  Rule, 85 Fed. Reg. at 80,362.  But the agencies failed to respond to those concerns, or to address the realities faced by asylum seekers, in any meaningful way.

400.    Separately, the COVID-19 pandemic has closed borders around the world for asylum seekers, including borders of signatories to the Convention, https://www.amnesty.org/en/latest/news/2020/06/east-africa-people-seeking-safety-are-trapped-at-borders-due-to-covid-19-measures/.  As a result, individuals may find themselves trapped and unable to reach a country in which they could reasonably apply for asylum.  The Rule would bar such asylum seekers from the U.S. asylum process due to no fault of their own.  This possibility has, however, not even been considered by the agencies.  *See* Ayuda Comment Letter at 42.

### 3.    The Rule Arbitrarily Shifts the Burden of Proof

401.    The BIA and the federal courts have uniformly placed the initial burden of proof on DHS to show that an individual was firmly resettled elsewhere prior to seeking asylum in the United States.  *Matter of A-G-G-*, 25 I. & N. Dec. at 501.

402.    The Rule, however, reverses that burden, stating that whenever "the evidence of record indicates that the firm resettlement bar *may* apply," the asylum seeker "shall bear the burden of proving the bar does not apply."  8 C.F.R. §§ 208.15(b), 1208.15(b) (2021) (emphasis added).  In other words, once DHS or an immigration judge spies the possibility of the firm resettlement bar, the asylum seeker will be required to prove that he or she could not have firmly resettled in a third country.

403.    The agencies failed to respond to significant comments related to this reversal. For example, the agencies failed to respond to comments that the shift in the burden of proof, in combination with the Rule's expansive redefinition of "firm resettlement," would require asylum seekers to undertake the impossible task of researching and providing evidence about immigration status in other countries.  *See, e.g.*, Lambda Legal Comment Letter at 28; *see also* LAJC Comment Letter at 32.  The agencies also failed to address comments noting that prior law reflected a balance between what DHS could reasonably show and what asylum seekers could reasonably show.  NIJC Comment Letter at 60–61.

404.    Instead of engaging with comments, the Rule claims that "[p]lacing a prima facie burden on DHS would . . . unnecessarily tax the agency's limited resources without any statutory or regulatory justification."  Rule, 85 Fed. Reg. at 80,365.  But that purported explanation is arbitrary and capricious because it is a problem of the agencies' own making: Absent the sweeping, illegal redefinition of "firm resettlement," the burden on DHS would be minimal.[5]

---

[5]    The Rule also asserts that placing the burden on DHS "appears to be in significant tension with existing regulations" on other topics that specify when DHS bears a burden of proof. Rule, 85 Fed. Reg. at 80,365.  That is, of course, no reason not to include a similar specification as to firm resettlement.

Further, the fact that DHS might be burdened provides no excuse for placing an equally heavy burden on asylum seekers—the party with *fewer* resources.

## L.      The Rule Harms Plaintiffs

405.    Like an individual plaintiff, an organization can assert standing on its own behalf on a showing of "actual or threatened injury in fact that is fairly traceable to the alleged illegal action and likely to be redressed by a favorable court decision." *Equal Rights Ctr. v. Post Props., Inc.*, 633 F.3d 1136, 1138 (D.C. Cir. 2011).  The test is satisfied if an organization can demonstrate that "the defendant's allegedly unlawful activities injured the plaintiff's interest in promoting its mission," and "the plaintiff used its resources to counteract that injury." *Am. Soc'y for the Prevention of Cruelty to Animals v. Feld Entm't Inc.*, 659 F.3d 13, 25 (D.C. Cir. 2011).

406.    Plaintiffs are nonprofit organizations with multiple locations across the country that (1) provide direct legal services to migrants fleeing violent persecution, including, for Ayuda, those in detention facilities, (2) provide training and educational programming to immigration practitioners and immigrant communities, and (3) provide social services and support to asylum seekers.  In addition, through its Project END, Ayuda provides legal services to individuals seeking to redress and recover from immigration legal services fraud and other fraudulent schema targeting low-income immigrants.  The Rule's drastic and illegal changes to well-established asylum rules and regulations will directly harm Plaintiffs and their clients. These harms will occur nationwide.

