UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA
----------------------------X

ANGE SAMMA, et al,

                    Plaintiffs

            v.            Civil Action 20-1104-ESH

 U.S. DEPARTMENT OF DEFENSE et al,

                    Defendants

----------------------------X
                              Washington, D.C.
                         Thursday, July 16, 2020
                              2:00 p.m.

            TRANSCRIPT OF VIDEO CONFERENCE
        BEFORE THE HONORABLE ELLEN SEGAL HUVELLE
            UNITED STATES DISTRICT JUDGE
APPEARANCES:

For the Plaintiffs: Scarlet Kim, Esq.
                    Arthur B. Spitzer, Esq.
                    Noor Zafar, Esq.
                    AMERICAN CIVIL LIBERTIES
                     UNION FOUNDATION
                    125 Broad Street, 18th Floor
                    New York, NY 10004
                    (917) 913-4923


For the Defendant:Nathan Michael Swinton, Esq.
                    U.S. DEPARTMENT OF JUSTICE
                    Civil Division, Litigation Branch
                    1100 L Street NW
                    Washington, DC 20530
                    (202) 305-7667


                    Maj. Joseph Nosse
                    U.S. DEPT. OF ARMY



Court Reporter:     Lisa Walker Griffith, RPR
                    U.S. District Courthouse
                    Room 6507
                    Washington, D.C.  20001
                    (202) 354-3247

P R O C E E D I N G S

1          THE COURTROOM DEPUTY:  Civil action 20-1140.

2  Samma, et al versus Department of Defense.  I'm going to ask

3  counsel to identify themselves starting with the plaintiffs.

4  Also state whether you are on video or telephone, then go to

5  the defendant.

6          MS. KIM:  Scarlet Kim with the ACLU for

7  plaintiffs.  And I'm on video.

8          MS. ZAFAR:  Noor Zafar from the ACLU for

9  plaintiffs, and I'm on video as well.

10          THE COURT:  Anyone else for the plaintiffs on

11  phone?

12          MR. SPITZER:  Yes, Your Honor, Arthur Spitzer for

13  the plaintiff by telephone.

14          MR. KAUFMAN:  Your Honor, Brett Kaufman for the

15  plaintiffs is also on the phone.

16          MR. HAFETZ:  Yes, Your Honor, good afternoon.

17  Jonathan Hafetz for the plaintiffs as well.

18          THE COURT:  Good afternoon.

19          All right.  That's the plaintiffs?

20          THE COURT:  Who will be speaking, Ms. Kim and

21  Ms. Zafar?

22          MS. KIM:  That is correct, Your Honor.

23          THE COURT:  On behalf of defendants start with Mr.

24  Swinton.

 1          MR. SWINTON:  Nathan Swinton with the United

 2   States Department of Justice on behalf of the defendants,

 3   appearing by video.

 4          MR. HOLLAND:  This is Liam Holland for the

 5   defendants on telephone, and technical issues with the

 6   video.

 7          THE COURT:  And Major Nosse?

 8          MAJ. NOSSE:  Yes, Your Honor.  Major Joseph Nosse

 9   via video.

10          THE COURT:  Who else is on the phone besides

11   Mr. Holland?

12          MR. CAPELLINO (PH):  Anthony Capellino (ph)

13   Department of Justice, Civil Division.

14          THE COURT:  Okay.

15          MR. FUCCI:  Good afternoon, Your Honor.  Michael

16   Fucci from the Department of Defense.

17          MR. ARENDT:  Good afternoon, Your Honor.  This is

18   Christopher Arendt from OASD Accession Policy on the line.

19          THE COURT:  Okay.  Is that it?  Just for my

20   information -- sorry?

21          MS. MEISNER:  Your Honor, Kyle Meisner from Army

22   Litigation is on the phone as well.

23          THE COURT:  Are there any of the people on the

24   phones that can step in Mr. Swinton's shoes here?  Lucky

25   you.  Or you don't know yet?

1          MR. SWINTON:  Your Honor, I don't think that

2     decision has been made yet.  Although Mr. Holland will stay

3     on this case, it is not clear what other Department of

4     Justice will join.

5          THE COURT:  I just want to start by clarifying a

6     couple of matters with the plaintiffs.  We've had a lot of

7     subsequent pleadings.  And I'm wondering whether we are,

8     what is your position on, we have now learned -- and let me

9     confirm this, that you don't need a favorable ESP to get an

10    N-426.

11         We were told that at the last meeting by the

12    government.  Is it true, Major, you said all three of the

13    plaintiffs we are talking about, which would be Mr. Gunawan,

14    Mr. Machado, M-a-c-h-a-d-o, and the third is Isiaka, do they

15    all have now favorable ESPs?

16         MAJ. NOSSE:  Your Honor, I don't believe all of

17    them have favorable ESPs.  I'm sorry.

18         THE COURT:  Do they all, those three people I just

19    named, do they have favorable ESPs yet?

20         MAJ. NOSSE:  Your Honor, my understanding is that

21    the process has been started -- (technical difficulties)

22         THE COURT:  I'm sorry.  You cut out.  The process

23    has been started but it has not been completed?  For the

24    ESP, I guess my only question has to do with Isiaka.  Has he

25    got it?  What is his status with ESP?

1          MR. SWINTON:  Your Honor, if I may answer, I

2     believe that his ESP has been initiated and he has a ship

3     date but it has not been complete.

4          THE COURT:  Okay.  But he can ship without it?

5          MR. SWINTON:  Correct, under phase one, you are

6     allowed to ship with an ESP that has been initiated, even if

7     it has not been completed.

8          THE COURT:  He can get an N-426 without a final

9     ESP, correct?

10          MR. SWINTON:  Yes, there is no requirement for

11     completion of an ESP in order to obtain an N-426

12     certification.

13          THE COURT:  His ship date, is it still going to be

14     the third of August as far as you know or has that changed?

15          MR. SWINTON:  Your Honor, I believe, that is my

16     understanding that is still the current ship date for

17     plaintiff Isiaka.

18          THE COURT:  Isiaka, yes.

19          MAJ. NOSSE:  Yes, Your Honor, that's correct.

20          THE COURT:  So he is going to ship on the third.

21     And what about, what is the status of the other two

22     gentlemen?

23          MR. SWINTON:  Yes.

24          THE COURT:  Gunawan and Machado.

25          MR. SWINTON:  We had previously reported that

```
1   plaintiff Gunawan would be eligible as of July 12

2   (inaudible.)

3              THE COURT:  He would be eligible for an N-426.

4              MR. SWINTON:  Correct.

5              THE COURT:  I think that's Machado as far as I

6   know.

7              MR. SWINTON:  I may have been confused.  But

8   Machado was eligible as of July 12th.  And he has -- yes, he

9   has met that date.  We do not know if he has yet submitted a

10  request for an N-426 but he became eligible on July 12.

11             THE COURT:  Ms. Kim, do you know whether he

12  submitted a request yet?

13             MS. KIM:  My understanding is that he has not

14  submitted a request since July 12th, which was a few days

15  ago.  He did request an N-426 prior to the time in which the

16  180 day clock had ended.

17             THE COURT:  Okay.  And as to Gunawan, I think he

18  was to be eligible the beginning of August, correct?

19             MR. SWINTON:  Correct, I believe that's August

20  8th.  And that date has not changed to my understanding.

21             THE COURT:  Okay.  And from the government's point

22  of view, is there any difference -- first of all, for class

23  representation purposes, between those two gentlemen and --

24  well, and an active MAVNI for purposes of obtaining an

25  N-426, is there any difference between an active MAVNI and
```

1    an active LPR?

2         MR. SWINTON:  I guess it depends on what

3    requirements the Court deems are at issue in this case.  The

4    active MAVNIs under active duty service don't have the

5    requirement under the October 13th policy to have a

6    favorable MSSD.  Whereas--

7         THE COURT:  We're not challenging the security

8    screening for active LPRs or MAVNIs.  We've established

9    that.   So they are challenging only the minimum service

10   requirement which is six months in the 0-6.  In the 0-6,

11   they're only challenging arbitrary and capricious and a

12   notice and comment.  So if you take out the security

13   screening, basically you are looking at the minimum service

14   in the 0-6.  Is there any difference between an active LPR

15   and an active MAVNI?

16        MR. SWINTON:  There isn't, Your Honor.  The only

17   difference I perceive is that there isn't a plaintiff with

18   standing to raise that challenge in the complaint because

19   the only active duty MAVNI who is a plaintiff has received

20   N-426 certification at the time that I think the amended

21   complaint was filed.  They don't have a class rep.

22        THE COURT:  Why do we need one?  That's the

23   question.  Why do you need one if they're indistinguishable

24   for purposes of this lawsuit?

25        MR. SWINTON:  I guess, Your Honor, I think that

1   would be extending the Court's order to the class of service

2   members who are not represented here, just as in Kirwa, the

3   class certifications to the reservists for MAVNIs didn't

4   extend to service for LPRs.

5            THE COURT:  It didn't ask.  The lawsuit in Kirwa

6   was strictly a lawsuit on behalf of MAVNI reservists, so I

7   didn't have to think about it.  Okay.

8            From the plaintiffs' point of view, is there any

9   difference between an active MAVNI and an active LPR?

10           MS. ZAFAR:  Your Honor, no, we don't believe that

11  there is a difference because the N-426 policy on its face,

12  the only difference between active duty MAVNIs and LPRs

13  arise with respect to the background screening.  Since

14  plaintiffs are no longer challenging that, there is no

15  substantive difference between active duty MAVNI's and

16  active duty LPRs.

17           THE COURT:  Okay.  From my point of view, the only

18  two people who could challenge what you are challenging for

19  actives are the two gentlemen Machado and Gunawan.  And

20  they're still proper class reps unless I hear something from

21  Mr. Swinton.

22           I want to know from the plaintiffs.  So, in terms

23  of the ESP, I'm talking about Isiaka, I-s-i-a-k-a, do you

24  still have a claim about the ESP?  They said you don't need

25  it to get an N-426.  He is moving on to basic even though he

1    hasn't finished it.  So where is the injury from the ESP to

2    Isiaka?

3            MS. KIM:  Your Honor, given the defendant's

4    representation that no LPR service member will need to

5    complete the ESP in order to be eligible for the N-426, we

6    are not going to maintain a challenge to the ESP on behalf

7    of plaintiff Isiaka at this time.  We would like to seek to

8    reserve the argument that we may seek to amend the complaint

9    if this requirement should change or we learn anything to

10   the contrary.

11           THE COURT:  Right.  I'm hoping to decide this case

12   before that happens.  But do you know anything about what is

13   going to happen on July 30 for purposes of ESPs?

14           MS. KIM:  Is that question directed to plaintiffs,

15   Your Honor?

16           THE COURT:  No, I don't think you would know any

17   more than I know.

18           MR. SWINTON:  Your Honor, in speaking with DOD,

19   they are waiting for the results of a study that is being

20   undertaken by an entity called PERSEREC, evaluating the ESP

21   program and whether or not the changes need to be made

22   before it is transitioned to phase two.

23           My understanding is that the July 30th deadline

24   that is stated in the DTM is an aspirationable (sic) and if

25   that deadline -- if there is not, like for example, if the

1    results of the PERSEREC study do not come in by that date,

2    DOD will continue to stay in phase one of the DTM, pending

3    the results of that the study and further deliberations

4    within the department about whether and what changes it

5    wants to make to the ESP.

6            THE COURT:  Okay.  So, I think we are in agreement

7    with the plaintiffs.  A couple of my questions are now moot.

8            Sorry.  Let me just ask.  Hold on.

9            (There was a pause in the proceedings.)

10           THE COURT:  Ms. Kim or maybe Ms. Zafar, you doing

11   the class cert?

12           MS. ZAFAR:  Yes, Your Honor.  I will be handling

13   the class cert.

14           THE COURT:  Now I want to move on to the 0-6

15   policy if I may.  You wrote a complaint that was at the end

16   of April and then amended complaint in July.  There has

17   never been a mention of either the 2020 NDAA or the policy

18   that was adopted at the end of April, April 24, 2020 policy.

19           It is now the policy of the Department of Defense

20   that they will have zero to six requirement, but they will

21   turn around the N-426, then you'll get your signature in 30

22   days.  So, I'm not sure what you want me to do about that.

