```
                 UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF COLUMBIA


  TAHIRIH JUSTICE CENTER,         .
  et al.,                         .
                                  .  CA No. 21-0124 (TSC)
          Plaintiffs,             .
                                  .
      v.                          .
                                  .  Washington, D.C.
  ALEJANDRO N. MAYORKAS,          .  Friday, June 2, 2023
  et al.,                         .  9:36 a.m.
                                  .
          Defendants.             .
  . . . . . . . . . . . . . . . . .


                   TRANSCRIPT OF STATUS HEARING
              BEFORE THE HONORABLE TANYA S. CHUTKAN
                  UNITED STATES DISTRICT JUDGE


   APPEARANCES:

  For Plaintiffs:            GARY DIBIANCO, ESQ.
                             Skadden Arps Slate Meagher & Flom
                             1440 New York Avenue NW
                             Washington, DC 20005
                             (202) 371-7858

  For Defendants:            CHRISTINA GREER, ESQ.
                             U.S. Department of Justice
                             P.O. Box 878
                             Ben Franklin Station
                             Washington, DC 20044
                             (202) 598-8770

  Court Reporter:            BRYAN A. WAYNE, RPR, CRR
                             U.S. Courthouse, Room 4704-A
                             333 Constitution Avenue NW
                             Washington, DC 20001
                             (202) 354-3186



  Proceedings reported by stenotype shorthand.
  Transcript produced by computer-aided transcription.
```

```
 1                      P R O C E E D I N G S
 2           THE DEPUTY CLERK:  Good morning, everyone.
 3   We're here today for a civil status conference, case 21-124,
 4   Tahirih Justice Center versus Alejandro Mayorkas, et al.
 5   Beginning with counsel please for the plaintiff, please
 6   approach the lectern and identify yourselves for the record.
 7           MR. DIBIANCO:  Gary DiBianco on behalf of Tahirih and
 8   Ayuda, Your Honor.
 9           THE COURT:  Good morning.
10           MS. GREER:  Christina Greer on behalf of defendants
11   Secretary of Homeland Security Alejandro Mayorkas, et al.
12           THE COURT:  All right.  Good morning.
13       All right.  Plaintiffs -- you know what, it occurs to me
14   with this case that I should probably disclose this, but it
15   doesn't make any difference to me; but in the interest of full
16   disclosure, a very long time ago, before I became a judge, I
17   think I made a donation to plaintiff's organization.
18       A friend of my husband's -- I think we went to a fundraiser
19   that featured Deborah Winger?  That's how long ago this was.
20   And I think I made a donation.  And I remember getting mail
21   from them for a while, and then it stopped.  But that was my
22   only involvement with the organization.  That's what I wanted
23   to let you know.  It had to be maybe 15 years ago.
24       All right. Plaintiffs Tahirih Justice Center and Ayuda --
25   and it was Tahirih Justice Center, by the way, not Ayuda, that
```

1    I made the donation to -- brought this case in January of 2021
2    against the Department of Homeland Security, the Department of
3    Justice and other defendants, challenging their final rule
4    with regard to procedures for asylum and withholding of
5    removal.
6       Per a stipulation of the parties, the Court stayed the
7    proceedings in a minute order dated February 9, 2021.  The
8    parties stipulated that the case should be stayed as long as
9    the preliminary injunction that was entered in *Pangea Legal*
10   *Services v. Department of Homeland Security* in the Northern
11   District of California, which is 20-CV-09253, and *Immigration*
12   *Equality v. U.S. Department of Homeland Security*, 20-CV-
13   09258, also before the same judge in Northern California, as
14   long as the preliminary injunction entered in those cases
15   remains in place.
16      Currently, DHS and DOJ are working on three notices of
17   proposed rulemaking that will address several of the topics
18   that are addressed in the global asylum rule, and in December
19   2022, before the stay, I issued an order dealing with that.
20      So, first of all, what is the status of the preliminary
21   injunction in *Pangea*?  Anybody?
22          MS. GREER:  So the preliminary injunction remains in
23   place, and the government does not have any plans to seek to
24   lift that preliminary injunction.
25          THE COURT:  And where are you in your rulemaking

1       process?

2              MS. GREER:  So the departments have many competing

3       priorities at the moment, but the departments do continue

4       to work on the rulemakings.

5              THE COURT:  Do you have any projected, expected dates?

6              MS. GREER:  Unfortunately, I don't.  There should be

7       coming out soon, or published soon, a Spring 2023 Unified

8       Agenda of Regulatory and Deregulatory Actions, which will

9       provide the aspirational dates for when those rulemakings will

10      be published.

11             THE COURT:  Okay.  Well -- just a minute.  Let me hear

12      from the plaintiffs.

