# Exhibit A

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| TAHIRIH JUSTICE CENTER, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> ALEJANDRO MAYORKAS, *et al.*, <br><br> Defendants. | Civil Action No. 1:21-cv-124-TSC |

**DECLARATION OF ADILENE NUNEZ HUANG OF THE TAHIRIH JUSTICE CENTER IN SUPPORT OF THE RENEWED MOTION TO LIFT THE STAY**

I, Adilene Nunez Huang, make the following declaration.

1. I am the Co-Director of Client Advocacy (Legal) of the Tahirih Justice Center ("Tahirih"), a national nonprofit organization that provides free holistic services to immigrants fleeing gender-based violence, including sexual assault, domestic violence, female genital mutilation/cutting, human trafficking, and forced and child marriage. Tahirih provides free legal representation for survivors who seek humanitarian immigration relief, including asylum, in the United States. This declaration is based on my personal knowledge and on information that I reviewed in the course of my duties as Co-Director of Client Advocacy (Legal) of Tahirih.

2. Tahirih has offices in Falls Church, VA; Atlanta, GA; Baltimore, MD; Houston, TX; and San Bruno, CA. Each office screens service seekers for potential legal representation in immigration matters, including asylum claims.

3. Tahirih's services are in high demand, far outstripping our capacity to serve all those who

1

seek legal representation. When a service seeker requests Tahirih's representation for a claim of asylum, an attorney reviews the facts of the case and analyzes its merit under U.S. law. The legal analysis requires knowledge of current standards for persecution, nexus to a protected ground, particular social groups, political opinion, and safe and reasonable internal relocation. Uncertainty surrounding the standards that apply to an asylum claim complicates the analysis of the merits of each case, adding to the time required to determine whether the case is appropriate for acceptance and representation.

4. For example, Tahirih maintains a set of standardized screening materials that guide and support our advocates as they gather relevant facts from service seekers. When a rule changes, the materials must be revised and updated to reflect the current applicable law and to facilitate the advocate's collection of facts relevant to the newly applicable law. When the rules change after screening or intake, the client must be re-screened for facts relevant to the new rules, and the client must be re-assessed for eligibility for immigration relief. Duplication of screening and assessment of eligibility for relief imposes a significant burden on our advocates, limiting the number of service seekers who can be screened and clients who can be represented. Screening and assessment for eligibility are complicated where, as here, regulations are preliminarily enjoined but with uncertainty regarding imminent enforcement. Advocates must screen and assess based on the status quo but must also consider the chance of both favorable and unfavorable changes to applicable standards, which will affect clients accepted under a different set of rules. This problem is compounded here where forthcoming regulations are anticipated but their specific content and timeline cannot be predicted with certainty. Unknown but expected changes make it harder to predict the merit and difficulty of a case, which affect

the number of hours required to provide representation in a case. These challenges in turn make it harder to set targets for case acceptance and overall advocate caseload.

5. Tahirih also provides brief advice and counsel to service seekers, particularly to those service seekers whom Tahirih declines to represent. When the regulations change, Tahirih must revise brief advice and counsel resources and retrain our advocates to ensure that each advocate understands the currently applicable rules and regulations. Maintaining current and valid brief advice and counsel materials is an essential function and requires significant time and effort. When regulations remain uncertain, advocates must explain to service seekers the risks of changes to the law, possible timing of such changes and the relationship to the timing of a service seeker's claim for asylum. For example, if a service seeker requests brief advice today, an advocate must explain to the service seeker not only the current state of the regulations and an assessment of the merit of the service seeker's claim under current regulations but also the tenuous nature of the preliminary injunction against the regulations and the merit of the service seeker's claim should it be adjudicated under the regulations—a scenario that becomes more likely with the passage of time and the lengthy backlogs in adjudications of both affirmative and defensive asylum claims. These complex explanations introduce significant confusion and stress to service seekers, who often have limited formal education and little to no familiarity with U.S. legal and regulatory processes.

6. Additionally, Tahirih provides training materials and webinars, which must be updated and given more frequently. Uncertainty around standards makes it more difficult to produce and provide written or recorded training materials as they must be frequently reviewed to ensure that they have not become obsolete or inaccurate.

