# Exhibit B

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| TAHIRIH JUSTICE CENTER, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> ALEJANDRO MAYORKAS, *et al.*, <br><br> Defendants. | Civil Action No. 1:21-cv-124-TSC |

**DECLARATION OF MEGAN TURNGREN, LEGAL DIRECTOR, AT AYUDA, INC. IN SUPPORT OF THE RENEWED MOTION TO LIFT THE STAY**

I, Megan Turngren, swear under penalty of perjury that the following is true and correct to the best of my knowledge, belief and understanding:

1) My name is Megan Turngren and I am the Legal Director for Ayuda Inc., a non-profit that provides legal, social, and language services to low income immigrants in the District of Columbia, Virginia, and Maryland. I began my position on May 1, 2022. As part of my job, I am responsible for supervising the immigration programs in all three Ayuda offices, Virginia, Maryland, and the District of Columbia.

2) My responsibilities include identifying and assisting with assessing case capacity, determining the type and quality of services provided, and obtaining and monitoring funding for Ayuda's programs to ensure stability for both its attorneys and clients.

3) The uncertainty around the Mega Rule is having a detrimental effect on Ayuda, its attorneys, and its clients and, therefore, prevents Ayuda from achieving its mission.

A. **<u>The Uncertainty Around the Mega Rule Hinders Ayuda's Ability to Evaluate Cases for Representation</u>**

4) The uncertainty revolving around the Mega Rule hinders Ayuda's attorneys' abilities to evaluate the strengths and weaknesses of asylum and withholding claims. This skews the types of claims Ayuda can take on, in disservice of Ayuda's mission to help build a community where all immigrants succeed and thrive in the United States.

5) Ayuda, like most other legal service providers serving low-income immigrants, receives many more requests for services than Ayuda's attorneys can provide. Ayuda's attorneys are constantly tasked with determining their caseload and their capacity for new cases. As Legal Director, I work with Managing Attorneys and Supervising Attorneys to guide Ayuda's attorneys in determining what is an appropriate caseload to ensure quality services for Ayuda's clients.

6) When determining caseloads, Ayuda's attorneys must assess the challenges each and every case presents. The attorneys consider a matrix of factors including the amount of funding and resources available, the client's history, and the case's likelihood of success under the laws and regulations in effect.

7) One of the most challenging types of cases Ayuda's attorneys work on is the asylum and withholding case. Asylum and withholding cases are particularly demanding of time and resources. Unlike some other forms of relief, succeeding on asylum or withholding claims requires meeting complex multi-pronged standards that are shaped by statutes and regulations, and requires providing the Immigration Judge an extraordinarily detailed brief, hundreds of pages of evidence—including background information on the conditions of the client's place of origin, medical expert reports, historical and/or cultural expert reports, detailed personal declarations by clients, supporting letters from persons

familiar with the persecution, with the client or with other information relevant for the court—and oral arguments and witness testimony in a multi-day trial. Each piece of the submission and trial work requires months of preparation by Ayuda's attorneys for each client, and most asylum cases can take multiple years from start to finish.

8) Given the complexity of asylum cases and the need for such extensive services, attorneys take great care when accepting new cases. They evaluate the strength of the case, the resources the case will require (both in terms of attorney hours and evidence collection), and the suspected length of time it will take to resolve the case.

9) The asylum case is one of the largest buckets of cases whose standards are implicated by the Mega Rule.

10) The problem Ayuda's attorneys are experiencing is determining whether these asylum claims (or other similar claims) that implicate the Mega Rule should be considered viable under the current circumstances, and if so, how much work should be expected for each. Attorneys may first develop estimates of how much time it will take to work on a case, including the types of legal arguments, how familiar they are with those arguments, how much support they can expect from their supervisor, and what types of evidence they will need to collect, under the assumption that the stay is in place and is properly enforced. But, despite the preliminary injunction in place, its temporary nature does not permit attorneys to decisively rely on the absence of the rule when determining the success of potential clients' cases.  Moreover, this uncertainty is particularly acute because some courts have improperly applied the Mega Rule, despite the preliminary injunction. Therefore, the current status of the Mega Rule makes it so that each asylum case taken by

the attorney has the possibility of erupting into something significantly different than what they are signing up for.

11) Ultimately, to maximize effort and success, some attorneys are feeling forced to pass over immigrants with claims impacted by the Mega Rule in favor of those immigrants with claims not impacted by the Mega Rule.  This hurts the immigrants Ayuda is driven to support and is detrimental to Ayuda's ability to advocate for immigrants through direct legal, social, and language services, training, and outreach.

**B. The Uncertainty Around the Mega Rule Creates Challenges Around Funding and Grant Deliverables**

12) The uncertainty of the enforcement of the Mega Rule has also limited Ayuda's ability to apply for and maintain funding.

13) Ayuda's services are primarily funded through grant applications and awards. In general, grants and awards for the public interest work Ayuda does are numbered but the need amongst similar non-profit organizations for the limited pool of funding is overwhelming. Receiving grants is, therefore, one of the most critical aspects of operating Ayuda and keeping Ayuda afloat to fulfill its mission.

14) To complete its applications for these awards, Ayuda must provide a "deliverable" to the grantor or funder. These deliverables are goals that often revolve around the number of cases Ayuda commits to retaining during the grant cycle for the award amount provided.