### 1.      The Rule Frustrates Plaintiffs' Missions

407.    Both Plaintiffs share a mission to support and provide legal services to as many low-income and vulnerable non-citizens as possible, including to asylum seekers.  For instance, Ayuda provides legal representation only to individuals earning at or below 300 percent of the

federal poverty guidelines.  Ayuda offers as many legal services as possible for free through grant-funded projects and also serves other clients unable to be served under grants through its low-bono fee program.  Ayuda does not turn away clients even in its low-bono fee program for inability to pay.  Tahirih provides free legal and social services to survivors of gender-based violence such as domestic abuse, sexual violence, and human trafficking.  The Rule frustrates Plaintiffs' missions because the extensive and new barriers to asylum it erects will make it far more difficult for Plaintiffs to serve their clients—many of whom the Rule will render ineligible for asylum.

408.    Because the Rule will make each case more complex and require significantly more time for attorneys to investigate and prepare to establish eligibility, the Rule will significantly reduce the number of cases in which Plaintiffs can support and represent asylum seekers.  Their attorneys and pro bono partners will need to expend an increased amount of time and resources on each client's case to establish eligibility under the Rule, so they will be unable to take as many cases.  The Plaintiffs will also need to expend an increased amount of time and resources on the cases of applicants who are barred from asylum by the Rule and bear the burden to meet a higher standard under the CAT.

## 2.    The Rule Diverts Resources from Core Programs and Services

409.    The Rule is also causing and will continue to cause Plaintiffs to divert resources from their core programs.  Before the Rule takes effect, each Plaintiff will need to expend significant resources—including by diverting resources from its core programs—to analyze and interpret the Rule, create new informational materials and resources to address the Rule, and provide training to its staff and advice to its clients.  In particular, Ayuda represents many child clients, including many children without a supportive adult in their lives to help them understand

116

the complexities of immigration law, and so Ayuda will have to dedicate substantial additional resources to making information about the new rule available and understandable to its child clients even beyond the resources necessary to train its staff to understand and adapt to these changes.

410.    Both Plaintiffs provide training and support to other practitioners and directly to immigrant communities.  The Rule will require them to expend substantial resources in the near term on tasks such as drafting client alerts, designing and hosting webinars, and updating any website content concerning asylum eligibility to provide guidance and training for those stakeholders.

411.    Tahirih has already diverted, and will be required to continue to divert, resources from representing clients, educating other service providers, and advocacy to training and educating its large network of affiliates, many of whom provide asylum representation, on the effects of the Rule.

412.    Likewise, Ayuda will also be required to divert its resources from asylum representation to education of its pro bono partners providing clients with full representation in asylum cases (and pro bono partners considering taking on new such cases) and its pro bono partners providing free immigration consultations to clients through Ayuda's advice and referral immigration consultation clinics, which Ayuda runs throughout the year to provide free immigration legal advice to individuals.  Ayuda anticipates hosting such pro bono clinics on a nearly monthly basis in early 2021.

413.    In addition, through Project END's work addressing immigration legal services fraud, Ayuda anticipates and is already preparing for an influx of individuals seeking help who have been or will be victimized by unscrupulous actors capitalizing on the uncertainty posed by

this dramatic shift in law.  Such cases are likely to include unscrupulous actors who, without their clients' knowledge, file incorrect, incomplete, or inaccurate applications.  Remedying the harms posed by those applications is likely to be become more difficult than ever before and require additional time and energy from Ayuda's limited Project END capacity, which as of January 2021 is supported by only a single dedicated funding stream of under $100,000.  Project END will have to adjust its community outreach work to prevent such fraud to incorporate education about this new role, diverting resources from ongoing representation and new cases addressing discrete cases of fraud.

414.    Both Plaintiffs also anticipate needing to substantially rework their existing training materials to ensure their staff and their pro bono networks understand the Rule's extensive new eligibility and processing framework requirements, especially on the complexities of framing particular social groups, which will take a tremendous amount of time and workforce effort that the Plaintiffs cannot afford to spare.

415.    Each of the tasks and expenses necessary to respond to the new Rule—including those described above—requires Plaintiffs to divert their finite resources from other aspects of the programs they provide.  As a result of the Rule, Plaintiffs anticipate the need to make changes including reallocating staffing, devoting less time to advocacy projects and community initiatives, and taking on fewer cases.