23           The people who are before me, let's assume for a

24   minute they're Machado, Gunawan and Isiaka, will all get the

25   benefit of that policy and the statute.  They will get their

1  N-426s, depending on what we do about the waiting time,

2  within 30 days, which is, it look to me like Congress told

3  them do what they did.  And I don't know how I could

4  possibly touch that.

5       MS. KIM:  So Your Honor, as you know, we're

6  bringing the challenge to the 0-6 requirement under the

7  arbitrary and capricious claim primarily.  The APA requires

8  that any departure from agency precedent be a product of a

9  recent decision.  It is true that the NDAA now requires the

10  Secretary of Defense to publish regulations to designate an

11  appropriate official to sign off on the form.

12       But we would like to note that, first of all,

13  defendants have yet to amend the relevant regulations.

14  Defendants issued a memo on April 2020 stating that they

15  would update the DOD instruction 5500.14 to reflect the 0-6

16  requirement.  There has been no update to date.  The current

17  version says nothing about a certifying official.

18       And if and when the Department of Defense amends

19  its regulations, it will still have to provide an

20  explanation because it will still amount to a change in

21  prior practice.

22       THE COURT:  Well, not if Congress says, go ahead

23  and do this.  I don't see why in the world that they have to

24  explain why they're doing it.  Congress just told them to do

25  it.

1        The problem is that all three people, they can

2   only complain about what they're subjected to.  And what

3   they will be subjected to, unless I'm missing something --

4   and I'd like the defendants to confirm this -- they will all

5   be subjected to the April 24, 2020 policy.  That's what

6   governs at this point in time.  Correct?

7        MR. SWINTON:  That is correct, Your Honor.

8        THE COURT:  And that policy also incorporates the

9   zero to six.  So I don't understand the APA to say that, if

10  Congress tells you to enact a statute and tells to you do

11  something and you do it, and obviously it is consistent with

12  the House report.  It is exactly what the House wanted.  I

13  don't see that it's my opportunity or that I have to require

14  them in any way to explain why they did it.  They were told

15  to do it.

16       MS. KIM:  Our position, Your Honor, is that,

17  because the prior practice was that a broad range of

18  military officials could sign off on the form, the agency is

19  still required to abide by the Administrative Procedure Act.

20  The Administrative Procedure Act requires that any change in

21  prior policy be accompanied by a recent decision.

22       THE COURT:  Let's go back to that.  If Congress

23  says to an agency, we want cleaner air, we want you to get

24  rid of all the particles in the air about X and Y that are

25  polluting it, and they go ahead and do that.  Well, it is

1    going to be a change because they were not required to do it

2    before.

3             So unless you can find me a case, I cannot see

4    that I could invalidate that policy on the grounds of

5    arbitrary and capricious or notice and comment.  Is that the

6    two grounds?  Yes.  You are challenging the 0-6 on behalf of

7    three people who will get the benefit of 30 day turnaround.

8    I can't possibly say that's unreasonable, per se.

9             MS. KIM:  Well, in terms of the 30 day turnaround,

10   Your Honor, with respect to our three plaintiffs and

11   possibly for the hundreds or even thousands of members of

12   the putative class, our argument is that they should have

13   all been subject to the N-426 months ago, perhaps even over

14   a year ago.  So they're currently suffering a persistent and

15   an irreparable injury.  For that reason--

16            THE COURT:  Wait, wait a minute, you are getting

17   away (inaudible).  One of the guys enlisted in the beginning

18   of 2020 basically.  He went to training in February 2020.

19   He is in active.  The other guy went to basic in January

20   2020.  So it's not like they've been wallowing here the way

21   they were in MAVNIs.  The first guy, he is the reservist.

22   He is the only one -- no, he enlisted I guess in January

23   2020.  So these people have not had long waits.

24            MS. KIM:  Well Your Honor, I would like to point

25   out the position of our six original plaintiffs who only

```
1   received the N-426 after we brought this lawsuit.  Of those

2   plaintiffs, many of them enlisted in 2017 and 2018, many of

3   them could not ship until 2019 because of the security

4   screening policy in place at that time.  And many of them,

5   once they did ship to basics had to wait months, in some

6   cases over a year, in order to obtain N-426 solely because

7   of the lawsuit.  And there may be thousands of other members

8   who --

9            THE COURT:  I understand your position but what

10  you are not understanding is you are seeking injunctive

11  relief to stop a policy that doesn't exist anymore.  I can't

12  give you that under the law.  You are asking me to

13  invalidate the zero to six, and you are saying because it

14  delays people from getting an N-426 based on the experience

15  of six people who are not subject to the current law.

16           You've got to give it to me on this one.  I don't

17  understand your position at all.  We're wasting time.  You

18  are asking for injunctive relief.  You want a class that is

19  going to seek injunctive relief.  I can't give you relief

20  for things that are no longer the current state of affairs.

21  There is no basis.

22           I mean, if something may change and they decide

23  that you are not going to get your N-426s for 90 days --

24  Mr. Samma, alleged that he had to wait two to three months.

25  But none of these people should have to wait two to three
```

months if they're going to be subject to the April policy.

So how can I enjoin a policy that doesn't basically -- first of all, it was mandated by Congress. That's the hardest thing for you to deal with.  But second of all, there is nothing about it that is going cause unreasonable delay.

You say this is no different than Kirwa.  But Kirwa, these people were sitting three to four years waiting to get an N-426.  And they were subject to deportation. They didn't have any protection whatsoever.

Here, these people are lawful, permanent residents.  So they have a lot of protection.  They're not going to get thrown out of the country.  So 30 days for them is nothing compared to what happened to thousands of reservists in Kirwa.  So I just don't get it at all.

MS. KIM:  Well Your Honor, I think one thing we would like to point out is some of our LPRs have been potentially subject to some of the same harms as MAVNIs. One of our original plaintiffs, for example, was about to adjust her status from conditional to permanent residency.

She abandoned her application on her recruiters' advice that she would receive her N-426 shortly after shipping to basic.  And then she had to wait close to a year before she was able to obtain her N-426.

There, what we're pointing to is really a delay in

1   the combination of both the service duration requirement and

2   whatever the length of time is that an O-6 would return the

3   form.  So it's not, they're not allowed to submit their

4   N-426 requests until they complete the service duration

5   requirement which is either 180 days or a year.  That's

6   point at which the O-6 requirement kicks in.  Previously,

7   that could take several months, the policy --

8            THE COURT:  Okay.  All right.  If I tell you that

9   nobody who will get class certification here is going to be

10  subject to a policy that doesn't exist anymore, it's only

11  going to apply to three possible plaintiffs here, and

12  anybody else who has not been named will get the benefit of

13  April 24, '20.  I cannot enjoin a policy that doesn't exist

14  anymore.  So either you drop it or get another kind of

15  plaintiff in here.  The three people you have are not going

16  to be prejudiced by this policy.  They're going to have a 30

17  day turnaround that is mandated by Congress.  I don't see

18  how I could touch it.  I could enter an injunction to tell

19  the Department of Defense to turn these around in two days

20  instead of 30?  I don't think so.

21           MS. KIM:  I think our argument there, Your Honor,

22  is that our plaintiffs have already been prejudiced if they

23  are entitled after a single day of honorable service.

24           THE COURT:  That's the time in service.  I'm

25  looking at what specific things I have to rule on.  I don't

1    have to rule on the 0-6 unless somebody is being hurt by it.

2    These three people are not going to be hurt by April 24,

3    2020 policy.  And I don't care if it's in the DODI yet.  Why

4    would anybody not apply this policy?  Just the 0-6, that's

5    all I'm talking about.

6                MS. KIM:  Yes, we understand, Your Honor.  Our

7    position is that they have been harmed because of the

8    combination of the requirements that we're challenging but

9    we understand what you're saying.

10               THE COURT:  Okay.  Why didn't you ever amend the

11   complaint?  You had very vague allegations.  This is what

12   Mr. Swinton is getting at.  There were vague allegations

13   that people say there can be no doubt of plaintiffs'

14   inability to obtain certificates of honorable service stems

15   from zero to six requirement.  That is in your recent

16   pleading, but you don't ever acknowledge that that is not

17   the requirement that applies here.  When you amended the

18   complaint, I don't understand why anybody didn't have

19   something to say about this.

20               MS. KIM:  Our position, Your Honor, on the M. D.

21   A. 2020 is that it requires the Secretary of Defense to

22   publish regulations regarding the 0-6 requirement.  At the

23   current regulation that the Department of Defense has

24   indicated will contain the updated process for who will sign

25   off has not yet been amended.  For that reason, we believed

1    that is the regulation that continued to apply.

2            THE COURT:  What regulation continued to apply?

3            MS. KIM:  That is DOD instruction 5500.14.  In the

4    April 2020 memo, the Department of Defense indicated that it

5    would update that DOD instruction to reflect the instruction

6    by Congress in the NDAA 2020.  But that instruction has yet

7    to be amended.

8            THE COURT:  Okay.  Is there any question, let's

9    ask this of Mr. Swinton.

10           Mr. Swinton, is the DOD committed to applying this

11   policy that set forth on April 24th at least for the

12   foreseeable future?  I don't know --

13           MR. SWINTON:  Yes, Your Honor.  As a data point

14   there, I understand from conversations with Major Nosse that

15   the Army sent out what is known as the ALARACT that

16   basically -- I'm sorry.  It's basically an execute order,

17   it's called an EXORD, and it required everybody in receipt

18   of that order to comply with the April 24, 2020 policy.  So

19   execute order, EXORD, E-X-O-R-D.

20           THE COURT:  So the people that are subject to,

21   would be at least the two gentlemen who are active LPRs and

22   Isiaka will get the benefit of that policy?

23           MR. SWINTON:  Correct.

24           THE COURT:  And do you know, does the Department

25   of Defense know how many LPR reservists are in the position

1    that Mr. Isiaka is, that is they are in phase one of the

2    7-30-2019 policy and they're either in the Army or the Air

3    Force because the others don't have a DTP.  Do you know what

4    that pool of people might be?

5         MR. SWINTON:  In terms of numbers, I don't know

6    myself, Your Honor.  And Major Nosse, I believe if anybody

7    knows on this call, it would be him.

8         THE COURT:  Major, do you know what the numbers

9    would be?  If we say that Mr. Isiaka is in phase one, which

10   is, that means he -- and second of all, how many other

11   people are in the Army or Air Force because it doesn't apply

12   to the Navy or Marines.  Do you know what the numbers might

13   be?  Hundreds or?

14        MAJ. NOSSE:  Your Honor, I believe we provided the

15   numbers of individuals who had enlisted (audio gap) and how

16   many of those individuals shipped to basic training yet

17   (audio gap.)

18        THE COURT:  You said that there were 1152 LPRs

19   have enlisted in the Army Reserves in the DTP and 495 are

20   waiting to ship to basic.  So, would that 495 be like

21   Mr. Isiaka?  That is they're subject to phase one?  And

22   they're subject to this April 24, '20 policy?

23        MAJ. NOSSE:  Your Honor, that is correct.

24        THE COURT:  495?

25        MAJ. NOSSE:  The 495, Your Honor, are the people

1    that have not shipped to basic training.  I believe of the

2    1152 that have enlisted since last July, the remainder of

3    them have already shipped to basic training.  So they were

4    able to ship to basic training under phase one of the DTM

5    without having an ESP prior to shipping to basic training.

6    And they have already, for the majority of them I suspect

7    have concluded basic training.  The 495 that have yet to

8    ship to basic training, those are the folks that are in the

9    same position as plaintiff Isiaka.  And they also currently

10   will be subject to phase one of the DTM.  And will not be

11   required to complete an ESP check prior to having to ship to

12   basic training.

13           THE COURT:  Any of them subject to the April 24th

14   policy?

15           MAJ. NOSSE:  Yes, Your Honor.  Every enlistee is

16   subject to the updated April policy.  The Army, in its

17   execution order, when it put it out to all of the commands,

18   that included not only the soldiers who enlisted for active

19   duty but it also imposes that requirements on all soldiers

20   who enlisted in the Army reserves as well.