13         I stayed this case in 2021.  It's been two years.  I

14      understand the wheels of justice, or rulemaking, are -- you

15      know, these kinds of things take time, but basically what it

16      seems you're asking me to do is have an indefinite stay and

17      you'll -- you know -- and I don't mean to be flip, but you'll

18      get to it when you get to it.  And, you know, you can

19      understand why plaintiffs have a problem with that position.

20      I'll hear from you, Mr. DiBianco.

21             MR. DIBIANCO:  Thank you, Your Honor.  The objective

22      information of the progress or lack of progress from the

23      government is that in the six months since the Court's order

24      on our motion to partially lift the stay is that they have not

25      finalized the three prospective rulemakings that they had

1      cited in their brief, and we don't know when those may be
2      finalized, and the government is not able to represent what
3      the future schedule might be.
4         So we do believe it's appropriate at this point to move
5      forward with our first, second, and third claims for relief,
6      that is, for renewal for the partial motion.
7            THE COURT:  I guess my problem with that is -- and I
8      understand why you want to do that, but isn't that just sort
9      of -- how will that advance -- if the government is engaged
10     in rulemaking and there's a preliminary injunction in place,
11     first of all, I'm not sure I can do that, and second, what
12     purpose would it serve other than perhaps getting you some
13     discovery, because once the government finishes their
14     rulemaking, it could obviate your claim, or moot your claim.
15     So it does seem like it could be possibly a waste of resources.
16           MR. DIBIANCO:  The posture here, we believe, Your
17     Honor, gives -- does give an efficient way to move forward
18     because, in our complaint, we've brought two sets of challenges
19     to what we call the mega rule, the withholding and asylum
20     rule.  The first set is based on the appointment of Chad Wolf
21     and whether he had valid authority to promulgate the rule.
22     The second set is a long and complicated challenge to each of
23     the substantive provisions.
24        So what we are proposing this court could do is move
25     forward only as it relates to our challenges to the

1    appointment of Chad Wolf, because we believe that if we're
2    successful on those challenges, the remedy would be
3    for the Court to invalidate the rule and it wouldn't have
4    to reach the substantive --
5         THE COURT:  But if you're successful on those
6    challenges and the remedy for me to invalidate the rule, I may
7    be overtaken by events that -- if the government continues in
8    their rulemaking, there may be no rule to invalidate.
9         MR. DIBIANCO:  That -- that's true.  I think none of
10   us can predict the speed at which the government is going to
11   be able to make the rules.
12      My co-counsel, Brian Frazelle, from the Constitutional
13   Accountability Center, has been litigating the issue of the
14   Chad Wolf appointment in other cases and tracking that.  And
15   to our research and understanding, every district court that
16   has addressed that issue -- and there are several -- has ruled
17   that his appointment was invalid.
18      And I don't want to be cheeky, but we believe that this
19   court could dispose of that question, or at least address that
20   question, faster than it is likely that the government is
21   going to come out with a new rule.
22         THE COURT:  But how would that advance your case?
23   If the injunction remains in place, even if I agree with
24   the other courts -- and I have no idea if I will or won't --
25   but even if I agree with them, how does that advance the ball?

1            MR. DIBIANCO:  So this area of the law is,
2    understandably, extremely complicated.  The mega rule itself
3    is extremely complicated.  Our clients, Tahirih and Ayuda,
4    believe that they would be best served by having an order that
5    fully invalidates the mega rule and reverts to the state of
6    the law prior to that rule being addressed.
7            THE COURT:  But what would be the effect of that?  I'm
8    trying to figure out what would be the practical effect other
9    than nice to have on the papers.  What would be the practical
10   effect of my ruling that way?  The DHS is still engaged in
11   rulemaking.  The preliminary injunction remains in place.
12   What's the practical effect?
13           MR. DIBIANCO:  So let's divide that -- if we divide
14   that into those two separate issues, the issue of the
15   preliminary injunction in the *Pangea* case, it would be our
16   preference that you would move forward.  But we understand --
17           THE COURT:  Can I?  Do I have the authority to do that?
18   Isn't it a nationwide injunction?
19           MR. DIBIANCO:  It's a nationwide injunction.  It's a
20   nationwide preliminary injunction.
21           THE COURT:  Right.
22           MR. DIBIANCO:  We believe you have the authority to
23   substantively look at the rule, and we could brief that if
24   you'd like us to.
25           THE COURT:  Yeah.  I'd actually be interested in that