7. Delays in adjudication of asylum claims further contribute to the uncertainty surrounding the merit of a case. Tahirih's docket includes a number of affirmative asylum cases that have been pending for several years, including some filed in 2015. Defensive asylum cases also face severe delays and backlogs, with many cases scheduled for individual merits hearings in 2026. On any given day, Tahirih staff must decide whether to accept a case that may not be adjudicated for many years. The prospect of applicable rules changing between case acceptance and adjudication threatens the integrity of the legal representation.

8. The changing rules combined with lengthy backlogs and delays in adjudications impact our pro bono partners and their ability and willingness to represent clients pro bono in both affirmative and defensive claims for asylum. These lengthy timelines increase the uncertainty that the regulations applicable at the time of case placement will also apply at the time of case adjudication—with serious effects on the merit of the case, particularly when, as now, the delays may reach three years or more. Our managing attorneys report increasing resistance and even refusal among law firms in accepting asylum cases for these reasons. An inability to place cases with pro bono partners dramatically increases the time spent on a case by Tahirih attorneys, which in turn reduces the number of service seekers accepted for full representation.

9. Tahirih represents survivors of gender-based violence. Because the Mega Rule purports to bar claims based on certain particular social groups, including some relating to gender, the viability of critical legal arguments for virtually every asylum client is at stake. A change in the status of the Mega Rule could dramatically reduce the viability of many of Tahirih's clients' asylum claims, resulting in a significant increase in hours required to

prepare a case for adjudication. Confusion is exacerbated where the reporting mechanisms for the regulations, such as e-CFR, do not offer sufficient clarity regarding which rules (or portions of rules) are currently in effect. Tahirih advocates frequently consult these web-based versions of the regulations and must confirm with every consultation that they are relying on a current version of the regulation. This results in attorneys having to spend even more time on a case, which unnecessarily frustrates the process. Indeed, enjoined regulations remain on the government website and are then picked up by additional reporting websites, such as Cornell LII, causing confusion for anyone doing internet research: attorneys and judges alike. Tahirih clients also feel the impact of this ongoing enjoined regulation confusion, particularly because it is not always clear whether a DHS attorney or Immigration Judge might have relied on a reported, but enjoined, regulation in reaching an adverse decision, for instance.

10. Such confusion is not mere speculation. Tahirih attorneys report continuing needs to provide education and clarifications regarding applicable regulations to newly hired and onboarded advocates, pro bono attorneys, DHS attorneys, and immigration judges—especially those recently appointed with minimal previous exposure to immigration law. One Tahirih advocate reported that her pro bono team had to redraft a section of an asylum brief after learning they had based an argument on a provision of an enjoined rule. Tahirih advocates have faced multiple instances in 2023 alone in which judges have relied on provisions of enjoined regulations to mischaracterize a client's eligibility for relief, requiring advocacy from the Tahirih attorney to prevent a serious miscarriage of justice.

11. Tahirih advocates bear the brunt of these additional burdens, at a high cost to their

resiliency. Turning away increasing numbers of asylum seekers, revising strategy on cases, advising service seekers and clients on the uncertain status of applicable regulations and resulting unpredictability of the merit of their cases, working harder to place fewer cases with pro bono partners, providing additional guidance to pro bono attorneys when cases are placed, and managing more asylum cases in house—these tasks contribute to escalating stress and burnout among Tahirih staff. Tahirih's advocates serve fewer clients in the same number of hours, leading to feelings of stress, anxiety, burnout, and attrition.

12. As Tahirih's direct services arm has coped with the practical implications of the lack of clarity and stability inherent in a rule subject to preliminary injunction, Tahirih's public policy team continues to invest significant time responding to the uncertainty of the regulations in at least two ways. First, the team's attorneys must attend administration stakeholder events and coalition meetings and regularly review various sources on the internet and elsewhere to stay abreast of the anticipation and publication of new rules, policies, and other developments that relate to the content of the instant Rule. Such efforts to stay informed requires an investment of several hours per month—time that could otherwise be spent developing unrelated advocacy projects such as internal and external technical assistance, amicus support, and additional litigation matters that promote Tahirih's mission. Second, and relatedly, the public policy team advocates for the publication of rules that rescind and replace these rules. For example, our Senior Immigration Policy Counsel has invested significant time and effort in drafting and circulating sign-on letters advocating the publication of a rule providing guidance on the law governing "particular social group" and related issues.

In accordance with 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Executed this  13  th day of July, 2023, in  Falls Church, VA  .

                                                                              _____
                                                                              Adilene Nuñez Huang
                                                                              Co-Director of Client Advocacy (Legal)
                                                                              Tahirih Justice Center