15) To calculate its deliverables, Ayuda examines its current staff levels, the award amount, and its attorneys' capacities.  The financial health of the entire organization depends upon its ability to accurately assess these factors, and it is exceptionally challenging to do so when the law is uncertain. As discussed, the uncertainty around the enforcement of the Mega Rule has hindered Ayuda's attorneys' abilities to determine their true capacity.

Even when Ayuda's attorneys take on risky claims that implicate the Mega Rule, the uncertainty of the Mega Rule makes it difficult for Ayuda to accurately calculate the resource investment needed to litigate asylum cases. The success of immigration claims can be difficult to assess on a good day, but the uncertainty surrounding the enforcement of the Mega Rule has made it nearly impossible for Ayuda to provide funders with accurate deliverable numbers.

16) The consequences of being unable to assess accurate deliverable numbers are heavy for Ayuda. Where Ayuda underestimates the amount of resources needed for its cases and overpromises its deliverables, Ayuda may be unable to deliver its promised metrics. This places Ayuda at risk of losing money from its funders, which would result in Ayuda having to lay-off attorneys. This would directly harm not only Ayuda's attorneys but its clients as well. If Ayuda cannot accurately predict and meet its deliverable numbers, it could lose funding, which results in a decreased staff size, further affecting the number of clients Ayuda can serve as a whole.

17) To avoid such disastrous consequences, in recent grant applications, Ayuda has had to lower the proposed case numbers it promises to take on, but underestimating deliverables is not an ideal solution. Ayuda is constantly competing with other organizations for fixed amounts of funding and, as one might guess, typically the organization that can promise more results from the same amount of grant money will be the more attractive applicant.

18) Put simply, this situation has placed Ayuda at high risk of losing key funding: being conservative with its estimate under the uncertainty of the Mega Rule may take Ayuda out of the running for key grants and funding, but overconfidence in the sanctity of the

preliminary injunction could lead to an overestimating of deliverables with potentially adverse long-term consequences.

C. **The Uncertainty Around the Mega Rule Negatively Impacts Ayuda's Ability to Retain Attorneys**

19) By inhibiting Ayuda's attorneys' abilities to accurately assess how much work a claim that implicates the Mega Rule will take to win, the uncertainty of the Mega Rule also deprives those attorneys of the ability to create a docket of cases that is meaningful and sustainable for each attorney. This increases the likelihood of attorney burnout and attrition, which harms Ayuda, its attorneys, and its clients.

20) Humanitarian-focused immigration legal work is a profession that has a higher risk of burnout. Ayuda's attorneys constantly deal with cases involving sexual assault, human trafficking, domestic violence, child abuse, persecution and gang violence. One of the ways to combat the secondary trauma that Ayuda's attorneys face is by helping them balance their stress and time at work, which they can only do when they have the ability to correctly assess and developed a catered docket of cases that fits their needs and limitations.

21) Therefore, where Ayuda's attorneys overestimate the number of cases they can take on by misjudging the state of play with the Mega Rule, they are effectively forced to take on more cases or more work per case than they have capacity to handle. From experience, Ayuda's attorneys cannot sustain an excessive number of hours on top of this secondary trauma without experiencing burnout.

22) On the other hand, Ayuda's attorneys cannot be banned from taking asylum cases or other Mega Rule-related claims altogether because this leaves attorneys dissatisfied with the type of work that they can do. Part of attorney satisfaction includes being able to

build a caseload with a well-rounded set of case types. This is especially true where Ayuda's attorneys are seeking to build experience in a breadth of cases that will help them in becoming better immigration attorneys. Relatedly, Ayuda's past attorneys have gone on to be Immigration Judges, directors of national immigration organizations, and policy analysts within federal government, and these positions value well-rounded and well-experienced immigration attorneys that Ayuda prides itself in training.

23) Ayuda also has a vested interest in ensuring that Ayuda attorneys have the ability to choose cases that best fit their needs and professional development because that level of professional autonomy is a key reason attorneys will forgo higher-paying jobs in the legal industry to stay at Ayuda. Given its non-profit nature, Ayuda simply cannot offer the same type of monetary compensation that its attorneys could receive elsewhere—a risk worsened by the funding problem that the uncertainty around the Mega Rule and its injunction has caused Ayuda.

24) Dissatisfaction for any one of these reasons can result in attorney burnout and eventually attorney attrition. Burnout, attorney departures, and turnover are harmful to Ayuda and the clients that Ayuda serves for obvious reasons. Attorneys who are experiencing burnout are more likely to make case errors or work at a slower pace. Overworked and burnt out attorneys are also incredibly unhappy and are more likely to leave Ayuda. The loss of attorneys could leave Ayuda's clients with no other option but to pursue their case *pro se*, which research has shown results an incredibly high likelihood of denial despite the potential strength of their claims. Even for clients whose attorneys Ayuda is able to replace, high turnover requires extra resources Ayuda does not have to recruit and re-train attorneys in order to continue high-quality service to Ayuda's clients.

25) For all the reasons listed above, Ayuda is experiencing harm and will continue to experience harm as the uncertainty of the Mega Rule and the injunction continues. Given the government's lack of progress over the last two years, there is no anticipated end to Ayuda's harms. Therefore, Ayuda supports lift of stay in this case so that there may be some progress and the possibility of an end to the harms experienced.

Executed this 12th day of July, in 2023.

_____
Megan Turngren
Legal Director
Ayuda