416.    The Rule will also jeopardize Plaintiffs' financial health.  The rendering of entire categories of Plaintiffs' clients ineligible for asylum frustrates not only Plaintiffs' missions, it also threatens its funding, some of which is directly tied to the number of clients the organization agrees to serve in a given period, or to progress made toward already established goals.  In addition, Ayuda serves some asylum-seekers through its low-bono fee program when grant

funding is unavailable to cover the costs of staffing their cases.  Ayuda revisits its fee structure only rarely, once every several years, and will not have the capacity to review or change its fee structure to encompass the new challenges posed by this Rule before it goes into effect.  Fees already do not cover the full costs of representation in asylum cases, and Ayuda will suffer further financial losses when the Rule goes into effect and requires significant additional time for attorneys with experience in the current structure to suddenly learn an entire new terrain of asylum law.  Because Ayuda does not decline or terminate representation due to clients' inability to pay, and because many clients are now deferring payments indefinitely because of the economic effects of the pandemic, even if Ayuda does revisit its fee structure in 2021, it anticipates continuing to suffer financial losses because of the changes brought about by this Rule, including not only additional time on each low-bono asylum case but also the inability to begin new cases because of the increased complexity of each individual case as a result of this rule.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
### Violation of the Appointments Clause, U.S. Const. art. II, § 2, cl. 2

417.    Plaintiffs repeat and incorporate by reference the preceding paragraphs of this Complaint as if fully set forth herein.

418.    The Secretary of Homeland Security is a principal officer of the United States whose appointment requires presidential nomination and Senate confirmation.

419.    The office of Secretary has not been filled with a Senate-confirmed presidential nominee for nearly 650 days.

420.    When Chad Wolf purported to approve the Rule, he was performing the functions and duties of the Secretary, even though he had not been confirmed by the Senate to that office, and even though there was no legal basis for him to exercise the Secretary's powers in an acting capacity under the HSA or the FVRA.

421.    Wolf's exercise of those powers without having been confirmed by the Senate or otherwise having the legal authority to exercise them violated the Appointments Clause. His purported approval of the Rule was therefore "not in accordance with law" and "contrary to constitutional . . . power," 5 U.S.C. § 706(2)(A), (B), and for that reason it must be set aside as unlawful under the APA, *see id.*

## SECOND CLAIM FOR RELIEF
### Violation of the Homeland Security Act, 6 U.S.C. § 113, the Federal Vacancies Reform Act, 5 U.S.C. § 3345 *et seq.*, and the Administrative Procedure Act, 5 U.S.C. § 706

422.    Plaintiffs repeat and incorporate by reference the preceding paragraphs of this Complaint as if fully set forth herein.

423.    Under the HSA, when the offices of Secretary, Deputy Secretary, and Under Secretary for Management are all vacant, a person may "serve as Acting Secretary" only if authorized to do so by a "further order of succession" that has been established by "the Secretary." 6 U.S.C. § 113(g)(2).

424.    According to the Department's further order of succession, Wolf was never eligible to be Acting Secretary. By occupying that position contrary to the Department's order of succession, Wolf violated the HSA. *Id.*

425.   The FVRA is "the exclusive means for temporarily authorizing an acting official to perform the functions and duties of any office" requiring Senate confirmation, unless, as relevant here, an alternative succession statute authorizes the appointment.  5 U.S.C. § 3347(a).

426.   If no acting official is lawfully filling a vacant office under the FVRA, *id.* §§ 3345, 3346, or under an alternative succession statute, *id.* § 3347, "the office shall remain vacant," *id.* § 3348(b)(1).

427.   By filling a vacant office in an acting capacity without authorization from the FVRA or any alternative succession statute, Wolf violated the FVRA.  *See id.* §§ 3347(a), 3348(b)(1).

428.   Because Wolf was serving as Acting Secretary and exercising the powers of the Secretary's office in violation of both the HSA and the FVRA, his purported approval of the Rule was "not in accordance with law" and was "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right."  5 U.S.C. § 706(2)(A), (C).  It must therefore be set aside as unlawful under the APA.  *Id.*

429.   Moreover, if "any person" performs a "function or duty" of a vacant office without being authorized to do so by the FVRA or an alternative succession statute, that action "shall have no force or effect" under the FVRA's penalty provision.  *Id.* § 3348(d)(1).