21           THE COURT:  Okay.

22           Do the plaintiffs contest the Court's ability to

23   look at sort of each of these policies?  I notice your

24   injunction, you say that they're supposed to -- you are

25   asking me to invalidate the NSP policy.  But if I were to

1  say that nobody has standing to complain about the ESP, the

2  phase one ESP, and no one has standing to complain about the

3  zero to six or it is not subject to Court review, then you

4  would agree that I couldn't invalidate the entire NSP

5  policy.  I could only invalidate the time in service.

6          MS. KIM:  Do you mean the N-426 policy, Your

7  Honor?

8          THE COURT:  That's what you write down in your

9  injunction.  Did I misstate?  N-426 policy.  I'm saying that

10 I don't think I can lump it all together and say I

11 invalidate the N-426 policy, given we're not looking at the

12 ESP and we're not looking at -- or I'm not looking at zero

13 to six.

14         MS. KIM:  Yes, Your Honor.  On the ESP policy,

15 we're not currently maintaining a challenge to that.  So we

16 would not expect you to invalidate that portion of the

17 policy.

18         Your Honor has made clear your position on the 0-6

19 requirement.  We would maintain that our plaintiffs continue

20 to suffer injury by it.  And that our APA claims still

21 stand, notwithstanding the passage of the NDAA 2020.

22         But if Your Honor were to find that those claims

23 would have to fail either because you did not have

24 discretion to review them or for some other reason, we would

25 also not expect that part of the policy to be invalidated.

1          THE COURT:  I'm happy, if I give you two days, I

2     don't want to put you up against your due date.  But if you

3     have any case law that says I should go back and look at a

4     policy or a requirement like the 0-6, that has been

5     modified, and is no longer either applicable or relevant,

6     I'm happy to hear it.  But without that kind of legal

7     authority, I don't think you can get injunctive relief

8     regarding something that is no longer the governing policy

9     for any of the plaintiffs.

10          MS. KIM:  We would appreciate the opportunity to

11     submit supplemental briefing if that would be amenable to

12     the Court.

13          THE COURT:  Sure.  I'm happy to see that I'm

14     wrong, but I just think that, when Congress tells the DOD to

15     do something, and what they did is not completely

16     unreasonable in any way, I don't see that I have the power

17     to invalidate that unless it were unconstitutional in some

18     way or violated the APA.  But that's not the claim.  The

19     claim is that prior policies violated the APA and were

20     arbitrary and capricious.

21          Okay.  I just to verify, you are asking for a

22     subclass two, all individuals who are non citizens serving

23     in an active duty status.  You are talking about the LPRs

24     and the MAVNIs who went by way of DEP.  Is that correct?

25          MS. ZAFAR:  That is correct, Your Honor.

1      THE COURT:  Your other group are the ones that

2  went by DTP.

3      MS. ZAFAR:  Correct, those would be the LPRs

4  reservists.

5      THE COURT:  Is the argument about Mr. Kotab --

6  K-o-t-a-b, I think -- is it a question, put aside that

7  obviously the judge there didn't agree with my Kirwa

8  opinion.  But is the government arguing he shouldn't be part

9  of the class because he has already had one bite at the

10  apple or something?

11      MR. SWINTON:  Yes, Your Honor.  He was a reservist

12  who was about to ship to basic training when derogatory

13  information was discovered about him.  And I can't remember

14  if he was discharged but he wasn't allowed to ship.  But if

15  the Court were to issue a Kirwa type injunction in this

16  case, as has been requested, based on service only in the

17  DTP drilling, I think that would entitle Mr. Kotab to a

18  certified N-426, contrary to the judge's decision in Nevada.

19      THE COURT:  So what happened to him?  I know he

20  was a reservist and you found derogatory information.  He

21  didn't ship.  Did he get uncharacterized discharge?  What

22  happened to the guy, do you know?

23      MR. SWINTON:  I don't know for certain, but I

24  believe for the reasons we described in our briefing, he

25  should have received an uncharacterized entry level

1  separation.  I would have to look again at the record in the

2  case just to be sure.

3        THE COURT:  You know, these cases would be moot, a

4  lot of them, if you, the DOD and USCIS got on the same page.

5  You are on different pages for what is required to be

6  naturalized.  And then you are on a different page when it

7  comes to uncharacterized service.  They consider it

8  dispositive.  Uncharacterized service, you don't naturalize.

9        I went back, just for the record, in case the

10  Court of Appeals would like to know this, that three

11  quarters of the people who have MAVNI reservists who got

12  negative MSSRs got -- about three quarters, I can't be exact

13  but that's a large number of people, over a thousand -- got

14  naturalized.  And I have no idea whether any of them made it

15  into the Army but they did become citizens.

16        Major Nosse, is that not correct?  Large numbers

17  of people who might not have made it into the Army -- I

18  don't know whether they did or didn't -- got naturalized,

19  even though they had negative derogatory information that

20  caused a problem under the Army's regulations for promotion.

21        MAJ. NOSSE:  Yes, Your Honor.  The Army is still

22  working through those folks with unfavorable or derogatory

23  information in their files.  There are going to be a few

24  people after the unfavorable MSSR, there are going to be a

25  few people that do eventually end up being able to serve in

1    the Army after being able to mitigate that derogatory

2    information.

3            However, it appears that the vast majority of

4    those individuals, if they're not able to mitigate that

5    derogatory information, will not be able or permitted to

6    serve in the Army.

7            THE COURT:  But many of them, by my count, about

8    three quarters of them anyways, so far have made it into the

9    -- they've been naturalized.  We have naturalized --

10            MAJ. NOSSE:  Yes, Your Honor.

11            THE COURT:  We've naturalized about 1900 people.

12   And many of them had red flags, correct?

13            MAJ. NOSSE:  Yes, Your Honor.  That is correct.

14   They were able naturalize the majority of them as the N-426

15   pursuant to an injunction in the Kirwa lawsuit, Your Honor.

16            THE COURT:  So, I have a problem with why it is

17   that the Army, given that situation, that is that we know

18   from experience that the USCIS is supposed to make an

19   independent judgment.  And for years and years and years,

20   they were able make that judgment without having a lot of

21   feedback -- in fact, they had none.  I realize that was the

22   problem but they had no real feedback from DOD.  Then now,

23   they're getting feedback in terms of ESPs, and for the

24   MAVNIs, they're getting MSSRs.  So they're learning more

25   than they learned before.

1          But they seemed to be able to make a

2    determination.  So, why is it that the Army feels obligated

3    to change the time and place?  I don't understand that at

4    all.

5          MR. SWINTON:  Your Honor, I'm not sure I follow

6    your question.  But are you asking about why DOD has imposed

7    the time in service requirement?

8          THE COURT:  Yeah.  I can understand why it might

9    be rational for the Army, might, before you decide to put

10   somebody in active duty after they have done their basic,

11   that you might have who criteria.  I understand that because

12   you are making a decision on whether or not they're going to

13   be in the Army.

14         But I don't understand the effect of that is your

15   controlling -- or I think the words I used before, you are a

16   proxy, you are acting as a proxy for USCIS.  By imposing a

17   one year and/or six month requirement, you are making it --

18   well, it is a different requirement than existed before.

19   And what I've always been confused about is, it may make

20   sense for the Army, but the USCIS claims to make their own

21   independent decision.  They claim that they're not ceding

22   that power to you.

23         The attorney general has the power to decide who

24   gets naturalized.  So therefore, your requirements may be

25   that they align with your zero to six for purposes of an

1    entry level separation, but I don't know what that has to do

2    with your providing an N-426.

3            MR. SWINTON:  Yes, Your Honor.  Obviously, I think

4    this is the heart of the case that remains.

5            THE COURT:  Yeah.

6            MR. SWINTON:  The military was given an obligation

7    by Congress in Section 1439.  The language that Congress

8    used was to determine whether or not a service member had

9    served honorably in an active duty status.  DOD takes that

10   obligation seriously.  That is an inherently military

11   obligation, to characterize a person's service.

12           DOD is not looking to insert itself and control

13   the naturalization process in any way.  That's for USCIS to

14   decide.  What DOD is doing is making characterization of

15   service members' service and the time and service

16   requirement was put into place to make sure that DOD

17   sufficiently developed a service record so it can make an

18   informed decision when it makes that characterization of

19   service.  And to do that, DOD has looked to the way it makes

20   other characterizations of service, which is set forth in

21   the DODI 1332.14.  It has an entry level period during which

22   time service members, absent very unusual circumstances,

23   receive uncharacterized discharges or characterization of

24   service.

25           DOD is using that consistent with the DODI, DOD is

1    using that same process and that same necessity of having to

2    develop service record when it makes same service

3    characterization determination on the N-426.

4             THE COURT:  Well, there is a service

5    characterization for purposes of, let's call it promotion

6    within the Army.  You can obviously become a U.S. citizen

7    even if your mother was in China, say.  But that may keep

8    you out of the Army because it's a different burden of proof

9    and it's different criteria and nobody says you have to meet

10   all those adjudicatory guidelines to become a U.S. citizen.

11            So I don't see why there is any rationale or

12   reason for you to equate an uncharacterized discharge with

13   your ability to say somebody is serving honorably --

14            MR. SWINTON:  For purposes --

15            THE COURT:  -- USCIS.

16            MR. SWINTON:  The idea is that, in the entry level

17   status, DOD has not observed the service member, it doesn't

18   have enough information about that service member's

19   performance to make an informed determination to

20   characterize the service.  They need a sufficient amount of

21   time.  They need a sufficiently developed service record.

22            And the same is true when making an honorable

23   service determination.  It is the same characterization, the

24   Congress used very specifically the same words about

25   honorable characterization in service, knowing full well at

1   the time that, when Congress passed this statute, that the

2   DOD had different ways of characterizing service.

3           And as the cases from the 1940s that we cited to

4   in our brief, specifically the Patterson case and Davis

5   case, made clear, approached the idea that the military

6   needs a sufficient amount of time in order to make an

7   honorable service characterization determination.

8           Congress used that exact same language when it

9   passed the operative language in 1948.  It is against that

10  background that (unintelligible) need a sufficient amount of

11  time (unintelligible) must be carried through at present

12  day--

13          (Audio gap)

14          MR. SWINTON:  I apologize.

15          THE COURT:  Finish up.

16          MR. SWINTON:  It is consistent with the way, as I

17  said before, it is consistent with the way that DOD made

18  service characterizations in the military, governed by the

19  DOD that controls entry level separations.

20          THE COURT:  Governed by what?  You seem to be a

21  little bit--

22          MR. SWINTON:   The LPRs, October 13th memo is

23  consistent with the way that DOD makes the characterizations

24  of service determinations.

25          THE COURT:  It is say it again.  It is consistent

1    with what?

2            MR. SWINTON:  With the way DOD makes

3    characterizations and service determinations elsewhere as

4    reflected by DODI 1332.

5            THE COURT:  Is that DODI 1332.14, is that what

6    you're talking about?

7            MR. SWINTON:  Yes.

8            THE COURT:  I have one more question.  Ms. Kim,

9    tell me when you need a break.

10           MS. KIM:  I'm okay for now, Your Honor.

11           THE COURT:  So, Mr. Swinton, if I know you say

12   that they enacted this requirement under the N. A. of having

13   executive department signing off here.  But how, in 2003,

14   the same Congress comes up with a requirement of one year

15   for peace time under 1439, and they have a reservist where

16   they don't have any time requirements.

17           So, why in the world is it rational to have a one

18   year reservist requirement for purposes of, well,

19   naturalization and if there were ever peace time, it's one

20   year.  I don't understand how that makes sense.

21           It's the same legislative, the same time, and the

22   regulations that came out afterwards said, they're talking

23   about the reservist, that's 8 CFR 328.1, that service is

24   active or reserve service, which is basically what 1440(a)

25   says, so how can that be rational?  Put aside

1  (unintelligible) DOD, whether it is ministerial or not.  Why

2  should a peace time person make it just as fast as a

3  reservist?

4       MR. SWINTON:  Well, there are two different points

5  to make here, Your Honor.  And the first concerns a question

6  by the USCIS regs, the operative language in 1440(a).  The

7  reference to individuals who served honorably as a member of

8  the selective reserve does not say that that individual is

9  able to get certification of honorable service based on time

10  not spent in active duty service.