1  because that's a very hot issue these days with regard to the
2  frequency of nationwide --
3          MR. DIBIANCO:  It is.
4          THE COURT:  -- injunctions the courts are issuing.
5          MR. DIBIANCO:  But, Your Honor, we would argue that
6  that actually weighs in favor of a court looking at the
7  substance of the rule, whether it be in the Northern District
8  of California or here or both, and this is a complicated
9  issue, and it's happening in a lot of places.
10         THE COURT:  Wouldn't the appropriate place to seek
11 relief be in the Northern District of California where the
12 injunction remains?
13         MR. DIBIANCO:  Our clients do not have the ability to
14 do that.  They don't have jurisdiction to do that.  So they're
15 seeking to vindicate their rights in this court.
16         THE COURT:  But you can see, Mr. DiBianco -- I'm not
17 an appellate court, but you can see the problem that would
18 arise if district courts issued nationwide injunctions and
19 other district courts went around saying, well, I don't care;
20 I could still go ahead and move forward in this area.  I mean,
21 that's a recipe for chaos, to say nothing of possibility
22 reversal.
23         MR. DIBIANCO:  Well, I think, Your Honor, our view is
24 that these issues can be litigated in different districts by
25 different plaintiffs and that those plaintiffs should have

1       their day in court.  And then it's a question, understandably,
2       of judicial efficiency as to whether or not it's appropriate
3       to move forward.
4               THE COURT:  Do you know if the Northern District of
5       California's ruling has been appealed to the Ninth Circuit?
6               MR. DIBIANCO:  No.  There is a case -- and my
7       co-counsel could speak to this.  There is a case pending in
8       the Ninth Circuit that is being briefed now that deals with
9       Mr. Wolf's appointment and when and if ruled upon, likely,
10      depending on the ruling, could be relevant to the injunction.
11              THE COURT:  The issue you want me to decide.
12              MR. DIBIANCO:  Well, the issue that we want you to
13      decide, but you won't be bound by that.  You would be bound
14      by the D.C. Circuit.
15              THE COURT:  Oh, yes.  I'm aware of that.
16              MR. DIBIANCO:  But it could affect the injunction in
17      the Northern District of California.
18              THE COURT:  I'll hear from the defendants on this --
19      well, before I hear from you, have you all met and conferred
20      on this issue as to maybe coming up with some kind of a -- say
21      the stay remains in place, but some kind of an agreement for
22      moving forward after a certain date, perhaps?  What's your
23      position on me ruling on the issue of the legality of Chad
24      Wolf's appointment while the rest of the case remains stayed?
25              MS. GREER:  So we are of the opinion that we continue

1   to work on the rulemakings that will likely moot out this
2   case and the stay should remain in place.
3           THE COURT:  But what about the issue of Mr. Wolf's
4   appointment?
5           MS. GREER:  So, with Mr. Wolf's appointment, we
6   continue to defend his appointment.  As opposing counsel has
7   stated, there's -- it's currently been briefed in the Ninth
8   Circuit, and there may be oral argument.
9       They said it's being considered for oral argument in
10  July in the case of *Gonzalez & Gonzalez Bonds v. DHS*.  If
11  you'd like that case number, it's 22-16552.  It's one of two
12  issues that are independently dispositive.  So it's possible
13  that the Ninth Circuit won't reach that issue, but they may.
14      So we would continue to litigate the Wolf issue, and we
15  think that at this point it's not prudent to go forward not
16  only because of the issue of judicial efficiency because we're
17  working on those additional rulemakings, but there's another
18  wrinkle in this case that would make remedy very difficult to
19  determine.
20          THE COURT:  All right.  I think what I have to do --
21  and I apologize, but I have a jury waiting.  I think I need
22  more briefing on this.  So, since plaintiffs are asking that
23  the case move forward at least on some fronts, how soon can
24  you get a motion on this issue briefed?
25          MR. DIBIANCO:  We can move within 30 days, Your Honor.

1          THE COURT:  All right.  Within 30 days if you could
2     file the appropriate motion, and then we'll proceed by the
3     local rules in the briefing schedule.  So I think 14 days to
4     respond, seven days to reply, and then I'll rule on the papers.
5          MS. GREER:  Would it be possible to negotiate a
6     briefing schedule, Your Honor?
7          THE COURT:  Oh.  That would be even better.  If you
8     all can work out a briefing schedule, just submit a proposed
9     order to me.  That would be even better because you know your
10     schedules better than I do.  And it seems to me, we have
11     reasonable people here.  That would be perfect.  Thank you.
12     So get me a proposed briefing schedule order, two weeks?  Is
13     that okay?
14          MS. GREER:  Yes, Your Honor.
15          THE COURT:  Okay.  Thank you all.
16          MR. DIBIANCO:  Thank you, Your Honor.
17        (Proceedings adjourned at 9:51 a.m.)

\* \* \* \* \* \*

CERTIFICATE

I, BRYAN A. WAYNE, Official Court Reporter, certify that the foregoing pages are a correct transcript from the record of proceedings in the above-entitled matter.

*/s/ Bryan A. Wayne*
Bryan A. Wayne