430.   Wolf performed a "function or duty" of the Secretary's office when he purported to approve the Rule.  Because he was not authorized to serve as Acting Secretary by the FVRA or any alternative succession statute, his purported approval was void ab initio under the FVRA. *Id.*

431.   In addition, Chad Mizelle's signing of the Rule violated the FVRA because he was illegally performing the functions and duties of the DHS General Counsel after the

expiration of the FVRA's time limits.  For this independent reason, the Rule has "no force or effect" under the FVRA, *id.*, and must be set aside as "unlawful" under the APA, *id.* § 706(2)(A), (C).

**THIRD CLAIM FOR RELIEF**
***Ultra Vires* Action**

432.    Plaintiffs repeat and incorporate by reference the preceding paragraphs of this Complaint as if fully set forth herein.

433.    Because Wolf was serving as Acting Secretary unlawfully, and because he had no authority to take any actions in that capacity or exercise any powers of the Secretary's office, his purported approval of the Rule was *ultra vires*, and this Court may enjoin it under the Court's inherent equitable authority to grant prospective injunctive relief from injuries caused by a government official who is acting in excess of statutory or constitutional limits.

**FOURTH CLAIM FOR RELIEF**
**Violation of Administrative Procedure Act, Contrary to Law**

434.    Plaintiffs repeat and incorporate by reference the preceding paragraphs of this Complaint as if fully set forth herein.

435.    The APA provides that a Court "shall hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A).

436.    The Rule is contrary to law because its various provisions violate both the INA and CAT, as the latter is incorporated into federal law by FARRA. Among other things, it (i) allows adjudicators to deny asylum or withholding of removal where the applicant's claim of persecution is based on "interpersonal animus," even though virtually all instances of

122

persecution, particularly against refugees fleeing domestic violence and gang violence, involve some form of interpersonal animus; (ii) supersedes the statutory "one central reason" test in situations where its laundry list applies; (iii) precludes asylum based on previous gang membership, contrary to the INA; (iv) restricts "political opinion" with the phrase "control of a state or a unit thereof"; (v) promulgates regulations under the CAT that contradict its plain text and undermine its fundamental objectives; (vi) generally eliminates the adjudicator's discretion to grant asylum if an applicant traveled through more than one third country, or was present in any third country for more than 14 days, contrary to the more narrowly drawn firm resettlement and safe third country bars found in the INA; and (vii) bars asylum seekers under the firm resettlement doctrine based on a definition of "firm resettlement" that does not comport with the INA's plain language.

437.    Defendants' violation is causing ongoing harm to Plaintiffs.

### FIFTH CLAIM FOR RELIEF
**Violation of Administrative Procedure Act, Insufficient Notice-and-Comment Period and Failure To Consider and Respond to Comments**

438.    Plaintiffs repeat and incorporate by reference the preceding paragraphs of this Complaint as if fully set forth herein.

439.    The APA requires an agency proposing a new rule to provide public notice and "give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments with or without opportunity for oral presentation."  5 U.S.C. § 553(c).

440.    The comment-making period should "generally be at least 60 days" for comments on proposed rules.  76 C.F.R. § 3821 (2011).  Executive Order 12866 requires agencies to "afford the public a meaningful opportunity to comment on any proposed regulation, which in

most cases should include a comment period of not less than 60 days." *Id.*  Executive Order 13563 likewise directs agencies to "afford the public a meaningful opportunity to comment through the Internet on any proposed regulation, with a comment period that should generally be at least 60 days." *Id.*

441.    Further, Defendants failed to meaningfully consider the comments that they did receive during the notice-and-comment period.

442.    Because Defendants failed to comply with the notice-and-comment requirements by limiting interested parties to only 30 days to submit comments instead of the enumerated 60 days, because 30 days was inadequate for commenters to participate fully in the notice-and-comment process, and because Defendants failed to consider comments the comments they received, the Rule was promulgated without observance of procedure required by law, in violation of the APA.  5 U.S.C. § 706(2)(D).

<h2 style="text-align:center">SIXTH CLAIM FOR RELIEF<br>Violation of Administrative Procedure Act, Arbitrary & Capricious</h2>

443.    Plaintiffs repeat and incorporate by reference the preceding paragraphs of this Complaint as if fully set forth herein.