11       It just simply says, it just simply makes clear

12  that individuals who are reservists are also eligible to

13  receive naturalization based on the military service.

14  That's what is reflected.  USCIS (unintelligible).

15       THE COURT:  I read that to be the regs from USCIS

16  as well as their manual, that a reservist who, I think it's

17  a weekends and a half, whatever the drilling period is, it's

18  very short, can then apply.  That's been the policy up to

19  2017.  So I just, you have now said no, it isn't active or

20  reserve, it's active and they've got to be there for at

21  least 180 days.

22       MR. SWINTON:  Well the statute does go on to say,

23  with respect to the DOD's obligation specifically, that

24  makes clear that the military has determined whether the

25  person served honorably in active duty status.  So the

active duty status phrasing is next to where Congress has

set forth military's obligation in the statute.  Military's

obligation to determine honorable service in an active duty

status.  That's is reflected again in the statute at

subsection B3.  It again says service must be in active duty

status.

So in other words, the first sentence of

subsection A says, consistent with the (unintelligible), the

reservists are eligible to naturalized based on the military

service.  But at the same time the second sentence in

Subsection A makes clear that they must have service in an

active duty status.

THE COURT:  I never bought that argument before

but I have to admit that I don't think you made it quite so

clear as it has been made now about the 1440(c).  You are

talking about the 1440(a), and then there is another subpart

that it's repeated in.

Okay.  Let's hear from Ms. Kim.

MS. KIM:  So I'd like to start by addressing the

question of the minimum service requirement, whether it is

one year or 180 days.  I'd like to start by pointing out

that, in the Kirwa litigation, the defendants' prior

position was that the entry level separation policy that it

cites to now, DODI, I believe 1332.14, actually has no

relevance or bearing at all on Section 1440.  So it's a

1    complete 180 reversal in their litigation position.

2           They stated that in their reply, their motion to

3    dismiss briefing, because during that briefing it was Kirwa

4    plaintiffs that noted that that separation policy actually

5    allows the Department of Defense to characterize service

6    within 180 days.

7           THE COURT:  Let me make sure I understand.  Can

8    you go back a little bit?

9           MS. KIM:  Yes, Your Honor.  So during the Kirwa

10   litigation, the Kirwa plaintiffs were the ones to raise the

11   entry level separation policy.  And the points they were

12   making there was that that policy allows non citizens to

13   receive -- or actually any service member to receive an

14   honorable characterization of service before 180 days.  That

15   was their position in that litigation.

16          And in the defendant's reply in the motion to

17   dismiss briefing, they stated that that policy, the one that

18   they're relying on now has no bearing or relevance on

19   section 1440 and how we should read section 1440.

20          THE COURT:  Can you give me a page cite?

21          MS. KIM:  Absolutely, Your Honor.  So, it is ECF

22   number 50, defendant's reply in support of their motion to

23   dismiss.  And on page 7, they say, plaintiffs further rely

24   upon DOD instruction 1332.14 which concerns characterization

25   of service upon discharge.

1        Later in that paragraph, they state:  This

2   authority does not purport to define honorable service as

3   referenced in section 1440, nor does it even mention section

4   1440.

5        THE COURT:  Give me your DODI cite again.

6        MS. KIM:  1332.14, which is the exact entry level

7   separation policy that they heavily relied upon in our

8   current briefing.

9        THE COURT:  I'm not sure whether that's apropos of

10  my argument regarding --

11       Mr. Swinton, let me make sure I understand this.

12  There's been a lot of debate about these two sections.

13       The people in Kirwa, as well as Nio, tried to

14  argue that the uncharacterized discharge for purposes of the

15  MAVNI reservists should be am honorable discharge.  And they

16  relied on 12685 and  1332.14.

17       I said in a foot note that I didn't need to decide

18  this issue because I wasn't going to figure out whether or

19  not the Army or USCIS could turn an uncharacterized

20  discharge into an honorable one.  They used those sections

21  to talk about whether or not uncharacterized is honorable.

22       I don't think that their argument is that the six

23  month thing is irrelevant.  My understanding is they have

24  always argued that six months -- not that they're arguing

25  now, that it is informative, but rather that people can get

1    an uncharacterized discharge within the six months.

2         MS. KIM:  Our only point there, Your Honor, is

3    that defendant's current position is that in implementing

4    the N-426 policy, specifically the minimum service

5    requirement, it sought to align the 180 days with its entry

6    level separation policy.

7         But in the prior litigation, it explicitly

8    disavowed the entry level separation policy had anything at

9    all to do with honorable service certifications under

10   section 1440.  And we believe that those arguments are

11   contention with one another.

12        But Your Honor, I would like also to move on to

13   discuss the statute itself, which is crystal clear in its

14   text scheme and legislative history that, during war time,

15   because service members could be assigned to combat shortly

16   after entering service, that they should be permitted to

17   apply for citizenship almost immediately upon entering

18   service.  And it did not distinguish between MAVNIs or LPRs

19   or those serving in the selected reserves or those in active

20   duty.

21        And I wanted to point in particular to two pieces

22   of legislative history that the defendants themselves have

23   also relied upon heavily in their briefing.  The first piece

24   of legislative history relates to the 1940 Nationality Act.

25   Congress was clear that, when it passed Section 1440, it was

carrying forward the provisions of the Nationality Act of 1940 with respect to naturalization of non citizens serving during wartime.

THE COURT:  Wait, wait.  Congress was clear that they were carrying forward 1940 when?  You used 1940 twice.

MS. KIM:  My apologies, Your Honor.  In 1952, when Congress passed the INA, it was clear that it was carrying forward the provisions of the 1940 Nationality Act.  The Nationality Act of 1940 originally did have a three year minimum service duration requirement for service members serving in World War II.

But in 1942, it amended the Act to eliminate the minimum service duration requirement.  And in doing so, we would like to highlight the exchange in debate.  In the debate, there was a question whether or not the bill simply made it mandatory that anyone who joins the Army should immediately get citizenship.

And the response to that was no, the service must be honorable, but that there was no particular period of time that the service member should have to serve.  And literally, the exchange is how long must he render service and the answer is no particular period of time.

In addition, there was another exchange later in that debate where one of the congressmen said in this bill: You propose that when a fellow goes into the Army

1    immediately, he becomes eligible to make application.  And

2    the answer was yes.

3              And this history is obviously supported --

4              Sorry, Your Honor.

5              THE COURT:  I'm sorry.  Where is that, that is in

6    1942?

7              MS. KIM:  That is in 1942.  In fact, both parties

8    did cite to this exchange, although the exchange itself was

9    not contained in any exhibits to the briefing.

10             THE COURT:  Can you refer me again to the page

11   that you are dealing with in 1942?

12             MS. KIM:  Yes, Your Honor.

13             THE COURT:  I see where it says how long must you

14   render service, no particular time.

15             MS. KIM:  Yes, Your Honor.

16             THE COURT:  What was your other quote?

17             MS. KIM:  The other quote appears on the following

18   page, Your Honor, actually on page 14.  But in this bill, as

19   I understand it, you propose that when a fellow goes into

20   the Army immediately, he becomes eligible to make

21   application and so forth, and response is yes.

22             THE COURT:  All right.  I see it.  All right.

23             Let me ask you about another argument, which I may

24   or may not have understood properly from your papers.  You

25   seem to be arguing that there is a difference between the

INA and the NA.  And that you seem to be critical of the

government for relying on the NA.  But you are relying on it

anyway.

MS. KIM:  Yes, Your Honor.  We do humbly

acknowledge that.  Our position now is that the legislative

history of the 1940 N.A. does inform our understanding of

Section 1440.  We're no longer disputing that with the

defendant.  It was the defendant's position and we agree

with that.

What we're trying to do now is to further

elucidate that history for you, to demonstrate that Congress

was very clear that, when it eliminated the minimum service

duration requirement, its purpose in doing so was that any

non citizens who began their service should be able to apply

almost immediately upon doing so.

THE COURT:  Okay.  We had a debate, I don't know

whether you had a chance -- The government has now cited to

me the legislative history regarding the 12865.  I think

that's it.  12685.

Do you have any position?  They say that it's

irrelevant.  They say that it doesn't apply here because it

has to be a reservist who has been separated for cause.  I

never understood why the guy who was separated for cause

should do better than the one that there is no cause.  But

I've gone around this one last time, too.  But they didn't

1    have the legislative history.

2          I don't know whether you've looked at that

3    legislative history and you disagree with the government's

4    representation.  I mean, I don't know that anything hangs on

5    12685 frankly, one way or another.  I think that it was

6    being used by the plaintiffs in Kirwa to argue that

7    uncharacterized means honorable.  I don't know that it had

8    any other great relevance.  But do you want to respond to

9    their argument on that in any way?

10         MS. KIM:  Sure, Your Honor.  We're in agreement

11   that, what I believe Your Honor just said, which is that

12   what matters is what section 1440 requires.  That is the

13   statute that governs honorable service certification in the

14   naturalization context.

15         And as I mention, Congress was crystal clear that

16   non citizens should be eligible to apply for naturalization

17   almost immediately upon entering service.  The DODI and

18   section 12, the legislative provision 10 USC section 12685,

19   as you, yourself, pointed out, Your Honor, governs something

20   completely different, which is entry level separation.  As I

21   mentioned, defendants agreed in Kirwa that that policy just

22   doesn't have any relevance to section 1440, a position that

23   they have now changed up in this litigation.

24         I think the last point we would make related to

25   12685 and it's legislative history is simply that the point

1    that Kirwa plaintiffs were making, and we don't dispute at

2    all and would agree with, is that actually that policy, both

3    the statutory provision and the policy, are consistent with

4    our reading of the statute because what 10 USC section 12685

5    says is that selected reserve service must be characterized

6    as honorable unless there's a specific finding by a court

7    martial that is other than honorable.  That would include in

8    the entry level -- so-called entry level period.

9           So it's not the case, as the government states,

10   that someone must serve 180 days in order to receive some

11   kind of honorable characterization of service.  That is

12   completely belied by both this statute and the DOD

13   instruction which incorporates that provision.

14          We don't believe that the legislative history is

15   relevant at all but the legislative history simply says that

16   the purpose for this statute was to ensure that there was

17   due process before selected reservists would be discharged

18   under less than honorable conditions, and that there had

19   been servicemen during World War II who had been discharged

20   in this manner.

21          That makes sense, that it wouldn't be just be

22   circumscribed to selected reservists.  It would make sense

23   that Congress would have due process concerns about

24   individuals being discharged under less than honorable

25   conditions without having some kind of court martial

1    finding.

2              THE COURT:  One second please.

3              (There was a pause in the proceedings.)

4              THE COURT:  Counsel, I'm having a little trouble

5    getting my hands on various statutes.  So think this is a

6    good time for a 10 minute recess.  I guess we all just have

7    to call back in or you can mute yourself and put the video

8    on blank.

9              (A brief recess was taken.)

10             THE COURT:  All right.  We were talking about -- I

11   think we got waylaid on 12685.

12             Ms. Kim, you were talking about the statute.  And

13   I'd like you to respond to the government's argument about

14   1440, which is that, within 1440, it says that the executive

15   department, under which such person serves, shall determine

16   whether persons have served honorably in an active duty

17   status.  They are now basically, for lack of better word,

18   reverting and taking the position that their certification

19   has to wait until active duty.

20             MS. KIM:  Yes, Your Honor.  So we have a couple of

21   points in response to that.  The first is related to the

22   broader structure of section 1440.  The second is related to

23   the accompanying regulatory regime.  And the third is we

24   would like to cite to a DOD instruction that supports our

25   reading of the statutory provision.

1           So with respect to the statutory scheme, when you

2     look at section 1440, it's clear that 1440(a) refers to the

3     substantive entitlement.  And it was clear when Congress

4     amended the statute in 2003 NDAA, they met meant to provide

5     selected reserve status as an independent basis for

6     naturalization.

7           That's exactly why they used the disjunctive "or."

8     That's the only language that they and amended in that

9     specific provision, section 1440, when they amended the INA

10    through the NDAA when they amended the provisions relating

11    to service member naturalization.