444.    The APA provides that a Court "shall hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A).

445.    The Rule is arbitrary and capricious because it seeks to upend the existing asylum system and effects a dramatic restriction on the availability of asylum without a reasoned explanation or consideration of important aspects of the problem, or of how its provisions will serve its stated purposes.

446.     In accordance with the APA, "[a]n agency must consider and respond to significant comments received during the period for public comment." *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 96 (2015).  A failure to do so "may require a finding that the agencies acted in violation of the APA by 'fail[ing] to consider an important aspect of the problem.'" *Loan Syndications v. S.E.C.*, 223 F. Supp. 3d 37, 63 (D.D.C. 2016) (alteration in original) (citing *Fox Television Stations, Inc. v. FCC*, 280 F.3d 1027, 1051 (D.C. Cir. 2002)), *rev'd on other grounds*, 882 F.3d 220 (D.C. Cir. 2018).  Defendants failed to consider and respond to significant comments received during the notice-and-comment period, and by so doing failed to consider important aspects of the problem before them.

447.     The Rule is arbitrary and capricious because it (i) offered explanations that were so implausible that they could not be ascribed to a difference in view or the product of agency expertise, and ran counter to the evidence before the agencies, including the comments Defendants received during the notice-and-comment period, (ii) considered factors that Congress did not intend to be considered, and (iii) implements actions courts have held to be unlawful.

448.     The Rule is arbitrary and capricious because it does not offer reasoned explanation or adequately consider serious aspects of the problems created by its de facto bars to asylum eligibility; its redefinition of particular social group, political opinion, nexus, persecution, internal relocation, acquiescence, public official, and firm resettlement; or its new standards and procedures that restrict the availability of asylum and heightened burden to establish torture.

449.     Defendants' violation is causing ongoing harm to Plaintiffs.

## SEVENTH CLAIM FOR RELIEF
### Violation of the Fourteenth Amendment Right to Equal Protection

450.     Plaintiffs repeat and incorporate by reference the preceding paragraphs of this Complaint as if fully set forth herein.

451.     The Equal Protection Clause provides that no State shall "deny to any person within its jurisdiction the equal protection of the laws."  U.S. Const. amend. XIV, § 1.  This prohibition extends to the federal government through the Fifth Amendment's Due Process Clause.  *See, e.g.*, *Bolling v. Sharpe*, 347 U.S. 497 at 499–500 (1954).

452.     The Rule violates the Equal Protection Clause because its list of barred nexus claims expressly draws distinctions on the basis of gender.

453.     Defendants' violation is causing ongoing harm to Plaintiffs.

### PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff respectfully requests that the Court:

A.     Declare the Rule unlawful, unconstitutional, arbitrary and capricious, an abuse of discretion, and invalid in its entirety;

B.     Vacate and set aside the Rule under 5 U.S.C. § 706(2);

C.     Enter a nationwide permanent injunction enjoining Defendants, their officials, agents, employees, assigns, and all persons acting in concert or participating with them from implementing or enforcing the Rule;

D.     Award Plaintiffs their reasonable attorney fees and costs pursuant to 28 U.S.C. § 2412; and

E.     Grant any such other or further relief as the Court deems just and equitable.

Dated: January 14, 2021

Respectfully submitted,

_/s/ Gary DiBianco_____
Gary DiBianco (D.C. Bar No. 458669)
Kara Roseen (D.C. Bar No. 997229)
Jennifer Gindin (D.C. Bar No. 1031874)
Shirley Diaz (D.C. Bar No. 1656347)
1440 New York Avenue, NW
Washington, DC 20005
Phone: (202) 371-7000
Gary.DiBianco@probonolaw.com

Sahng-Ah Yoo (*pro hac vice pending*)
One Manhattan West
New York, NY

*Co-Counsel for Plaintiffs*

Elizabeth B. Wydra (D.C. Bar No. 483298)
Brianne Gorod (D.C. Bar No. 982075)
Brian Frazelle (D.C. Bar No. 1014116)
Constitutional Accountability Center
1200 18th Street NW
Suite 501
Washington, DC 20036
Phone: (202) 296-6889

*Co-Counsel for Plaintiffs*

Laurie Ball Cooper (D.C. Bar No. 1017998)
Ayuda, Inc.
6925 B Willow Street NW
Washington, DC 20012
(202) 349-0656
laurie.ballcooper@ayuda.com

*Counsel for Plaintiff Ayuda, Inc.*