12          And our argument is that the other two provisions

13    that the government cites are process provisions.  And the

14    most logical reading there is really that this was

15    inadvertent legislative drafting error.  And any limitation

16    on the process cannot completely contravene the substantive

17    entitlement that's contained in section 1440(a).

18          And we like to note that the regulatory regime

19    also confirms this reading of selected reserve status as an

20    independent basis for naturalization without a requirement

21    for active duty status.

22          So for example, the Department of Homeland

23    Security has implementing regulations for Section 1440, and

24    in 8 CFR 329.2, it also reiterates that either selected

25    reserve or active duty status can be independent bases for

1    naturalization.

2            The Department of Homeland Security, in 2010, also

3    promulgated a final rule, extending Section 1440 to selected

4    reservists in line with the 2003 amendment.  And in it, it

5    also notes that what it is intending to do is provide

6    selected reserve service as an independent basis for

7    naturalization.

8            And the USCIS manual currently itself also states

9    qualified military service is selected reserve or active

10   duty.  And finally -- I'm sorry, Your Honor.

11           THE COURT:  (Unintelligible)  said 329 in regs,

12   you says USCIS manual, even now says --

13           MS. KIM:  Qualifying military service is selected

14   reserve or active duty.

15           THE COURT:  You said something in the middle.

16           MS. KIM:  I had the DHS 2010 final rule which

17   extends section 1440 to selected reservists in line with the

18   2003 amendment to the statute.

19           THE COURT:  And what is that cite?  I'm sorry.

20           MS. KIM:  We actually have that in an exhibit,

21   Your Honor.  It's exhibit number four to our original

22   preliminary injunction motion.  Sorry, Your Honor.

23           THE COURT:  Okay.

24           MS. KIM:  There are just two other supporting

25   pieces of evidence that I wanted to cite to in support of

1   our reading of the position that active duty status is not

2   required for reservists to be eligible to apply for

3   naturalization.

4          The first is that DOD instruction 5500.14, which

5   covers the naturalization of non citizens, also states an

6   alien who serves honorably as a selected reservist or in an

7   active duty status may be naturalized.  So that reading

8   obviously confirms our interpretation of section 1440.

9          And in the final piece of evidence we wanted to

10  cite was to look at the legislative history.  During the

11  debate when Congress amended section 1440 to add selected

12  reserve status as an alternative qualifying service, one of

13  the senators described this as providing, quote, a process

14  of immediate naturalization, unquote, for selected

15  reservists because, quote, we rely heavily and strategically

16  on our reservists, and it is only fair to extend this

17  benefit to reserve as well as active duty personnel serving

18  our country in a time of war.  Unquote.

19          THE COURT:  Is that Senator Chambliss that said

20  that?

21          MS. KIM:  I can check, Your Honor.  It was Senator

22  Chambliss, Your Honor.

23          THE COURT:  Okay.  But 5500.14, is there a

24  subsection?

25          MS. KIM:  Yes, Your Honor.  It is subsection -- my

1    apologies, Your Honor.  I'm just trying to find the

2    appropriate –– it falls under E. 2.2, under E. 2.2.1.

3            THE COURT:  Okay.  I know what you're talking

4    about.  All right.  And did I cut you off?

5            MS. KIM:  No, Your Honor.  We have cited to myriad

6    sources that support our reading.

7            I think the last thing we would just mention is

8    that, as we noted, the entire intent of Congress in

9    originally passing section 1440 was to ensure that non

10   citizens would be able to naturalize almost immediately upon

11   entering service.  And when they extended the benefit to

12   selected reservists, there is no indication whatsoever that

13   they were going to require different criteria or that they

14   were differentiating between two different types of non

15   citizens.  So that underlying intention applies equally to

16   both selected reservists and active duty service members.

17           THE COURT:  What do you make of the reference on

18   occasion, both in the regs and in the DODI, about waiting

19   periods are not applicable.  How do you interpret the words

20   "waiting period"?

21           MS. KIM:  We would interpret it, Your Honor, that

22   there is no minimum service duration requirement.  Once the

23   member has begun service, they do not have to wait any

24   period of time before they can seek an N-426 and be eligible

25   for naturalization.

1          THE COURT:  Okay.  Mr. Swinton, how do you respond

2     both to the notion that there is no waiting periods or no

3     waiting periods are applicable?  It comes up over and over.

4     It comes up in 5500.14.  It comes up in the 68 legislative

5     history and it comes up in the 8 CFR 229 subpart A.

6          MR. SWINTON:  Yes, Your Honor.  A few points in

7     response to what Ms. Kim said.  The authority that she cited

8     to, the statutory language, the USCIS regs, the USCIS manual

9     and also the DODI 5500.14, they all say the same thing.

10    They speak to who is eligible to seek naturalization.

11    Congress made clear in 2004 that both reservists and active

12    duty service members are eligible to seek naturalization.

13          What none of these authorities say is, that does

14    not mean that he served honorably.  That is what DOD's

15    responsibility is.  Of course, USCIS is going to promulgate

16    regs about who is eligible to seek naturalization.  But that

17    is a USCIS responsibility.

18          DOD's responsibility is how to figure out whether

19    or not someone has served honorably.  And how DOD has

20    interpreted that consistently across the decades is that

21    there must be sufficient amount of service record.  And that

22    includes some time in active duty service.

23          THE COURT:  Okay.  Where is this, your

24    understanding  of the record defining service as being

25    something more than a point in time whether you check the

1   box yes or no?  I don't understand the long term service.

2   The way I understand it, it says a lot of places, including

3   military publications, one day is enough for an active

4   person or a reservist.

5          MR. SWINTON:  I think those are some recent

6   authorities, Your Honor, after the creation of the MAVNI

7   Program.  So that the more recent history may have shown

8   that, but that is a departure from the norm.  To see how

9   entrenched this notion is, we can do back to the 1940s,

10  specifically in the legislative history that Ms. Kim was

11  drawing upon.  What she failed to mention in her discussion

12  of the committee hearing were the excerpts that the

13  government pointed out in its brief.  Specifically where the

14  author of the Naturalization Act made clear that the bill

15  does not make it mandatory that anybody who joins the Army

16  immediately gets citizenship.  He said no, the service must

17  be honorable.  And that's what DOD's role is, is to figure

18  out what is honorable.

19         THE COURT:  The big debate here has to do with

20  when they figure it out and what does it represent.  But

21  what do you say to all the parts of the statute that has

22  waiting periods that are not applicable?  One is DODI

23  5500.14.  That is not USCIS.  And when you passed the

24  October 13, 2017 policies, section one, which is what is at

25  issue here, they recognize that it was one day.  That's why

1    they said they were changing it.  It was a big, that's a big

2    change from one day to 180 or more.

3            So I don't know how you can sweep this all under

4    the rug and say that's what the committee hearing was

5    talking about in 1942.

6            MR. SWINTON:  It's not just the committee hearing

7    Your Honor.  It is also two places in the current version of

8    the statute.  The operative language says that it must be

9    based on active duty status.  The plaintiffs are trying to

10   suggest that Congress erred, not once, but twice in section

11   1440.

12           Our reading actually doesn't make the Court or

13   wouldn't require the Court to determine that there is a

14   drafting error at all.  It simply says the first sentence of

15   1440(a), it says who is eligible, reservists and people who

16   are on active duty service.  The second sentence--

17           THE COURT:  There are a couple of propositions

18   that I raised in the prior cases.  One of them is that you

19   couldn't impose active duty statute on an active, on a

20   reservist.  And it seems like that was not highly contested.

21   You are now contesting that proposition.

22           MR. SWINTON:  We're saying that consistent with

23   the policy memo, the time in service requirement and the

24   statutory language, DOD for reservists, they need to have

25   attended some sort of active duty training in order to make

1   the honorable service requirement.  That is by policy.

2           THE COURT:  Policy, which policy?

3           MR. SWINTON:  The October 13, the time in service

4   requirement because they have to meet the basic training

5   requirement.

6           THE COURT:  Do you dispute the notion that 1440

7   determination is not a military determination?  It is a

8   naturalization criteria.  And how you interpret it, meaning

9   1440, is an issue -- not as an issue for USCIS.

10          MR. SWINTON:  I think the issue that is reserved

11  in the responsibility that is reserved for DOD is whether or

12  not the services has been honorable.  And what that means,

13  the record DOD needs in order to make that determination.

14          THE COURT:  Where is this longstanding practice?

15  My understanding, and correct me if I'm wrong, that LPR

16  reservists or active for that matter, what they used to do

17  is they get to basic training.

18          And they got there pretty quickly back in the old

19  days before there was this DTP problem.

20          But they got to basic training.  They got an N-426

21  when they walked in the door.  And unless there were

22  problems of some sort, they left basic training as

23  naturalized citizens.  That is my understanding, and that

24  that took somewhere around four, five, six months or 10

25  weeks.  That the record, at least that I understand, for

1   both LPRs, and for that matter, MAVNIs, was that they went

2   to basic, and when they came out they got naturalized.  Is

3   that not the practice that occurred prior to October 13?

4        MR. SWINTON:  That's the practice in the short

5   term, Your Honor.  The longstanding practice that I was

6   referring to was broader about DOD taking sufficient time to

7   make the characterization of service determinations.  I

8   would actually point you to the Patterson case in 1946, also

9   the Davis versus Woodring case  from the D.C. Circuit from

10  the 1940.  In both of those cases, the plaintiffs were

11  inducted into the military and were shipped to, or had begun

12  attendance at what they called mobilization camp.  And I

13  presume that is basic training.

14       They were discharged, in one case, in Patterson,

15  they were discharged after three days.  Woodring, I believe

16  the plaintiff was discharged after 33 days at attendance of

17  basic training.

18       In both cases, the plaintiffs received what was

19  then called a discharge of duty through characterization as

20  opposed to an honorable characterization of service.  And

21  the Courts, in both cases the declined to review or second

22  guess DOD, the military determination of that individual's

23  service.

24       And again, I think the principles that the Courts

25  were affirming were, when someone has served for a short

period of time that is insufficient for DOD to make a

characterization of service, the Courts are not going to

second guess that and Courts are not going to require that

to make an honorable service characterization.

That is exactly what plaintiffs are trying to do

in this case.  The plaintiffs are trying to make DOD make an

honorable service determination based on one or two days of

drilling (unintelligible) basic training (unintelligible)

Patterson.

THE COURT:  What can you point to -- I understand

that those two cases had to do with discharge.  But what do

you point to in the real world about how you treated -- DOD

treated LPRs or MAVNIs -- but mainly LPRs.

MR. SWINTON:  Your Honor, the information that the

Court has is correct with regards to the military's more

recent practice.  I know that was a factor in the Court's

consideration of the Kirwa case.  But in that case, there is

significant reliance (unintelligible) in what the Court

found.

Whereas here, the plaintiffs have yet to receive

an N-426 certification in this case.  They all enlisted

years after the date that the policy went into effect.  They

don't have that same reliance, where they have the claim

about the rules being changed on them concerning N-426

certification, that doesn't exist here the way it did in

1    Kirwa.

2              THE COURT:  I'd like to go back, in reading your

3    documents Samma administrative record 28 or 17 or 20, it

4    sounds like you are making these changes because of national

5    security.  You are not standing on that ground, correct?

6              MR. SWINTON:  No, Your Honor.  No national

7    security concerns went to the suitability screening.

8              THE COURT:  I know that that is your position.

9    But if you read these documents, it does seem like they are

10   considering the fact that they need this kind of information

11   down to fully -- they need the time to develop the

12   information, and that it's relating --

13             At one point, you had a document that talked about

14   national security counterintelligence and internal threats.

15   I'm not 100 percent sure which one that was.  It could have

16   been 9-22-2017.  But there are a whole bunch of them, there

17   are several of them that I to be read to be the motivation

18   that had to do with having enough time to basically ensure

19   you didn't have any security threats.

20             MR. SWINTON:  That may be a consequence of the

21   fact that there were three different policy memos that were

22   ruled out on October 13, 2017.  And all three of those

23   address, in one way or the other to a certain extent,

24   security concerns that DOD had with the MAVNI population

25   specifically, but also the LPR population.  It included the

memo that we're looking at here.  But that requirement is
not an issue in this case.  So I think it may be more of an
issue of (unintelligible) administrative record lining up
which reference to national security pertains to which part
of the October 13, 2017 policies.

THE COURT:  I'm looking at a document, September
22, 2017.  They recommend in that policy any non citizen
enlistee complete basic training include 180 days.  But they
don't talk about aligning it with any notion of your
uncharacterized discharge.  Then, you look on to the next
document, which is the Samma 15.

Then that goes on, if you look at 20, 19 and 20,
again it seems to be the motivation started out with the
whole question of counter intelligence, vulnerabilities.

And then it says that DOD enlists approximately
7,000 lawful permanent residents each year.  Current policy
allows LPRs to proceed through initial military training,
provided their tier three background investigation has been
initiated.  And then they say that LPRs share the risk
factors with the other -- the MAVNIs.  And then --

Who wrote this document by the way?  This is the
one that is October 12, 2017?  Samma 20.

MR. SWINTON:  Yes, Your Honor, it looks like it
was prepared by the Office of the Secretary of Defense
Personnel Readiness (unintelligible).

1          THE COURT:  Then it says: Due to security counter

2     intelligence and insider threat concerns, it is the

3     department's intent to ensure all appropriate security

4     screenings complete prior to the entry into military service

5     and the certification of honorable service is granted for

6     the purposes of expedited naturalization.  This is the

7     change from current practice of one day of service.

8          I have a hard time sort of -- I understand that

9     they need the six-month, uncharacterized definition.  But I

10    don't know why.

11          MR. SWINTON:  Yes, again, these were three

12    policies that were being issued all on the same day.  Maybe

13    not being isolated to the extent that we've done so in this

14    case.

15          The majority of what Your Honor just read from is

16    under the heading of Change in LPR Security Screening

17    Requirements which is why it's focused so much on security

18    screening and national security concerns.

19          The best place in the administrative record that

20    demonstrates or reflects DOD's intent to align service

21    requirements with DODI 1332.14 is the Army's memo of July

22    2017, which follows a group meeting between the various

23    services and PMR; at which time, various proposals were

24    discussed that the Army was providing feedback on those

25    proposals.  And DODI (unintelligible) desirable to align the

1    time in service requirements (unintelligible) entry level

2    separation framework set forth.  So there are references to

3    natural security screening in the record.

4           Again, I think that has to do with the fact that

5    there were various policies all being issued on the same day

6    and also different parts being issued within the same memo

7    that pertain to N-426 (unintelligible).

8           THE COURT:  Ms. Kim, can you respond?  First of

9    all, Mr. Swinton invokes these cases Patterson and Davis.

10   What do you want to say about them?

11          MS. KIM:  Our position, Your Honor, is that these

12   cases are not relevant at all.  They have to do with

13   discharge characterizations.

14          And what we're talking about here is what Congress

15   said, when it enacted section 1440, which had to do with

16   honorable service certification in the naturalization

17   context.

18          We would also like to correct the defendant's

19   reading of Patterson.  There, there was a service member,

20   the plaintiff who had enlisted.  But he had not actually

21   entered service at all.  He enlisted and was discharged

22   three days later on his way to begin his service.

23          So that case was just complete inapposite for that

24   reason as well, considering that all of our plaintiffs and

25   putative class members are actually serving.

1          But to go back to this point about what section

2    1440 requires, the plaintiffs are not making the defendants

3    do anything.  Section 1440, as we've already noted, makes it

4    very clear that non citizens are entitled to an N-426 and to

5    seek naturalization as soon as they begin their service

6    without a minimum service duration requirement.  And this is

7    reflected both in the 1948 history, which we discussed

8    earlier, and is also buttressed by the 1968 legislative

9    history of the Act, which this Court actually cited in its

10   first Kirwa preliminary injunction decision.

11          And there, the debate made very clear that, while

12   the peace time serviceman has a one-year minimum service

13   requirement, the wartime serviceman does not.  It explains

14   again that encompasses for non citizens to naturalize before

15   being assigned to actual combat.

16          One thing we wanted to note in relation to

17   relevant case law, there is a 1944 case which came shortly

18   after the 1942 amendment to the 1940 Nationality Act.  It's

19   called Petition of Delgado from the Northern District of

20   California that explicitly finds that the amendment to the

21   provision that eliminated the minimum service duration

22   requirement establishes no prerequisites as to the duration

23   of service.

24          And this case directly pertains to section 1440

25   and honorable service certification in the naturalization

1   context.  Whereas, as discussed, the cases that defendants

2   cite have to do with discharge characterization, which is a

3   completely different context.

4           THE COURT:  Do you have a cite?

5           MS. KIM:  Yes, Your Honor.  My apologies that I

6   don't have that just offhand.

7           THE COURT:  So the petition is Delgado?

8           MS. KIM:  Yes.  The Northern District of

9   California.  It is a 1944 case, Your Honor.

10          THE COURT:  Okay.

11          MS. KIM:  I have the cite.  It's 57 F. Supp. 460,

12  Your Honor.

13          THE COURT:  Anything you want to say further about

14  the question of the length of service?

15          MS. KIM:  Yes, Your Honor.

16          So the defendants, I believe they asserted that

17  the practice of providing N-426 certifications after only a

18  single day of service began with the MAVNI program.  But

19  that is incorrect, Your Honor.  That is demonstrated both by

20  the DOD internal naturalization guidance, which you cited to

21  numerous times in your Kirwa preliminary injunction opinion.

22          For example, there was an Army human resources

23  command guide to naturalization that was in effect from the

24  at least 2005 to 2017 that made it clear that a service

25  member who was seeking an N-426 would receive an honorable

service characterization so long as they had not received a

court martial finding, discharging them for under less than

honorable conditions.

And we also cited, Your Honor, in our preliminary

injunction motion, to a Navy military personnel manual,

which I believe dates back to 2008, which says that one day

of service is sufficient to request an N-426.

There is also, to go back to the DOD instruction

5500.14, which covers naturalization for service members,

that dates back to 2006.  And in that instruction, it

states: military basic training shall include assistance to

interested aliens in completing and submitting the

application and other forms required to initiate

naturalization proceedings.  So that instruction--

THE COURT:  I thought that dated back to 1970.

MS. KIM:  It may, Your Honor.  I have the 2006

version, but it's possible, Your Honor, we didn't go back to

go back to see how long that language reflected back.

THE COURT:  The paragraph talks about

(unintelligible).

MS. KIM:  Yes, it does, Your Honor.  And then,

below that, the DOD instruction makes it very clear, the

military's practice and policy of permitting non citizens to

seek naturalization with the help of the military as soon as

they arrive at basic training.

1          THE COURT:  What do you say to the government's

2     position that --

3          I'm sorry, go ahead.  Go ahead.

4          MS. KIM:  There is one other thing we wanted to

5     note, Your Honor, which is that we wanted to point out that,

6     as part of the management of the Kirwa class, in October of

7     2017, I believe it was October 27, 2017, the government

8     actually issued a policy memo on how it was going to manage

9     the Kirwa class.  And that memo is reflected in defendant's

10    filing to the Court in Kirwa docket number 41.

11         And what is interesting about that October 27 memo

12    is that it describes a two-step process for certifying the

13    N-426s of MAVNI selected reservists who had served at least

14    one day in accordance with your preliminary injunction

15    order.

16         And it notes that that two-step process is

17    necessary in order to permit a performance evaluation in

18    order to make the honorable service determination.  That

19    memo is a clear admission that defendants know how to make

20    an honorable service determination,even for service as

21    little as one day.  They've been doing it for hundreds of

22    MAVNI select selected reservists in the Kirwa case.   And

23    there is no reason they cannot do so for our plaintiffs

24    here.

25         THE COURT:  Can we go on to your 706(2)(A)

1    argument.

2            MS. KIM:  That would be, is that the arbitrary and

3    capricious --

4            THE COURT:  No.  This is 2A.  Contrary to law.

5            MS. KIM:  Yes, Your Honor.

6            THE COURT:  It is both A and C, contrary to law.

7            MS. KIM:  Right, Your Honor.

8            So the exceeds statutory authority contrary to law

9    argument relies on the Chevron framework.  And the first

10   step of inquiry, as the Court is familiar, is to ask whether

11   Congress directly spoke to the precise question at issue.

12           And here, our argument overlaps significantly with

13   our unlawful withholding argument, which is that Congress

14   was crystal clear that non citizens are eligible for

15   naturalization almost immediately after entering service.

16           And this is reflected in the text supported by the

17   structure and legislative history.  So looking first at the

18   text, the text uses the mandatory "shall" to instruct the

19   Department of Defense to certify if a non citizen has served

20   honorably.

21           In the Kirwa preliminary injunction decision on

22   page 26, when Your Honor describes this language, "served

23   honorably" and the use of the past tense, the Court

24   interpreted that as meaning that there is no minimum period

25   of military service required, and that defendants must

1    certify based on existing service records.

2         And we believe that this interpretation is

3    supported by the structure of the statute, as Your Honor

4    already noted, when you compare sections 1439 and 1440, the

5    1439 provision, which covers naturalization during

6    peacetime, has a one-year minimum service requirement.

7         And therefore, the logical conclusion that we draw

8    from that when looking at section 1440 is that Congress

9    deliberately omitted a minimum service requirement for

10   service members serving during peacetime.  And all of this

11   is buttressed of course by the legislative history, both the

12   1942 legislative history, which we discussed, as well as the

13   1968 legislative history, which buttresses our comparative

14   reading of sections 1439 and 1440.  And there, in the

15   debate, Congress was explicit that, while the peacetime

16   serviceman has a minimum service requirement, the wartime

17   serviceman does not.

18        THE COURT:  Okay.  What do you gain, or what --

19   706(1) requires me to find (unintelligible), right?

20        MS. KIM:  Yes, Your Honor.

21        THE COURT:  That's the necessary -- And if one

22   were reluctant to embrace that, if you, for instance,

23   hypothetically found arbitrary and capricious, why would I

24   need to consider 706(1)?

25        MS. KIM:  I think, Your Honor, the reason there is

1    that 706 -- or unlawful withholding or exceeds statutory

2    authority contrary to law arguments would make it very clear

3    that what the Department of Defense is doing is contrary to

4    the Immigration and Nationality Act and is not appropriate.

5    Whereas, with the arbitrary and capricious claim, there, the

6    finding would be that there was no recent explanation for

7    the change.  It would, therefore, allow the Department of

8    Defense to potentially reissue a new rule that provides

9    another explanation, whether or not that is recent or not is

10   questionable, given our position regarding the statute.

11          But for plaintiffs, they would seek a clear

12   finding that what defendants are doing currently is clearly

13   contrary to the statutory text of section 1440.

14          THE COURT:  But that's a different -- that's

15   706(2) (A) and (C).  I'm asking what difference does it make

16   that 7061--

17          MS. KIM:  The ministerial duty argument.

18          THE COURT:  Yeah.

19          MS. KIM:  Well, our argument there is that the

20   unlawful withholding ministerial duty argument does overlap

21   significantly with the exceeds statutory authority argument.

22   And so, the Court's conclusions would likely rise and fall

23   together with respect to those two claims.

24          THE COURT:  Not necessarily because one of them

25   depends on being ministerial.

1      MS. KIM:  Right, Your Honor.  But our reasoning

2 behind why defendants have ministerial duty is predicated

3 largely on the text of the structure and the history of the

4 statute, which are our arguments primarily in support of why

5 what defendants are doing with the minimum service

6 requirement exceeds the agency's statutory authority.

7      THE COURT:  Okay.  Mr. Swinton, do you have any

8 response on the 706(2) argument other than I know 1940, or

9 42.

10      He is not appearing here anymore.  Where did Mr.

11 Swinton go?

12      Go ahead.  Mr. Swinton, are you able to hear?  I'm

13 not hearing him.

14      (Technical difficulties).

15      MR. SWINTON:  I apologize, Your Honor.  My video

16 froze.

17      THE COURT:  I'm not sure I can repeat where we

18 were.  Did you hear the end of Ms. Kim's discussion--

19      MR. SWINTON:  Unfortunately, I haven't heard the

20 last five or six minutes.

21      THE COURT:  Okay.  Ms. Kim, can you repeat what

22 you were saying.

23      MS. KIM:  Yes, Your Honor.  I started out by

24 distinguishing Patterson and Davis.  I believe Mr. Swinton

25 probably heard that part of the discussion.  I think that

1   was more than five or six minutes ago.

2          I then discussed section 1440 and where Congress

3   requires under section 1440 and cited to the petition of

4   Delgado case, and also discussed briefly the 1948 and 1968

5   legislative histories.

6          I also, following that, I rebutted the point that

7   the one day of service being sufficient as beginning with

8   the MAVNI program by citing to the DOD's internal

9   naturalization guidance and the DODI 5500.14.

10         And then the last point I made was regarding DOD

11  memo related to the class, management of the Kirwa class, a

12  memo dated October 27, 2017, which was referenced in a

13  filing by defendants in Kirwa, which laid out a two-step

14  process for determining whether or not a MAVNI selected

15  reservist who served for at least one day could receive an

16  N-426 certification.

17         THE COURT:  Let me ask you this, that's apropos of

18  this.

19         Mr. Swinton, what do you do -- let's just say that

20  a person is in there for four months, five months, six

21  months.  How do you decide whether they have served

22  honorably at that point in time?  They have been there 180

23  day and the 182nd day, you give them an N-426.  What do you

24  do?  How do you do it?

25         MR. SWINTON:  Sure.  The request is made through

1    the individual's unit.  So it would go up the chain of

2    command, up to a certifying authority, the O-6 is typically

3    the unit command out of the unit.  They would review, as I

4    understand it, the unit command would review the personnel

5    records and have any necessary discussion with duty officers

6    to discuss service and performance in order to make the

7    appropriate determination on how to characterize the

8    service.

9              THE COURT:  Well, how do you know that?  I mean,

10   is there a procedure set out or anything in the department

11   of defense regulations or --

12             MR. SWINTON:  Yes, there are --

13             THE COURT:  -- tells O-6 what to do.

14             MR. SWINTON:  Yes, there are regulations, Your

15   Honor, including I believe 1332.14 enclosure four, has

16   discussion about how to characterize service.  Notably, one

17   of those criterion is the length of time.  And we've also

18   cited to multiple regulations about characterizing service

19   that date back to the mid-20th century, all of which I

20   believe have that same length in time provision in there.

21             THE COURT:  I don't know where I would find that

22   historical, out of curiosity.

23             MR. SWINTON:  It is in our briefs.  We have

24   citations to various CFRs.

25             THE COURT:  You talk a lot about reviewability

1    based on Kuang, K-u-a-n-g.  I don't understand why that

2    tells me that I should review what is going on here.  That

3    was strictly a military rule.  That was the second policy of

4    October 13, which had to do with who gets in the military

5    and talking about LPRs.  I don't know why it has anything to

6    do with the naturalization issue.

7            MR. SWINTON:  Well Your Honor, actually it does

8    based on the way the plaintiffs pled the complaint in Kuang.

9    The policy in Kuang at issue applied to the LPRs and the

10   requirement of the LPRs to have a favorable MSSD in order to

11   be shipped to basic training.  One of the complaints the

12   plaintiffs made was that requirement is delaying or denying

13   our ability to have an N-426 certification.

14   (Unintelligible) claim based on the pleadings.

15           (There was a pause in the proceedings.  Technical

16   difficulties.)

17           THE COURT:  Yes, we're having some problems.

18           MR. SWINTON:  Let me start over, Your Honor.

19           THE COURT:  Yes.  Please.

20           MR. SWINTON:  -- had to do with one of the three

21   October 13th policies, specifically the one that required

22   that LPRs have favorable MSSDs in order to ship to basic

23   training.  The (unintelligible) N-426 was made by plaintiffs

24   in that case because they were complaining that that

25   requirement, among other things, was delayed in their

1   ability to receive N-426 certifications.  So it was not the

2   N-426 policy that had patience for their requests for

3   N-426s, their desire to have N-426 certification.

4         Again, in the 9th Circuit, the three judge panel

5   determined that it was not going to review the military's

6   policy (unintelligible).

7         THE COURT:  I can't remember precisely.  But did

8   the 9th circuit talk about the naturalization aspect or

9   strictly the fact that you are trying to figure out what the

10  military will require for accession to the military, just

11  the ability to access.

12        MR. SWINTON:  That 9th circuit opinion did not

13  make mention of naturalization or N-426 certification that I

14  can remember.  The District Court's preliminary injunction,

15  one of the harms that it cited as the plaintiffs

16  (unintelligible) receive N-426s.

17        THE COURT:  You said at some point in one of your

18  pleadings, it's in docket 19, that you claim that the

19  characterization of current service for purposes of

20  naturalization ensures proper military discipline and

21  control.

22        I don't understand that.  I mean, if you are

23  saying to USCIS, the person is eligible has served X days,

24  whether it be two days or five, I don't understand how that

25  undercuts your ability to exercise proper military

1    discipline and control over the LPRs.

2            MR. SWINTON:  I think that was the broader point

3    we were trying to make there, Your Honor, about the nature

4    of this administrative action.  That it is an inherently

5    military function that has to do with the internal

6    operations of the military.

7            Yes, it has its external consequence of enabling

8    them to have a completed application for naturalization.

9    But this is a classic military determination that pertains

10   to the way that the military governs and controls its

11   personnel policy.  That's the points that (unintelligible).

12           THE COURT:  Where is the USCIS manual of October

13   2018, was there one between 2017 and 2019?

14           MR. SWINTON:  I don't know the answer to that

15   question, Your Honor.

16           THE COURT:  Could you find out if there is a 2018,

17   USCIS?

18           MR. SWINTON:  Yes.

19           THE COURT:  And would that mean that, if there

20   isn't one, the one from 2017 remains in effect until it was

21   superseded in 2019?  I don't know how it works.  I've never

22   seen one for 2018.  I have seen them for 2019 and 2020.

23           MR. SWINTON:  Yes, Your Honor, I can find out that

24   information.  I don't know it off the top of my head.

25           THE COURT:  All right.  I've sort of asked this

1    question in other ways, but I'm going the ask it once more.

2         Why does the military need a developed service

3    record in order to say somebody is eligible to naturalize?

4         MR. SWINTON:  The military is not saying whether

5    someone is eligible to naturalize.  That's what Congress

6    said in (unintelligible).  The DOD is saying that someone

7    has served honorably, that is a different decision.

8         DOD needs that, as it has needed it -- again, this

9    is the longstanding practice that we referred to.  DOD needs

10   to make sure that someone has made an informed decision

11   about how to characterize someone's service.  This dates

12   back to the, as we've discussed earlier, it's necessary in

13   order to ensure that the service member has performed in a

14   way that allows them (unintelligible) to serve, to make a

15   decision sufficient to characterize the service.  That's why

16   the default under DODI is that for active duty service

17   members, anything less than six months of service is going

18   to be uncharacterized because, by default, that is not

19   enough time for DOD to make that informed decision.

20        THE COURT:  Well, what happens with the person

21   that's at basic and they develop cancer.  So that person

22   can't serve and they get uncharacterized discharge.  You,

23   the military knows that, by doing that, they're not going to

24   naturalize.  That's basically what will happen.  I've always

25   found that to be very problematic.

1           MR. SWINTON:  Well, the default is an

2    uncharacterized discharge.  There are exceptions listed in

3    enclosure four, specifically under enclosure four,

4    subsection 3B1A2.  The Secretary, a case by case basis, able

5    to make exceptions, clearly warranted by the

6    (unintelligible) of unusual military duty.  So I'm not

7    saying that a medical discharge was an exception.  But there

8    are ways for DOD to make service determinations outside of

9    default rule that should be uncharacterized service

10   (unintelligible).

11          THE COURT:  With the exception of that, they're

12   going to be out and they can't naturalize.  And is it not

13   fair to say, as was said by Ms. Miller, that the Department

14   of Defense does not think than an uncharacterized discharge

15   should be the basis for refusing naturalization?

16          MR. SWINTON:  Your Honor, I don't believe we're

17   taking a position on that.  As we've said in our filing last

18   Friday, whether or not an uncharacterized discharge is

19   sufficient is something for (unintelligible) that the DOD

20   would have to (unintelligible.)

21          THE COURT:  What do you say, Ms. Kim, to their

22   rationale, explanation for changing from a no required time

23   to either six months or a year?

24          MS. KIM:  Well Your Honor, we reiterate, Your

25   Honor, that this idea that they're trying to align honorable

service certifications in the naturalization context with

the entry level separation policy is quite odd, given that

in the Kirwa litigation they disavowed any reliance on the

entry level separation policy as having any relevance for

Section 424--

THE COURT:  (Unintelligible)

MS. KIM:  I'm sorry, Your Honor.

THE COURT:  I think the policy A5.  I think they

disavowed that as being relevant.  And I don't think that

they are saying it is irrelevant, the six-nothing for

uncharacterized.  But they don't buy into your reading of

12685.  Now he's again got legislative history.

MS. KIM:  Yes, Your Honor.  I think the important

thing is really to focus on section 1440 and what section

1440 says and requires.  All of the sources that the

Department of Defense relies upon relate to discharge

characterizations.  They talk about a long history of

military regulations, saying they need to build a sufficient

record of service.  All of those regulations, every single

one has to do with discharge characterization.

What is relevant here is what section 1440 says.

Section 1440 governs honorable service certifications in the

naturalization context.  As we've said, section 1440 is

crystal clear that non citizens are eligible for an

honorable service certification as soon as they begin

1  service.

2          And we have also demonstrated that the Department

3  of Defense has had no problem for years certifying the

4  honorable service of individuals who have served at least

5  one day in compliance with the statute.

6          THE COURT:  You say for years.  What do you point

7  to that gets us back more than where the MAVNIs came into

8  being?  That was 2009 probably.

9          MS. KIM:  Right, Your Honor.  So one source that

10  we would cite to would be the Army Human Resources Command

11  Guide, which was cited by Your Honor in the Kirwa

12  preliminary injunction order which dates at least back to

13  2005, up until 2017.

14          That guidance states that, when a non citizen

15  seeks an N-426, the military must determine if service is

16  honorable on the basis  of whether or not at the time the

17  N-426 is requested, if a court martial -- if there was a

18  court martial finding to discharge the service member under

19  less than honorable conditions.  If that court martial

20  finding was not reflected in the record at the time that the

21  N-426 was submitted, the service member would receive an

22  N-426.

23          We also cite, Your Honor, to a 2008 Navy Military

24  Personnel Manual, which states that only one day of service

25  is sufficient in order to obtain an N-426.

1          THE COURT:  They were both exhibits to your PI

2   motion?

3          MS. KIM:  Yes, they were, Your Honor.

4          THE COURT:  Okay.

5          MS. KIM:  The other source is the administrative

6   record itself, which states clearly that the prior practice

7   was to certify honorable service after a single day.  I can

8   provide a citation to the administrative record.  Samma 17

9   and Samma 20, Your Honor.

10         THE COURT:  Okay.  You were talking about, I know

11  where the Navy one is.  The Army Human Resources from '05,

12  is that -- I see one for the soldiers.  Where do I find the

13  ' 05 one, Ms. Kim?

14         MS. KIM:  I believe, let's just look at the

15  exhibits, Your Honor.  That would be exhibit 10 to our PI

16  motion, our original PI motion, docket number four.

17         THE COURT:  In the administrative record we're

18  talking about Samma 17 and 20?

19         MS. KIM:  Yes.  And there is one more authority

20  that we would like to cite, which is the DOD instruction

21  5500.14 again.  The one that we cite is dated back to 2006.

22  And that one states that the military shall assist non

23  citizens to initiate their naturalization proceedings by

24  filling out and submitting the appropriate forms at basic

25  training.

1          THE COURT:  That is one of your exhibits?

2          MS. KIM:  Apologies, Your Honor, we did not

3    include that particular instruction in our exhibits.

4          THE COURT:  I think I've asked a million questions

5    and gotten a lot of are answers.  And I appreciate your

6    patience.  I'm just doublechecking here for one minute.

7          (There was a pause in the proceedings.)

8          THE COURT:  Ms. Kim, you seem to tell me that my

9    case is really on all fours with Kirwa, and therefore, I've

10   got my hands tied.  I'm not sure I understand that argument

11   frankly.

12         MS. KIM:  So Your Honor, the reason that we

13   continuously cite to Kirwa is because we believe that your

14   ultimate findings in Kirwa were not cabined to MAVNI

15   selected reservists, they were not cabined to the MSSD

16   requirement and they were not cabined to section two of the

17   policy.

18         As you found in Kirwa, the defendants have a non

19   discretionary and ministerial duty to certify the N-426s of

20   non citizens based on their existing service records.  That

21   is exactly what we're requesting here.

22         The Court's preliminary injunction order in Kirwa

23   enjoins the defendants from refusing to certify the

24   honorable service of Kirwa plaintiffs who have served for

25   one day or more except for conduct reflected in their

1   existing service records.

2          Now section 1440 simply doesn't distinguish

3   between any type of non citizens, whether it's a MAVNI or an

4   LPR, doesn't require different criteria for those serving in

5   the selected reserve or active duty.

6          And we believe that it would really be grossly

7   unfair that MAVNI selected reservists are now able to obtain

8   N-426 certifications after a single day of serving, while

9   leaving thousands of other non citizens out in the cold.  We

10  believe that your findings about section 1440, therefore,

11  apply equally to our plaintiffs in this case.

12          THE COURT:  Mr. Swinton, you think I'm not bound

13  by Kirwa.  Can you tell me why?

14          MR. SWINTON:  Well, starting out to respond to

15  what Ms. Kim said, she is seeking to apply the Kirwa

16  injunction in this case, but failing to recognize the

17  reliance interests that was at stake in Kirwa.

18          The Court was very concerned with DOD and what it

19  perceived to be a changing of the rules of the game.  The

20  time turnaround for the Kirwa injunction specifically came

21  from the time it took DOD to certify the N-426s in the Nio

22  plaintiffs.  All of these individuals were those who

23  enlisted before the date of October 13, 2017.

24          This case, by contrast, everyone is enlisted, and

25  in fact, the three plaintiffs who have yet to receive

1  certifications are the only three standing, they all

2  enlisted years after the policy was in effect.  So there is

3  no change of the rules for these plaintiffs.

4          I think, in fact, it would be grossly unfair to

5  confine DOD forever to the Kirwa injunction, where that

6  interest simply has not arisen in this case.

7          THE COURT:  Well, the Kirwa injunction came about

8  because of the problem of not certifying while they checked

9  all the MSSD requirements.  I mean, section two was a

10 different, was different.  It wasn't a --

11         MR. SWINTON:  Yes, Your Honor, it was--

12         THE COURT:  Yeah.

13         MR. SWINTON:  It applied to a different group of

14 service members.

15         THE COURT:  Did you argue in the Kirwa case?

16         MR. SWINTON:  I did.

17         THE COURT:  Over time your papers have gotten a

18 lot better.

19         MR. SWINTON:  We have longer time before we have

20 to submit it and I had some great help in this case, Your

21 Honor.

22         THE COURT:  Sorry.  You have what?  More time?

23         MR. SWINTON:  Yes.  And great help from Mr.

24 Holland.

25         THE COURT:  Where was Mr. Holland in December 17.

1      MR. SWINTON:  He may have still been in law

2  school.

3      THE COURT:  Ms. Kim probably was aren't around

4  either.

5      Anyway, okay.  I would like to know from the

6  government whether there is a USCIS policy manual for 2018,

7  if anything existed between the one I have from 2017.

8      I would like to know from Ms. Kim whether there is

9  anything that tells me I can go back and worry about the

10  reasons for the 0-6 given the intervening statute.  At the

11  moment, I think it is important for us to move along here

12  and not get bogged down.

13      I think that the two gentlemen -- because we're

14  going to have an argument that they're not qualified or, you

15  know, I have to some way or another relate back.  I won't

16  get to the relation back.  Do you agree, Ms. Kim, if I find

17  these two gentlemen can represent a class of active MAVNIs

18  and active LPRs?

19      MS. KIM:  Yes, Your Honor.

20      THE COURT:  We don't need to worry about that.

21      I also think that my tentative ruling is that

22  Isiaka can represent the LPR reservists.  But I think he

23  only has standing regarding the one year service requirement

24  or it may not be exactly the year.

25      Is there any way, you wrote me all this stuff in

1  your last go-around, your last filing, is there any way

2  under all your scenarios under document 34, page four, Mr.

3  Swinton, that this guy can get an N-426 before he gets

4  through a year or thereabouts, through this scenario of DT

5  form 214?

6          MR. SWINTON:  Not for plaintiff Isiaka in this

7  instance, Your Honor.  That is a case where a reservist

8  would be able to receive an N-426 in less than a

9  calendar year by completing E.C.T. followed by AIT or its

10 equivalent (unintelligible).

11         I also want to point out that, even where there is

12 a slip in training, the time in service requirement will not

13 really align with the calendar year.  The one year time in

14 service requirement could be less, depending on how much

15 drilling that individual was able to get in, and how points

16 he was able to (unintelligible).

17         THE COURT:  That will still be over six months for

18 the reservists?

19         MR. SWINTON:  Yes, because of the I. E. T.

20 requirement.

21         THE COURT:  Okay.

22         That is the ruling.  I don't think there is any

23 actual, the only contest has to do with the plaintiffs

24 saying that Isiaka can represent the class of LPRs

25 reservists.  They are similarly situated, which means they

1    are phase one, that they are covered, meaning they have to

2    be part of either the Army or the Air force and he doesn't

3    represent any MAVNIs.

4         I just don't see either injury from the 0-6, given

5    the statute that is in the policy that has been adopted, or

6    that that is reviewable by me.  I can think of six reasons

7    why I can't get involved with the 0-6.  So you'll have to

8    tell me why I'm wrong on that one.

9         Then we will take under advisement the issue of

10   whether or not the policy, having to do with the one year or

11   less for the reservists and six month for the active

12   violates any of the APA.

13        You are not asking for a ruling under the INA, are

14   you?

15        MS. KIM:  No, we're not, Your Honor.  All of our

16   claims are brought under the APA.

17        (There was a pause in the proceedings.)

18        THE COURT:  Ms. Kim, you said 706(1) and 706(2)(A)

19   -- not A, sorry, A and C, the one that has to do with

20   contrary to law, overlap.  I'm not sure I understand that.

21        MS. KIM:  The reason, Your Honor, is that section

22   706(1), our argument about compelling agency action

23   unlawfully withheld rests on whether or not defendants have

24   a ministerial duty.

25        THE COURT:  Yes.

1              MS. KIM:  And their arguments about ministerial

2    duty rests on the text and statutory scheme and legislative

3    history of section 1440.  So we rely, for example, on the

4    use of "shall," the use of the past tense.  We rely

5    specifically on the comparison between sections 1439 and

6    1440 to demonstrate that is part of the ministerial that

7    defendants have.  They cannot predicate an N-426

8    certification upon any kind of minimum service requirement.

9    And we also use the legislative history to buttress those

10   points.

11             THE COURT:  I understand in terms of the similar

12   sources and similar arguments.  But are you saying that, to

13   find a violation of 706(2)(A) and (C), you have to find it's

14   ministerial?

15             MS. KIM:  No, Your Honor.  We're saying that's

16   only cabined to the 706(1) inquiry.

17             THE COURT:  And notice and comment.  Is it not

18   fair, at least every time I've ever had -- you really don't

19   necessarily within a vacatur.

20             MS. KIM:  That would not be the first source of

21   relief that we would be seeking, Your Honor, that is

22   correct.

23             THE COURT:  You get it sent back and have notice

24   and comment is generally what happens.  It's not necessary

25   to reach it, is it?

1          MS. KIM:  We don't believe it is necessary, Your

2     Honor.  But we do rely upon it as an alternative argument in

3     case the other ones do fail.

4          THE COURT:  Mr. Swinton, in the notice and

5     comment, are you conceding that these are legislative

6     ruling, this 0-6 and the service in place?  You invoke

7     exceptions to the notice and comment.  But you didn't argue

8     the legislative versus interpretive rule dichotomy.

9          MR. SWINTON:  Right, Your Honor.  And I think the

10    interpreter rule would align well with our internal

11    management rule, which is an internal personnel rule.  But

12    correct, we did not make that argument.

13         THE COURT:  Super.  All right.  As I said, unless

14    I get convinced by the plaintiff, I will tentatively rule

15    that on the class cert, that I will grant it.  But I guess I

16    have to exclude Mr. Kotab from the reservists, I believe.

17    So I'll have to look at it more carefully.  Do you agree

18    that he doesn't belong in the class?

19         MS. ZAFAR:  Yes, Your Honor, to the extent that he

20    (unintelligible) N-426, he would be precluded.

21         THE COURT:  All right.

22         MS. KIM:  Your Honor, would it be okay if I

23    responded very quickly just to two points in rebuttal

24    related to the relationship between Kirwa and this case

25    which Mr. Swinton raised?

1          The first is Mr. Swinton mentioned the reliance

2   interest.  But what we would like to note is that, the harm

3   is the same across both cases.  And the primary harm that

4   Your Honor emphasized in the Kirwa opinion was the

5   irreparable injury due to the delay and the statutory

6   entitlement to naturalization.

7          So we just wanted to distinguish there this

8   question about the reliance interest and the injury, the

9   primary injury, which we believe was emphasized in your

10  Kirwa preliminary injunction opinion.

11         The second point I just wanted to make was about

12  section two.  Section two does have language that says that

13  it requires service in a manner that permits an informed

14  determination that the member has served honorably.

15         Under defendant's theory you need a minimum 180

16  days to develop a sufficient record in order to determine

17  whether someone has served honorably or not.  That means

18  that, at a minimum the 180 durational period should apply to

19  both sections equally.  And for Kirwa selected MAVNI

20  reservists to be able to obtain an N-426 after a single day

21  of service, without having to serve 180 days, would be

22  unfair, given that the defendant's argument about the

23  building of a sufficient record would apply equally across

24  both sections.

25         THE COURT:  There are two things that I can, Mr.

1    Swinton can correct me.  But my recollection is that I

2    strong-armed them to agree that you couldn't have a service

3    in place requirement of a certain amount of time.  So they

4    came up with section two as we were about to have argument

5    on the question of whether or not you could require active

6    duty service.

7            Does that coincide with your recollection, Mr.

8    Swinton?  We had a lot of brief.  I never read it because

9    you had to start all over again.  You thought that was going

10   to be their policy and then they changed their mind.  My

11   only surmise is they changed their mind because they thought

12   they couldn't convince me.  So that's why section two is

13   different than section one.  Your point may still exist.

14           And as to the reasoning for the irreparable

15   injury, I had people waiting four years who were going to be

16   deported, which is not necessarily the case for 99.9 percent

17   of the LPRs.

18           The fact that people had lost, didn't have any

19   other way to be here other than their military service was

20   the really bad problem.  So thousands of people, they

21   couldn't get an N-426.  But they couldn't also lawfully

22   remain here in this country.  So, I do remember that being

23   very, very important.

24           And it's not that, Mr. Swinton is right about the

25   retroactivity argument, it doesn't really apply here.  But

1    these people were all sort of brought into the Army with

2    different expectations.  Here, at least the policy existed

3    before the three enlisted.

4            That's my historical memory.  I think that we're

5    set.

6            Mr. Swinton, good luck, you are going to let us

7    know who is taking your place.  You are off to the national

8    security.

9            Is Major Nosse still here?

10           MAJ. NOSSE:  Yes, Your Honor.

11           THE COURT:  All of these cases, to the extent

12   they're still alive, will go to a new judge some time in the

13   next month or two.

14           Thank you all for excellent pleadings.  It is

15   never easy but I appreciate it.  And good luck.

16           Thank you, have a good day.  Good luck to you all.

17           (Whereupon, at 5:43 p.m., the hearing concluded.)

18

19                          oo0oo

20

21

22

23

24

25

CERTIFICATE OF REPORTER

        I, Lisa Walker Griffith, certify that the foregoing is a correct transcript from the record of the remotely reported proceedings in the above-entitled matter.

        Please Note: This hearing was held in compliance with the COVID-19 pandemic and the standing orders of this court, and is therefore subject to the technological limitations of court reporting remotely, including static, signal interference and other restrictions.

_____     7-22-2020
Lisa Walker Griffith, RPR        Date